AMERICAN CAPITAL CORPORATION
and Transcapital Financial
Corporation, Plaintiffs,

and

Federal Deposit Insurance Corporation, as
Successor to the Rights of the Transohio
Savings Bank, Plaintiff–Intervenor,

v.

The UNITED STATES, Defendant.

No. 95–523C.

United States Court of Federal Claims.

May 31, 2005.

Charles J. Cooper, Michael W. Kirk, Vincent J. Colatriano, and Hamish P.M. Hume, Washington, D.C., for plaintiffs.

William F. Ryan, Jane M.E. Peterson, Jeffrey Hughes, and Jeffrey T. Infelise, Washington, D.C., for defendant, United States Department of Justice.

Andrew Charles Gilbert, Washington, D.C., for plaintiff-intervenor, Federal Deposit Insurance Corporation.

## FINAL OPINION AND ORDER FOR JUDGMENT AWARDING TRANSCAPITAL FINANCIAL CORPORATION $109.309 MILLION DAMAGES FOR LOSSES BASED ON RELIANCE INTERESTS

BRADEN, Judge.

This breach of contract case was filed a decade ago. During the 21 months this case has been pending before the undersigned judge, the court issued a decision determining, as a matter of law, that the United States ("Government") was liable for a breach of contract. *See American Capital Corp. v. United States,* 58 Fed.Cl. 398 (2003) (*"American Capital I"*). Next, the court issued a decision determining, as a matter of law, that one of the plaintiffs, Transcapital Financial Corporation ("TFC"), incurred a loss of reliance interests as a direct result of the Government's breach in the amount of $168.645 million. *See American Capital Corp. v. United States,* 59 Fed.Cl. 563 (2004) (*"American Capital II"*). Following a 14-day Evidentiary Hearing spanning three months, the Government was afforded an opportunity to establish with reasonable certainty, under the standard set forth in RESTATEMENT (SECOND) OF CONTRACTS ("RESTATEMENT") § 349 (1981), those losses that would have been incurred irrespective of the breach. Thereafter, the court decided to reduce the damage amount to $109.309 million. *See American Capital Corp. v. United States,* 63 Fed.Cl. 637 (2005) (*"American Capital III"*). Although the United States

Court of Appeals for the Federal Circuit recently recognized the relevance of RE-STATEMENT § 349 in *Westfed Holdings, Inc. v. United States*, 407 F.3d 1352, 1369–71 (Fed. Cir.2005), as of this date, no federal trial court in this country has ever afforded a defendant the opportunity to utilize it, as was done in this case. As the court will again and further clarify herein, the court has determined in *American Capital II* and *American Capital III* that causation-in-fact and causation-in-law were established by TFC, whether the standard is "substantial factor," "substantial evidence," "but for," "directly caused," "definitely established," or any other traditional causation standard utilized in our common law tradition.

Subsequently, the court exercised its discretion to evaluate three separate motions for reconsideration by the Government, *i.e.*, November 17, 2003, March 12, 2004, and February 27, 2005, subsumed in which were 16 separate arguments, in addition to affording supplemental briefing regarding the United States Court of Appeals for the Federal Circuit's decision in *California Federal Bank v. United States*, 395 F.3d 1263 (Fed. Cir.2005) (*"California Federal Bank"*), issued on January 19, 2005, on the same day as *American Capital III. See American Capital Corp. v. United States*, 65 Fed.Cl. 241 (2005) (*"American Capital IV"*). The court further exercised its discretion to allow the Government the additional opportunity to supplement the record to argue the relevance of the United States Court of Appeals for the Fed-

eral Circuit's opinion in *Westfed Holdings, Inc. v. United States*, 407 F.3d 1352 (2005).

In the court's judgment, this is a case in which the factual record has been fully developed and the law is clear and settled. As the United States Court of Appeals for the Federal Circuit advised in *Glendale Federal Bank, FSB v. United States*, 239 F.3d 1374 (Fed.Cir.2001) ("[It] is ... in the interests of the United States to settle these [*Winstar*-related] cases equitably and fairly, so the cost to the taxpayers can be concluded without further delay.") *Id.* at 1383–84. If the Government decides to ignore that thoughtful and pragmatic guidance, then this case now is ripe for appellate review in every sense.

\*    \*    \*    \*    \*    \*

On August 9, 1989, Congress enacted the Financial Institutions Reform, Recovery, and Enforcement Act, Pub.L. No. 101–73, 103 Stat. 183 (1989) ("FIRREA") requiring all savings and loan associations ("thrifts") strictly to comply with new "core capital," "tangible capital," and "risk-based" capital requirements.[1] In *United States v. Winstar Corp.*, 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996), the United States Supreme Court held that, although Congress may decide to change applicable law allowing the federal government to disavow agreements made in the 1980s with thrifts as an inducement to acquire failing and failed institutions, *"[contractual] terms assigning the risk of regulatory change to the Government are enforceable*, and the Government is

---

1. After FIRREA was enacted and implemented, "unidentified intangible assets," such as supervisory goodwill, were excluded from consideration as "core capital," which had to be maintained in an amount not less than 3% of an institution's total assets. *See* 12 U.S.C. § 1464(t)(2)(A). Although qualifying "supervisory goodwill" could be counted against half of the "core capital" requirements, that transition rule expired in 1995. *See* 12 U.S.C. § 1464(t)(3)(A). In addition, "tangible capital" was to be maintained in an amount not less than 1.5% of the institution's total assets, defined to exclude supervisory and other forms of goodwill. *See* 12 U.S.C. § 1464(t)(2)(B). FIRREA also imposed "risk-based" capital requirements necessitating increased reserve capital for assets that had a higher credit risk, such as construction, commercial real estate, and consumer loans. *See* 12

U.S.C. § 1464(t)(2)(C); *see also* 12 C.F.R. § 567, *et seq.* In addition, by April 12, 1989, all thrifts were required, pursuant to a regulation implemented by the new Office of Thrift Supervision ("OTS"), to amortize FSLIC capital credits on a straight-line basis over a period that was the shorter of the remaining life of the contract or 20 years. *See* 12 C.F.R. § 567.1 (qualifying supervisory goodwill); *see also* PX 1266. The same OTS regulation required future amortization according to GAAP, if the period was shorter than 25 years, pursuant to the level yield method over the estimated life of assets. *Id.* By December 1, 1992, minimum core capital requirements were increased to 4% of an institution's assets. *See* Federal Deposit Insurance Corporation Improvement Act of 1991, Pub.L. No. 102–242, 105 Stat. 2236.

therefore liable in damages for breach." *Id.* at 843, 116 S.Ct. 2432 (emphasis added).

In *American Capital I,* incorporated herein, the court held that the terms of an August 29, 1986 Assistance Agreement between the Federal Savings and Loan Corporation ("FSLIC") and American Capital Corporation ("AMCAP"), Transcapital Financial Corporation ("TFC"), and Transohio Savings Bank, FSB ("Transohio Savings"), assigned the risk of regulatory change to the Government, at least with respect to a promise to allow Transohio Savings to amortize a FSLIC $107.5 million capital credit and $50 million in supervisory goodwill,[2] as adjusted on a 25 year straight-line basis and to apply that amount toward meeting regulatory capital requirements. *Id.* at 409. The court also held that on December ·9, 1989,when FIRREA was enacted, the Government breached those essential terms of the August 29, 1986 Assistance Agreement ("the breach"). *See American Capital I,* 58 Fed.Cl. at 401.[3]

In *American Capital II,* incorporated herein, the court held that the Government's breach of the August 29, 1986 Assistance Agreement was the cause of TFC's loss of reliance interests and therefore TFC was entitled to damages in the total amount of $168.645 million, subject to an Evidentiary Hearing to afford the Government an opportunity, pursuant to RESTATEMENT (SECOND) OF CONTRACTS § 349 (1981) ("RESTATEMENT"), to establish with reasonable certainty any losses that Transohio Savings would have incurred, irrespective of the breach. *See American Capital II,* 59 Fed.Cl. at 582–83, 589.

At that Evidentiary Hearing the court learned, as the United States Supreme Court observed in *Winstar* that:

> [t]he impact of FIRREA's new capital requirements upon institutions that had acquired failed thrifts in exchange for supervisory goodwill was swift and severe.

*Winstar,* 518 U.S. at 857, 116 S.Ct. 2432. And, so it was for Transohio Savings. Nevertheless, in the court's judgment, the Government established at the Evidentiary Hearing with reasonable certainty, or the record otherwise evidenced, that $50.336 million of the net losses recorded in fiscal years 1989–1991 would have been incurred by Transohio Savings irrespective of the breach. Accordingly, in *American Capital III,* incorporated herein, the court determined that TFC's losses based on reliance interests should be reduced from $168.645 million to $109.309 million.

On January 19, 2005, the same day that the court issued *American Capital III,* the United States Court of Appeals for the Federal Circuit issued *California Federal Bank v. United States,* 395 F.3d 1263, 1268 (Fed. Cir.2005), wherein the standard of causation for lost profits cases was clarified to be one "definitely established." Since the Government had motions for reconsideration pending regarding the court's determination in *American Capital I* and *American Capital II* and indicated a motion for reconsideration would be filed regarding *American Capital III,* the court requested that the parties also address the relevance of *California Federal* at the same time that it submitted briefs regarding reconsideration of *American Capital III.*

On April 27, 2005, the court issued a Memorandum Opinion and Order Regarding the

---

**2.** Goodwill "recognized under the purchase method [of accounting] as the result of an FSLIC-sponsored supervisory merger was generally referred to as 'supervisory goodwill.'" *Winstar,* 518 U.S. at 849, 116 S.Ct. 2432. "Recognition of goodwill under the purchase method was essential to supervisory merger transactions of the type at issue in this case. Because FSLIC had insufficient funds to make up the difference between a failed thrift's liabilities and assets, the [Federal Home Loan] Bank Board had to offer a 'cash substitute' to induce a healthy thrift to assume a failed thrift's obligations." *Id.* at 849–50, 116 S.Ct. 2432.

**3.** Regulatory capital credits and supervisory goodwill served two critical purposes. First, they could be "counted" toward meeting minimum regulatory capital ratios allowing a financial institution to remain in compliance and open for business. Second, and perhaps more important, regulatory capital credits and supervisory goodwill were treated for accounting purposes as if they were assets against which a thrift could leverage loans, as if it were tangible capital, or expand the institution's financial base by acquiring new assets. *See, e.g., Old Stone Corp. v. United States,* 63 Fed.Cl. 65, 67 (2004).

Government's November 17, 2003, March 12, 2004, and February 27, 2005 Motions for Reconsideration, including the parties' arguments regarding the relevance of *California Federal Bank. See American Capital IV*, 65 Fed.Cl. at 253, also incorporated herein.[4]

On May 17, 2005, the Government filed a Notice of Supplemental Authority regarding the decision of the United States Court of Appeals for the Federal Circuit in *Westfed Holdings, Inc. v. United States*, 407 F.3d 1352 (2005), that the court has treated herein as a motion for reconsideration. On May 25, 2005, plaintiffs filed a response. The court's determination of the issues raised in *Westfed Holdings* is included in the final section of this Final Opinion discussing all the *Winstar*-related decisions of the United States Court of Appeals for the Federal Circuit issued after *American Capital III* and *American Capital IV.*

In light of the multitude of issues addressed herein, an outline of the Final Opinion follows.

I.  **FACTUAL BACKGROUND BEFORE TRANSOHIO SAVINGS BANK, FSB INCURRED NET LOSSES IN FISCAL YEAR 1989**
    A.  **1984 American Capital Corporation's Acquisitions Of Transohio Savings Bank, FSB And AmeriStar Financial Corporation.**
    B.  **1985–1986 American Capital Corporation's Negotiations With The Federal Home Loan Bank Board That Resulted In Transohio Savings Bank, FSB's Supervisory Mergers Of Citizens Federal Savings And Loan Association Of Cleveland, Ohio And Dollar Savings Bank Of Columbus, Ohio.**
    C.  **August 29, 1986 Supervisory Mergers Of Citizens Federal Savings And Loan Association Of Cleveland, Ohio And Dollar Savings Bank Of Columbus, Ohio With Transohio Savings Bank, FSB.**
    D.  **The Financial Condition Of Transohio Savings Bank, FSB After The August 29, 1986 Supervisory Mergers Until 1989.**
        1.  **The October 21, 1987 Joint Examination By The State Of Ohio Division Of Savings And Loan Associations And The Federal Home Loan Bank Board For The Period January 1986–May 1987.**
            a.  **Transohio Savings—Management.**
            b.  **Transohio Savings—Asset Quality.**
            c.  **Transohio Savings—Capital.**
            d.  **Transohio Savings—Risk Management.**
            e.  **Transohio Savings—Operating Results.**
        2.  **Transohio Savings' Financial Condition From October 21, 1987 Until The Next Joint Examination Was Issued On March 30, 1989.**

II. **PROCEDURAL BACKGROUND IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

III. **DISCUSSION**
    A.  **Jurisdiction And Standing.**
    B.  **The "Reliance Interest" Is A Recognized Judicial Remedy That Is Fixed When An Expenditure Is Made, But Does Not Arise Until The Breach Of Contract.**
        1.  **"Essential Reliance" Damages.**
        2.  **"Incidental Reliance" Or "Collateral Reliance" Damages.**
    C.  **The Court's Final Determination Of TFC's Reliance Interest Is $117.479 Million.**
        1.  **TFC Is Entitled To $126.479 Million, Based On The Government's Breach Of TFC's "Essential Reliance" Interest Or The Book Value Of Transohio Savings' Stock, As Of August 29, 1986, Minus The $9 Million Dividend Paid To AMCAP In Fiscal Year 1989.**

**4.** To facilitate any appellate review, relevant portions of *American Capital I, American Capital II, American Capital III,* and *American Capital IV* also are repeated herein, together with editorial and factual corrections and other clarifications made in response to the Government's February 25, 2005 Motion for Reconsideration of *American Capital III.*

        a.   The Court's Determination Of TFC's "Essential Reliance" Interest In *American Capital II.*

        b.   The Court's Determination Of TFC's "Essential Reliance" Interest By Book Value, Rather Than Market Value.

        c.   The Court's Final Determination Of TFC's "Essential Reliance" Interest.

    2.   TFC Is Entitled To $42.166 Million Regarding Its "Collateral Reliance" Interest, *i.e.,* The Capital TFC Transferred To Transohio Savings As A Result Of The December 31, 1986 Transohio Rights Offering.

D.   Calculating Damages Based On The Reliance Interest.

E.   Regulatory Enforcement Attitudes After FIRREA.

F.   The Arguments Of The Parties.

    1.   Summary Of The Government's Argument.

        a.   Causation.

        b.   Transohio Savings' Net Losses.

    2.   Summary Of TFC's Argument.

G.   Overview Of The Court's RESTATEMENT § 349 Analysis.

H.   Overview Of The Experts.

    1.   Overview Of The Government's Experts.

        a.   Professor Kroszner.

        b.   Dr. Hamm.

        c.   Mr. Johnson.

    2.   Plaintiffs' Expert.

        a.   Professor James.

I.   Final Determination Of Net Losses That The Government Established With Reasonable Certainty That Transohio Savings Bank, FSB Would Have Incurred Irrespective Of The Breach.

    1.   January 1, 1989–December 31, 1989.

        a.   The Financial Condition Of Transohio Savings Bank, FSB And Net Losses Incurred.

           (1)  Transohio Savings Bank, FSB's SEC Forms 10–K And Internal Documents.

           (2)  The Supervisory Authorities' Joint Examination F or The Period March 30, 1989–September 6, 1989.

               (aa) Transohio Savings—Management.

               (i)    General–Personnel.

               (ii)   The Aborted AmeriFirst Acquisition.

               (iii)  The Aborted Consolidation Of AMCAP And Transcapital Financial Into Transohio Savings.

               (bb) Transohio Savings—Asset Quality.

               (i)    Asset Classification Policies And Procedures.

               (ii)   Composition Of Classified Assets.

               (iii)  Loan Underwriting.

               (cc) Transohio Savings—Capital Adequacy.

               (dd) Transohio Savings—Risk Management.

               (i)    Interest Rate.

               (ii)   GAP Hedging Activities.

               (iii)  Risk–Controlled Arbitrage–Hedged Mortgage Investment ("HMI").

               (iv)  Other Hedging And Trading Activities.

               (v)   Secondary Market Activities.

               (vi)  Liquidity Risk.

               (ee) Transohio Savings—Operating Results.

           (3)  The FDIC Examination For The Period January 1, 1989–December 31, 1989.

               (aa) Transohio Savings—Capital.

               (bb) Transohio Savings—Asset Quality.

               (cc) Transohio Savings—Management.

               (dd) Transohio Savings—Earnings.

               (ee) Transohio Savings—Liquidity.

           (4) Post–FIRREA.

    b.  Analysis And Opinions Of The Government's Experts.
      (1) Professor Kroszner.
      (2) Dr. Hamm.
      (3) Mr. Johnson.
    c.  The Government Established With Reasonable Certainty That Transohio Savings Bank, FSB Would Have Incurred Net Losses of $19.846 Million In Fiscal 1989 Irrespective Of The Breach.
  2.  January 1, 1990–December 31, 1990.
    a.  The Financial Condition Of Transohio Savings And Net Losses Incurred.
      (1) Transohio Savings' OTS Form 10–K And Internal Memoranda.
    b.  Analysis And Opinion Of The Government's Experts.
      (1) Professor Kroszner.
      (2) Dr. Hamm.
      (3) Dr. Johnson.
    c.  The Government Established With Reasonable Certainty That Transohio Savings Bank, FSB Would Have Incurred Net Losses of $11.69 Million In Fiscal 1990 Irrespective Of The Breach.
  3.  January 1, 1991–December 31, 1991.
    a.  The Financial Condition Of Transohio Savings And Net Losses Incurred.
    b.  Analysis And Opinion Of The Government's Experts.
      (1) Professor Kroszner.
      (2) Dr. Hamm.
      (3) Mr. Johnson.
    c.  The Government Established With Reasonable Certainty That Transohio Savings Bank, FSB Would Have Incurred Net Losses of $18.8 Million In Fiscal 1991 Irrespective Of The Breach.
  4.  January 1, 1992–July 10, 1992.
J.  Limiting Rules On Reliance Damages.
  1.  Foreseeability.
  2.  Certainty.
K.  The Government Is Not Entitled To A Credit In This Case.
L.  *Winstar*–Related Decisions Of The United States Court Of Appeals For The Federal Circuit Issued After *American Capital II, American Capital III,* And *American Capital IV.*
  1.  *California Federal Bank v. United States,* 395 F.3d 1263 (Fed.Cir.2005).
  2.  *Home Savings of America, FSB v. United States,* 399 F.3d 1341 (Fed.Cir. 2005).
  3.  Fifth Third Bank of Western Ohio v. United States, 402 F.3d 1221 (Fed.Cir. 2005).
  4.  *Westfed Holdings, Inc. v. United States,* 407 F.3d 1352, 2005 WL 1119654 (Fed.Cir. May 12, 2005).
  5.  *Hometown Financial, Inc. v. United States,* No. 04–5116, 409 F.3d 1360, 2005 WL 1253120 (Fed.Cir. May 27, 2005).

IV.  CONCLUSION

## I. FACTUAL BACKGROUND BEFORE TRANSOHIO SAVINGS BANK, FSB INCURRED NET LOSSES IN FISCAL YEAR 1989 [5]

### A. 1984 American Capital Corporation's Acquisitions Of Transohio Savings Bank, FSB And AmeriStar Financial Corporation.

Transohio Savings was a federally chartered stock savings and loan association, in-

---

[5]. The facts herein primarily were derived from the following portions of the record: Plaintiffs' Exhibits 1–1092 ("PX at ___"); Defendant's Exhibits 1–1110 ("DX at ___"); Transcript of an Evidentiary Hearing held on: June 21, 22, 23, 24, 25, 2004, July 19, 20, 21, 22, 23, 2004, and August 9, 10, 11, 12, 2004 ("TR at ___"); and Transcript of Oral Argument held on December 3, 2004 ("Post Hearing TR at ___").

At the Evidentiary Hearing, the Government's witnesses were: Mr. Jerry M. Benham, a FHLBB Supervisory Agent from 1980–1989, who was

sured by the FSLIC and a member of the Federal Home Loan Bank Board ("FHLBB") of Cincinnati. *See* DX 29 at WOT286 0081. On July 24, 1984, First Global Investors, Inc. ("FGI") acquired control of Transohio Savings' common stock. *See* DX 29 at WOT286 0063, WOT286 0080. On July 27, 1984, FGI became a wholly-owned subsidiary of AM-CAP, which became a savings and loan holding company. *See id.* FGI also owned 50.8% of the common stock of Transohio Financial Corporation,[6] which also owned 100% of Transohio Savings' stock. *See* DX 29 at WOT286 0080–81; *see also* TR at 2448. And so, in this manner, Transohio Savings became a wholly-owned subsidiary and the principal asset of TFC. *See* DX 102 at PAC086 0489.

The primary lending activity of Transohio Savings was originating and purchasing loans secured by mortgages on residential properties, primarily those insured by the Federal Housing Administration or Veterans Administration. *See* DX 29 at WOT286 0081; DX 102 at PAC086 0464. Transohio Savings generated residential loan originations primarily through branch personnel and real estate brokers. *See* DX 102 at PAC086 0464. In addition, Transohio Savings made con-

struction loans, usually only one year in length, that were generated by contractors. *See* DX 29 at WOT286 0082. Mobile home and home improvement loans were generated through dealers and contractors. *See* DX 102 at PAC086 0464.

Under the National Housing Act, Pub.L. No. 73–479, 48 Stat. 1246 (1934), as amended by the Competitive Equality Banking Act of 1987, Pub.L. No. 100–86, § 1204, 101 Stat. 552 (1987), AMCAP, as a savings and loan holding company, was authorized to engage in non-savings institution transactions, if it controlled one institution that met the "qualified thrift lender" test, *i.e.*, that directed 60% of its assets to housing and related activities. *See* DX 102 at PAC086 0477. Moreover, under the laws of the State of Ohio, Transohio Savings could invest up to 15% of its assets in capital stock, obligations, or other securities of service corporations; 20% of its net worth in loans to service corporations; 10% of its assets in real estate; 10% of its assets in corporate equity securities; 3–10% of its assets in non-service corporations; and 15% of its assets in loans or investments not "otherwise specifically authorized or prohibited." DX 102 at PAC086 0470–71.

employed by OTS after the enactment of FIRREA as a Field Manager; Mr. Michael L. Doebereiner, a FHLBB Supervisory Agent from 1984–1989, during which time he was assigned to Transohio Savings, *i.e.*, from the second quarter of 1988 to the end of 1989, and later served at OTS from 1989–1995; Mr. Ronald T. Leonard, a former FDIC Examiner and the Examiner–in–Charge of OTS's February 20, 1990 Examination; Mr. George J. Masa, former Regional Director of the FDIC's Chicago Regional Office with oversight responsibility for the insured funds of 1,500 financial institutions, including Transohio Savings from February 1989–January 1991; Mr. Leonard J. Farrell, currently an examiner in the OTS Cleveland Office, who was a FHLBB Examiner from January 1985—January 1989, during which time he was assigned to work on examinations of AMCAP in 1986–1987 and Transohio Savings in September 1991; Mr. Stuart M. Brafman, recruited in 1986 to be the Executive Vice President of Regulatory Functions at FHLBB's Chicago Office, which became part of OTS in 1989 and where Mr. Brafman remained until 1992; Mr. David Mangian, currently Assistant Director of the FDIC's Chicago Regional Office and Assistant Regional Director from 1990–1992 for mid-western states including Ohio; and Mr. John F. Downey, former Executive Director of Supervision at the OTS and Deputy Director for Regional Oper-

ations in 1998, responsible for review of "special supervisory cases," including Transohio Savings.

The Government's expert witnesses were: Dr. William G. Hamm, Managing Director of the Public Policy Practice of LEGG, LLC, an economic consulting firm; Professor Randall S. Kroszner, University of Chicago, Graduate School of Business and former member of the President's Council of Economic Advisors; and Mr. R. Larry Johnson, a Managing Partner of Johnson Lambert & Company, CEO of VERIS, a consulting firm.

Plaintiffs' witnesses were: Mr. Steven R. Cook, Senior Vice President, and Chief Financial Officer of AMCAP and TFC and a former Director of Transohio Savings; Mr. William D. Wooldredge, former TFC and Transohio Savings Board member and CEO; and Mr. William Snider, former Executive Vice President and Chief Financial Officer of Transohio Savings until February 1992.

Plaintiffs' expert witness was Professor Christopher James, the William H. Dial/SunBank Eminent Scholar and Professor of Finance at the University of Florida.

**6.** In 1986, the name of Transohio Financial Corporation formally was changed to Transcapital Financial Corporation. *See* DX 30 at PAC024 1534.

On September 19, 1984, Transohio Savings acquired all the common stock of a company that later changed its name to AmeriStar Financial Corporation ("AmeriStar"), for approximately $3.3 million, as well as the rights to other payments if AmeriStar was profitable. *See* DX 31 at WON251 1132; *see also* DX 30 at PAC024 1582; DX 33 at PAC016 1629–30; DX 41 at WON327 0756; DX 90 at FAC011 2210.

**B. 1985–1986 American Capital Corporation's Negotiations With The Federal Home Loan Bank Board That Resulted In Transohio Savings Bank, FSB's Supervisory Mergers Of Citizens Federal Savings And Loan Association Of Cleveland, Ohio And Dollar Savings Bank Of Columbus, Ohio.**

In June 1985, AMCAP raised approximately $75 million through the issuance of "Units consisting of an aggregate of $80 million principal amount of Notes and 14,960,000 Warrants in a public offering. . . . As a condition to incurring the indebtedness relating to the Units offering, *[AMCAP] agreed not to use the proceeds of the Units offering without the approval of the [FHLBB]*. [AMCAP] invested $20 million of the proceeds of the Units offering in 13% Convertible Subordinated Notes of Transohio." DX 29 at WOT286 0074 (emphasis added). Consequently, as of June 30, 1985, Transohio Savings had $2.9 billion in assets, shareholder equity of $101.4 million, and was the largest thrift in Ohio. *See* DX 29 at WOT286 0081; DX 41 at WON327 0755; *see also* TR at 84.

On August 29, 1985, the FHLBB notified AMCAP and TFC that the agency was looking for a viable financial institution to purchase two financially troubled thrifts: Citizens Federal Savings and Loan Association of Cleveland, Ohio ("Citizens") and Dollar Savings Bank of Columbus, Ohio ("Dollar"). *See American Capital I,* 58 Fed.Cl. at 401 (citing Pl. Motion for Partial S.J. on Liability Appendix at 322); *see also* TR at 2687–88. On May 30, 1986, the FHLBB's Office of Supervisory Agent in Cincinnati provided the Assistant Director for Regional Operations in Washington, D.C. with an analysis of a proposal by AMCAP, TFC, and related entities to acquire both Citizens and Dollar. *See* DX 41. Approval of these acquisitions was recommended by the federal regulators, but made contingent upon several conditions being fulfilled, first among which was: "[Plaintiffs] shall stipulate to the FSLIC that it will cause the net worth of the surviving insured institution to be maintained at a level consistent with the requirements of Section 563.13(b) of the Rules and Regulations for Insurance of Accounts [12 C.F.R. § 563.13(b) (1986),] as now or hereafter in effect, and, as necessary, will infuse sufficient additional equity capital, in a form satisfactory to the Supervisory Agent, to effect compliance with such requirement." DX 41 at WON327 0762. By December 31, 1985, AMCAP owned approximately 51% of TFC, which in turn owned all of the common stock of Transohio Savings. *See* DX 31 at WON251 1129.

Within six months, Transohio Savings increased its total assets to $3.5 billion and had a regulatory net worth of 3.5%. On June 19, 1986, the FHLBB was informed of AMCAP's intent to provide Transohio Savings with $45 million from a Transohio Rights Offering, which was planned to be concluded by the time the requisite regulatory approvals were completed, but prior to the closing of the Transohio Savings acquisition of Citizens and Dollar. *See American Capital II,* 59 Fed.Cl. at 566 (citing Pl. P.H. Appendix at 857–58); *see also* DX 29 at WOT286 0074 (emphasis added) (AMCAP's 1985 Annual Report issued on May 2, 1986 that stated: *"[AMCAP] intends to invest approximately $45 million of the remaining proceeds in subordinated notes and additional Transohio common stock to be issued in connection with a proposed rights offering by Transohio."*). The June 19, 1986 letter reflects that there had been extensive prior communications with the FHLBB about the terms of the proposed $45 million "Transohio Rights Offering" and that TFC was frustrated by the pace of regulatory review and upset with how that delay was interfering with the implementation of the Citizens/Dollar closing. *See American Capital II,* 59 Fed.Cl. at 567 (citing Pl. P.H. Appendix at 857–58).

Although the precise date that the Transohio Rights Offering was first known by the

FHLBB cannot be ascertained from the record, that date was well before the time that the AMCAP's Units Offering took place and over a year before August 29, 1986, when Transohio Savings' proposed acquisition of Citizens and Dollar finally was approved by the federal regulators—and, by which time the federal regulators had actual knowledge of and expected that an additional $45 million in capital would be provided to effectuate that transaction. *See* DX 35 at PAC058 0054; *see also American Capital II,* 59 Fed. Cl. at 568 (citing Pl. P.H. Appendix at 727–858) (evidencing that AMCAP's 1985 Annual Report was provided to the FSLIC as an Exhibit to Plaintiffs' Application H-(e)3 to acquire Citizens/Dollar).

## C. August 29, 1986 Supervisory Mergers Of Citizens Federal Savings And Loan Association Of Cleveland, Ohio And Dollar Savings Bank Of Columbus, Ohio With Transohio Savings Bank, FSB.

On August 21, 1986, the FHLBB declared Citizens, a federally chartered FSLIC-insured thrift institution, insolvent. *See American Capital I,* 58 Fed.Cl. at 401 (citing Pl. Motion for Partial S.J. on Liability Appendix at 14–23). Citizens' assets were estimated at $430 million, with $520 million in liabilities. *See* DX 33 at PAC016 1629. Independently, the FSLIC estimated that a liquidation of Citizens would cost the Government $131 million. *See American Capital II,* 59 Fed.Cl. at 566 (citing Pl. Motion for Partial S.J. on Liability Appendix at 338). On August 21, 1986, the FHLBB also declared that Dollar, an Ohio chartered FSLIC-insured mutual savings bank, was insolvent. *See American Capital I,* 58 Fed.Cl. at 401 (citing Pl. Motion for Partial S.J. on Liability Appendix at 14–23). Dollar's assets were estimated at $335 million, with $375 million in liabilities. *See* DX 33 at PAC016 1629. The FSLIC estimated that a liquidation of Dollar would cost the Government $52.5 million. *See American Capital II,* 59 Fed.Cl. at 566 (citing Pl. Motion for Partial S.J. on Liability Appendix at 340).

On August 21, 1986, the FHLBB also issued Resolution No. 86–864 conditionally approving a proposed Assistance Agreement among plaintiffs, Transohio Savings, and the FHLBB. *See American Capital II,* 59 Fed. Cl. at 568 (citing Pl. Motion for Partial S.J. on Liability Appendix at 14–23). At that time, Transohio had a regulatory net worth of $132.2 million with liabilities of $3.4 billion, which exceeded regulatory requirements by $29.1 million. *See American Capital II,* 59 Fed.Cl. at 568 (citing Pl. Motion for Partial S.J. on Liability Appendix at 7) (Dec. 25, 2000 Aff. of Jack D. Burstein, former Chairman of Transohio Savings, Chairman, President and CEO of TFC, and President and CEO of AMCAP). On August 29, 1986, an Assistance Agreement was signed by Transohio Savings, AMCAP, TFC, and the FSLIC, in its capacity as a corporate instrumentality and agency of the United States. *See* DX 102 at PAC086 0489; *see also American Capital II,* 59 Fed.Cl. at 568 (citing Pl. Motion for Partial S.J. on Liability Appendix at 228–85). The Assistance Agreement had several key provisions: Transohio Savings would merge with Citizens and Dollar to form one entity to be known thereafter as Transohio Savings; FSLIC would make a $107.5 million cash contribution to the "new" Transohio Savings; FSLIC agreed to indemnify AMCAP, TFC, and Transohio Savings for certain claims and potential losses; FSLIC agreed to purchase 19 "problem loans," representing approximately $41.5 million of Citizens' assets at their book value; Transohio Savings would be allowed to book the $107.5 million in FSLIC assistance as a capital credit toward its regulatory net worth; Transohio Savings would be allowed to amortize intangible assets, *i.e.,* approximately $50 million in supervisory goodwill over a 25 year period using the straight-line method of depreciation; and AMCAP and TFC agreed to maintain the net worth of Transohio Savings at required regulatory levels and to a "Dividend Limitation Restriction." DX 102 at PAC086 0489; *see also American Capital II,* 59 Fed. Cl. at 568–69 (citing Pl. Motion for Partial S.J. on Liability Appendix at 1–10).

On September 10, 1986, after the closing, the FHLBB issued a Forbearance Letter promising that neither the FHLBB nor the FSLIC would foreclose on Transohio Savings in the event it failed to meet regulatory net

worth requirements for a five-year period after Transohio Savings merged with Citizens/Dollar, *i.e.,* September 10, 1991. *See American Capital II,* 59 Fed.Cl. at 569 (citing Pl. Motion for Partial S.J. on Liability Appendix at 293–94). On September 30, 1986, Transohio Savings had $240.6 million in regulatory capital, of which $162.5 million was "contractual regulatory capital," including $55 million in goodwill. *See* PX 659; *see also* TR at 1242–43.

On December 31, 1986, four months after the Citizens/Dollar mergers were concluded, "[TFC] issued 626,219 shares of common stock pursuant to a shareholder rights offering." DX 30 at PAC024 1580. "In addition, [TFC] issued 3,673,469 shares of common stock to [AMCAP] in a private placement transaction for an aggregate purchase price of approximately $45 million," derived from AMCAP's June 1985 issuance of $80 million in subordinated notes, and subject to a prior FHLBB "approval order." DX 30 at PAC024 1580; *see also* DX 31 at WON251 1142–43. As a result, TFC "received net proceeds of $52 million of which approximately $42 million was contributed to Transohio Savings as additional equity capital." *American Capital II,* 59 Fed.Cl. at 569 (citing Pl. Motion for Partial S.J. on Damages Appendix at 570–72); *see also* DX 30 at PAC024 1580; DX 412 at WOT665 0016. With this additional equity, Transohio Savings' regulatory capital "exceeded minimum regulatory requirements by approximately $158 million at December 31, 1986, taking into account an amount of approximately $106 million which [was to be] treated as regulatory capital pursuant to the terms of the financial assistance package entered into with the FSLIC in connection with the acqui-

sitions of Citizens and Dollar." *American Capital II,* 59 Fed.Cl. at 569 (citing Pl. Motion for Partial S.J. on Damages Appendix at 571). On December 31, 1986, "[Transohio Savings'] net worth, as calculated on the basis of generally accepted accounting principles, exceeded 3% of liabilities by $31 million." *American Capital II,* 59 Fed.Cl. at 569 (citing Pl. Motion for Partial S.J. on Damages Appendix at 571).[7] By that date, AMCAP had increased its ownership position in TFC common stock to 65.5% and therefore its control over Transohio Savings. *See* DX 31 at WON251 1129.

**D. The Financial Condition Of Transohio Savings Bank, FSB After The August 29, 1986 Supervisory Mergers Until 1989.**

**1. The October 21, 1987 Joint Examination By The State Of Ohio Division Of Savings And Loan Associations And The Federal Home Loan Bank Board For The Period January 1986–May 1987.**

The State of Ohio's Division of Savings and Loan Associations and the FHLBB Office of Examinations and Supervision (hereinafter "the Supervisory Authorities") jointly conducted examinations of Transohio Savings on a periodic basis. During the period from 1986 to 1989, the Supervisory Authorities utilized a five-element qualitative composite rating system, known as "MACRO," *i.e.,* "Management," "Asset Quality," "Capital Adequacy," "Risk Management," and "Operating Results." Each MACRO element also had components that were rated individually and then collectively.[8] First, each MACRO

---

7. As of December 31, 1986, the FHLBB required "a 5% liquidity ratio.... *[Transohio Savings'] liquidity ratio was 13.6% ... [that] primarily reflects* the recent high levels of loan repayments, cash received in connection with the acquisitions of Citizens and Dollar *and the investment of additional available cash in liquid investments." American Capital II,* 59 Fed.Cl. at 569 (citing Pl. Motion for Partial S.J. on Damages at 572) (emphasis added).

8. The "Management" MACRO element consisted of 10 components: Effectiveness of Directors; Capability of Executive Management; Depth/Succession; Compensation; Conflict of

Interest; Response to Supervision; Compliance with Laws and Regulations; Records, Systems, Controls; Accurate Financial Reports to FHLBB; and Nondiscrimination. According to Mr. Leonard Farrell, a FHLBB Examiner, the "Management" MACRO element was the most important. *See* TR at 682–88.

The "Asset Quality" MACRO element consisted of 11 components: Scheduled Items/Class Assets; Loan Underwriting; Appraisal/Feasibility Studies; Unsecured Lending; Credit Analysis; Service Corporations; Risk Exposure; Portfolio Diversification; Loan Servicing/Collection; Se-

element was assigned a rating of "1" through "5" in "ascending order of supervisory concern," with a "1" representing the rating with least regulatory concern and a "5" representing the rating with highest regulatory concern. Then, all of the MACRO elements collectively were evaluated to arrive at an overall composite rating.[9] *See, e.g.,* DX 90 at FAC011 2247.

The first Joint Examination conducted by the Supervisory Authorities following the August 29, 1986 merger of Transohio Savings with Citizens/Dollar was issued on October 21, 1987, covering the fifteen-month period of January 1986 through May 1987. *See* DX 90. Transohio Savings received an overall "3" composite rating for this period. *See* DX 90 at FAC011 2247.

### a. Transohio Savings—Management.

The Supervisory Authorities concluded that Transohio Savings' management "appears to be in substantial compliance with the terms of th[e] Assistance Agreement relating to corporate structure." DX 90 at FAC011 2120. It was noted, however, that no formal management policy had been implemented regarding Risk Controlled Arbitrage ("RCA") nor did the Directors have sufficient information to monitor this activity, which significantly contributed to Transohio Savings' growth from $3.5 billion to $5.6 billion or a 60% increase during this period. *See* DX 90 at FAC011 2120, 2123 ("The income produced by RCA maximizes shareholder return on investment and appears to

be the second motivating factor behind such activity. The generation of profits enables the current shareholders to maintain their controlling interest in American Capital[.]"); *see also* DX 30 at PAC024 1547 (AMCAP 1986 Annual Report stating that Transohio Savings "has evolved from an essentially break-even operation in July 1984 into a highly profitable business with a return on equity of 19.8% in 1986. This transformation was achieved through American Capital's continuing interest and involvement in Transohio.").

Transohio Savings received a "2" rating for "Management;" 8 of the 10 components thereunder received a "2" rating, however, "Records, Systems, Controls" and "Accurate Financial Reports to FHLBB" each were ranked "3." *See* DX90 at FAC011 2247.

### b. Transohio Savings—Asset Quality.

Approximately $111.538 million or 2% of Transohio Savings' assets were classified as "criticized assets." DX 90 at FAC011 2159. Regarding those assets, Transohio Savings was found to have proper internal controls but was criticized for not providing sufficient information to the Supervisory Authorities. *See* DX 90 at FAC011 2122, (reporting that Transohio Savings did not always obtain an appraisal for repossessed real estate assets or establish reasons for parcels having a book value in excess of the most recently appraised value).

Transohio Savings received a "2" rating for "Asset Quality," with 8 of the 11 components

---

cured Market Activity; and Direct Investment Compliance.

The "Capital Adequacy" MACRO element consisted of 4 components: Net Worth Compliance; Comparative Level; Composition; and Trend.

The "Risk Management" MACRO element consisted of 6 components: Asset/Liabilities Structure; Cash Flow/Liquid Management; Savings Solicitation; Business Plan, Budgets, Projection; Liabilities Growth Compliance; and Brokered Savings Compliance.

The "Operating Results" MACRO element had 1 component: Comparative Level. *See* DX 90 at FAC011 2247.

9. Mr. Jerry Benham, a FHLBB Supervisory Agent from 1980–1989 and responsible for Transohio Savings' examinations until July 8, 1988, explained at the Evidentiary Hearing that because the MACRO ratings inherently included

a subjective component, the ratings also had to be evaluated in light of the examiner's comments on the Joint Examination. *See* TR at 177–81. At the Evidentiary Hearing, Mr. Benham described Transohio Savings as the "largest institution in the District, plain vanilla thrift, retail deposits in the local area, local lending. They were just a real good institution." TR at 84; *see also* TR at 82–88. Although Mr. Benham also noted that the "institution itself seemed to take on a lot different risk profile ... also seemed like the Board of Directors didn't seem to be watching management as closely as we thought they had under the prior administrations[,]" as court discusses later in this opinion, Mr. Benham's 2004 opinion of management seemed in conflict with the October 21, 1987 "2" rating. *See infra* Section E.

receiving a "2" rating. *See* DX 90 at FAC011 2247. "Service Corporations," "Risk Exposure," and "Secured Market Activity" each were rated as a "3." *See* DX 90 at FAC011 2247.

### c. Transohio Savings—Capital.

For the period January 1986 through May 1987, Transohio Savings increased assets by 3.5% or $186.758 million, *i.e.*, from $123.537 million to $310.295 million. *See* DX 90 at FAC011 2121. Of this amount, $107.5 million was attributed to the FSLIC capital credits conveyed to Transohio Savings as a result of the mergers with Dollar/Citizens and the reclassification of approximately $15 million in borrowings. *See* DX 90 at FAC011 2121.

During the first six months of 1987, AmeriStar recorded a "stand alone" $1.498 million loss attributed to unfavorable market movement, high operating expenses, and rising interest rates. *See* DX 90 at FAC011 2211. By the end of 1987, AmeriStar lost $2.9 million. These losses, however, were absorbed by Transohio Savings and offset by other assets.[10] To address declining mortgage servicing revenues, the Supervisory Authorities recommended "selling whole loans instead of mortgage-backed securities and by selling excess servicing to the marketplace for extra cash instead of buying the excess servicing for its own portfolio by issuing lower pass-through rates." DX 90 at FAC011 2214.

Transohio Savings received a "2" rating for "Capital," including all 4 components. *See* DX 90 at FAC011 2247.

### d. Transohio Savings—Risk Management.

The Supervisory Authorities noted that although Transohio Savings had been successful in using interest rate swaps [11] to hedge liabilities involved in its Risk Controlled Arbitrage activities, this situation presented a "significant interest rate risk in a rising interest rate environment." DX 90 at FAC011 2122.

Transohio Savings received a "3" rating for "Risk Management," with 2 out of 6 components rated as a "3." DX 90 at FAC011 2247.

### e. Transohio Savings—Operating Results.

Transohio Savings "operated profitability" in 1986 and the first half of 1987, with reported net income of $22.6 million and $6.9 million for the first half of 1987. *See* DX 90 at FAC011 2128. Transohio Savings, however, sold $2.3 billion in mortgage loans in 1986 and $1.2 billion in the first half of 1987. *See* DX 90 at FAC011 2124. Since a major portion of Transohio Savings' operating income was derived from mortgage banking operations, the Joint Examination included the following caveat: "Proposed accounting changes, if adopted, will have a major impact on the earnings of Transohio [Savings] and its wholly-owned mortgage banking subsidiary, AmeriStar Financial Corporation." DX 90 at FAC011 2121. Despite Transohio Savings' net profit, the Supervisory Authorities noted that both Dollar and Citizens "had experienced significant losses prior to the time of the [August 29, 1986 supervisory] merger and continued to have a negative impact on Transohio [Savings'] earnings." DX 90 at FAC011 2128.

---

10. In 1986, AmeriStar had a net profit of $3.487 million and "rank[ed] among the nation's top mortgage companies in loan originations and sales." DX 30 at PAC024 1548. As of March 1, 1987, AmeriStar retained all of its originated loans and operated as an independent mortgage banking entity. *See* DX 90 at FAC011 2211. Transohio Savings, through its wholly-owned subsidiary, Alpha, contributed $20 million to AmeriStar as paid-in capital and invested directly in a $20 million five year note. *See* DX 90 at FAC011 2211. By June 30, 1987, Transohio Savings' aggregate investment in AmeriStar was $131.1 million, although AmeriStar apparently also had access to an additional $114.7 million of borrowing from other sources. *See* DX 90 at FAC011 2211.

11. Interest rate exchange contracts or swaps "fix the cost of certain savings deposits and securities sold under agreements to repurchase. These exchange contracts are utilized in [Transohio Savings'] asset/liability management program, and permit the purchase of fixed rate assets while controlling interest rate risk. Under these contracts, [Transohio Savings paid] a fixed rate of interest and receives a floating rate of interest based on the contracts' principal amounts." DX 31 at WON251 1133; *see also* TR at 343–45.

Transohio Savings received a "3" rating for "Operating Results," although the "Comparative Level" component was rated as a "2." DX 90 at FAC011 2247.

### 2. Transohio Savings' Financial Condition From October 21, 1987 Until The Next Joint Examination Was Issued On March 30, 1989.

On February 5, 1988, AMCAP's President provided Mr. Lawrence Muldoon of the Cincinnati Office of the FHLBB with a proposed Restructuring Plan to be discussed at a February 18, 1988 meeting. *See* DX 114 at WOL237 0743. This Restructuring Plan stated:

> Transohio Savings is *faced with increasing capital requirements* arising from *regulatory initiatives* and its acquisition objectives. At the same time, American Capital and TransCapital Financial have significant assets/capital which are not currently included in Transohio Saving's net worth.... [A] restructuring would alleviate the cash flow pressures of the consolidated group. The regulatory concerns and influence on Transohio Savings surrounding the fixed charge funding needs of the holding company would be favorably resolved through the combination of all entities into one.... Generally, the plan calls for an exchange of holding company securities for securities of Transohio Savings, including the restructuring of subordinated indebtedness into a new issue which qualifies as regulatory capital. The existing minority interest of TFC will receive common stock.
>
> As set forth in the pro forma financial statements, Transohio Saving's capital would be increased to a level of 6.27% of liabilities (from 5.53% currently) and thrift earnings would be enhanced as well.

DX 114 at WOL237 0746.

On July 8, 1988, a meeting of AMCAP, TFC, and Transohio Savings was held with the FHLBB where the agency expressed concern about the proposed restructuring of AMCAP. *See* DX 144. Specifically, the high cost of subordinated debt, decrease in GAAP capital, impact of net losses on Transohio Savings, and real estate problems were raised as factors mitigating against FHLBB approval of the restructuring. *See* DX 144 at WOL240 2204. The principal concern of the FHLBB staff was that AMCAP might not be able to meet its debt service, which could adversely effect the insurance fund because Transohio Savings was an insured entity. *See* DX 144 at WOL240 2205. On August 15, 1988, the FHLBB's Office of Supervisory Agent recommended that the Office of Regulatory Activities deny approval for the restructuring. *See* DX 154. Approximately one year later, AMCAP tried to resurrect this transaction.

By the end of fiscal year 1988, Transohio Savings had recorded net earnings of $18.5 million. *See* DX 102 at PAC086 0489. Transohio Savings reported that two new 1988 accounting requirements had an adverse impact on earnings: Statement of Financial Accounting Standards No. 91 ("SFAS No. 91") and Financial Account Standards Board Technical Bulletin 87–3 ("Bulletin 87–3"). *See* DX 102 at PAC086 0489. SFAS No. 91 required all non-refundable loan origination fees and certain direct origination costs to be deferred and recognized over the life of the loan as a yield adjustment that cost Transohio Savings $5.6 million. *See* DX 102 at PAC086 0489. Bulletin 87–3 decreased net earnings by approximately $5.6 million. *See* DX 102 at PAC086 0489–90. Despite $11.2 million in unexpected charges resulting from these new accounting requirements, Transohio Savings increased earnings in 1988 (over 1987) because of the "increased volume of loans and mortgaged-backed certificates combined with increased gains on the sales of investments and mortgage-backed certificates." *See* DX 102 at PAC086 0490. In addition, Transohio Savings' regulatory capital exceeded minimum requirements by approximately $169 million, of which $26 million was attributed to regulatory forbearance and $97.5 million of direct financial assistance provided by FSLIC as a result of the Citizens/Dollar mergers. *See* DX 102 at PAC086 0496.

In anticipation of the enactment of FIRREA, on December 23, 1988, the FHLBB published proposed regulations governing the computation and minimum amount of

regulatory capital for FSLIC-insured institutions that "would fundamentally alter, and over time substantially increase" capital requirements. *See* DX 102 at PAC086 0481.

## II. PROCEDURAL BACKGROUND IN THE UNITED STATES COURT OF FEDERAL CLAIMS

On August 8, 1995, plaintiffs filed a Complaint in the United States Court of Federal Claims asserting both breach of contract and takings claims. On March 25, 1997, the Federal Deposit Insurance Corporation ("FDIC") filed a Complaint in Intervention, as successor to the rights of Transohio Savings. *See* 12 U.S.C. § 1441a(m)(2); 12 U.S.C. § 1821a(a)(1)(2). The FDIC's Complaint included: claims for breach of contract; frustration of purpose; and violations under the Fifth Amendment to the United States Constitution, pursuant to the Just Compensation and Due Process clauses thereof.

On October 10, 2000, plaintiffs filed a Motion for Partial Summary Judgment challenging the Government's breach of two specific promises: "(1) to record [the approximately $50 million in supervisory] goodwill created by the transaction as an intangible, amortizing asset, and to count the goodwill toward compliance with Transohio regulatory capital requirements; and (2) to record, as a direct credit to Transohio's regulatory capital, a $107.5 million cash contribution made by the Federal Savings and Loan Insurance Corporation in order to partially offset the massive net worth deficit of the failing thrifts that Plaintiffs acquired." Pl. Motion for Partial S.J. on Liability at 2.

On August 31, 2001, plaintiffs also filed a Motion for Partial Summary Judgment regarding "the value of their investment in Transohio [Savings] at the time of the Citizens/Dollar deal under either a reliance or restitution theory." Pl. Motion for Partial S.J. on Damages at 20, 21–26. In addition, plaintiffs asked the court to enter summary judgment regarding the $42 million capital "infusion" plaintiffs made to Transohio Savings on December 31, 1986 as "reliance damages." *Id.* at 27, 28–31. On August 31, 2001, plaintiffs filed an Appendix in support. *See*

Pl. Motion for Partial S.J. on Damages Appendix at 466–696. On that date, plaintiffs also filed Proposed Findings of Uncontroverted Facts incorporating by reference plaintiffs' Proposed Findings of Uncontroverted Facts, submitted together with plaintiffs' October 10, 2000 Motion for Partial Summary Judgment as to Liability.

On November 30, 2001, the Government filed a Response. On November 30, 2001, the Government also submitted two volumes of Appendices. In addition, on that date, the Government filed a Statement of Genuine Issues, incorporating by reference the Government's December 18, 2000 Statement of Genuine Issues, submitted with an Opposition to Plaintiffs' Motion for Partial Summary Judgment regarding liability. On February 15, 2002, plaintiffs filed a "Combined Reply," in support of a Motion for Partial Summary Judgment with Respect to Damages.

\*     \*     \*     \*     \*     \*

On August 15, 2003, this case was reassigned to the undersigned judge. On October 31, 2003, the court issued a Memorandum Opinion and Order entering a judgment granting plaintiffs' October 10, 2000 Motion for Summary Judgment as to Liability. *See American Capital I,* 58 Fed.Cl. at 406–09. On November 17, 2003, the Government filed a Motion for Reconsideration regarding the court's determination of liability. On December 19, 2003, plaintiffs filed a Response, together with three additional Exhibits. On January 23, 2004, the Government filed a Reply.

On December 16, 2003, the court held an oral argument to consider the plaintiffs' August 31, 2001 Motion for Partial Summary Judgment as to damages, in which all parties, including the FDIC, participated. On January 13, 2004, the court issued an order affording all parties an opportunity to address issues that the parties requested to brief further and/or that arose during that oral argument.

On January 5, 2004, the Government filed a Cross–Motion for Summary Judgment upon Plaintiffs' Claims for Restitution, together with a Statement of Genuine Facts in

support thereof. On February 2, 2004, Plaintiffs filed an Opposition, together with two additional exhibits. On February 2, 2004, the FDIC filed an Opposition. On February 17, 2004, the Government filed a Reply.

On February 27, 2004, the court issued a Memorandum Opinion and Partial Summary Judgment granting plaintiffs' August 31, 2001 Motion determining that TFC's "essential reliance" interest was $126,479,000 and TFC's "collateral reliance" interest was $42,166,000, subject to an Evidentiary Hearing to provide the Government with the opportunity to identify: "Any loss that plaintiffs would have suffered, if Transohio Savings had been allowed to count the [capital credit and supervisory goodwill toward regulatory capital]." *American Capital II,* 59 Fed.Cl. at 585. Accordingly, the court denied Plaintiffs' Motion for Partial Summary Judgment as to Restitution and granted the Government's January 5, 2004 Cross–Motion for Partial Summary Judgment in that regard. *Id.* at 585–86.

On March 29, 2004, May 14, 2004, and June 4, 2004, the court convened telephone conferences with the parties to resolve certain pre-trial motions and set a schedule for an Evidentiary Hearing on reliance damages. On May 14, 2004, the Government filed a Memorandum of Contentions of Fact and Law ("Gov't Pre–Trial Brief"). On May 28, 2004, TFC filed a Memorandum of Contentions of Fact and Law ("Pl. Pre–Trial Brief"). An Evidentiary Hearing took place over a three month period on: June 21, 22, 23, 24, 25, 2004; July 19, 20, 21, 22, 23, 2004; and August 9, 10, 11, 12, 2004 ("TR"). *See supra* note 5.

On October 1, 2004, the Government filed a Post–Trial Brief, including proposed Findings of Fact and Law ("Gov't Post–Trial Brief"). On that date, TFC also filed a Post–Trial Brief, including proposed Findings of Fact and Law ("Pl. Post–Trial Brief"). On October 25, 2004, the Government filed a Post–Trial Reply ("Gov't Post–Trial Reply"). On November 22, 2004, the court convened a telephone conference to discuss a schedule for an oral argument that later took place on December 3, 2004 over a period of five hours.

On December 6, 2004, at the request of the court, TFC filed a reproduction of a demonstrative used at oral argument summarizing their investment in Transohio Savings at the end of fiscal year 1989, 1990–1992 and losses allegedly caused by the breach. On December 17, 2004, also at the request of the court, the Government filed two rebuttal demonstrative summary charts. In addition, while the court was finalizing the opinion, the parties were asked to answer certain additional questions.

On April 27, 2005, the court issued a Memorandum Opinion and Order Regarding the Government's November 17, 2003, March 12, 2004, and February 27, 2005 Motions for Reconsideration, including the parties' arguments regarding the relevance of *California Federal Bank. See American Capital IV,* 65 Fed.Cl. at 253, also incorporated herein.

On April 27, 2005, the court also directed plaintiffs to advise the court no later than May 6, 2005 whether "the pending claims brought under the Just Compensation Clause of the Fifth Amendment to the United States Constitution should be set for trial or voluntarily dismissed, without prejudice." *American Capital III,* 63 Fed.Cl. at 715. On May 6, 2005, plaintiffs advised the court that the pending " 'takings' claims should be voluntarily dismissed without prejudice." *See* May 6, 2005 Plaintiffs' Notice Regarding Disposition of "Takings" Claims. The Government did not object to the voluntary dismissal of these claims.

On May 17, 2005, the Government filed a Notice of Supplemental Authority regarding the decision of the United States Court of Appeals for the Federal Circuit in *Westfed Holdings, Inc. v. United States,* 407 F.3d 1352 (2005), that the court has treated herein as a motion for reconsideration. On May 25, 2005, plaintiffs filed a response. The court's determination of the issues raised in *Westfed Holdings* is included in the final section of this memorandum decision discussing all the *Winstar*-related decisions of the United States Court of Appeals for the Federal Circuit issued after *American Capital III* and *American Capital IV.*

## III. DISCUSSION

Although most of the analysis in Sections A, B, and C 2 that follows was set forth in *American Capital II,* and repeated substantial portions in *American Capital III* to facilitate an understanding of the court's final determination of TFC's essential reliance interest in Section C 1 and determination in Section I of the net losses that the Government established with reasonable certainty, or the record otherwise evidenced, that Transohio Savings would have incurred during fiscal years 1989–1991, irrespective of the breach.

### A. Jurisdiction And Standing.

The United States Court of Federal Claims is authorized under the Tucker Act, 28 U.S.C. § 1491(a)(1) (2000), to render judgment and money damages on any claim against the United States based on the United States Constitution, an Act of Congress, a regulation of an executive department, or an express or implied contract with the United States. *See United States v. Testan,* 424 U.S. 392, 397–98, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976). The United States Supreme Court, however, has clarified that the Tucker Act does not create any substantive right for monetary damages. *See United States v. Mitchell,* 445 U.S. 535, 538, 100 S.Ct. 1349, 63 L.Ed.2d 607 (1980). Instead, a plaintiff must identify and plead an independent contractual relationship, constitutional provision, federal statute, and/or executive agency regulation that provides a substantive right to money damages for the court to have jurisdiction. *See Khan v. United States,* 201 F.3d 1375, 1377 (Fed.Cir.2000).

Plaintiffs properly have pled a basis for the court's jurisdiction in this case. *See* Pl. Amended Compl. at ¶¶ 10, 104–11. In light of the court's Memorandum Opinion and Order in *American Capital II,* only TFC had standing thereafter to participate in the Evidentiary Hearing and subsequent briefing to defend the preliminary determination made

of TFC's essential and collateral reliance interests. *See American Capital II,* 59 Fed. Cl. at 582 n. 16, 59 Fed.Cl. at 584 n. 18 (noting that the court specifically did not consider whether AMCAP is entitled to any portion of this amount based on its alleged ownership of First Global and that entity's 50.8% alleged ownership of 100% of TFC's stock).

### B. The "Reliance Interest" Is A Recognized Judicial Remedy That Is Fixed When An Expenditure Is Made, But Does Not Arise Until The Breach Of Contract.[12]

■ The RESTATEMENT has recognized the "reliance interest," *i.e.,* the "interest in being reimbursed *for loss caused by reliance on the contract* by being put in as good a position as [the party] would have been in had the contract not been made," as a judicial remedy for breach of contract. *Id.* at § 344 (emphasis added). The United States Court of Appeals for the Federal Circuit has required that a plaintiff seeking damages based on reliance interest or interests must demonstrate that: 1) plaintiff's losses were reasonably foreseeable at the time of the contract; 2) the breach was a substantive factor in causing its losses; and 3) the losses must be proven with reasonable certainty. *See Bluebonnet Sav. Bank, FSB v. United States,* 47 Fed.Cl. 156, 167 (2000), *rev'd on other grounds,* 266 F.3d 1348 (Fed.Cir.2001); *see also* RESTATEMENT §§ 344(b), 351–52. It is well established that "the reliance claim must be considered as an option when the plaintiff cannot prove expectancy damages with reasonable certainty." DOBBS LAW OF REMEDIES ("DOBBS") § 12.3(1)(2d ed.1993); *see also* RESTATEMENT §§ 347, 349. Damages for a breach of contract based on reliance interest protects "an injured party that has relied and is of particular importance if the *cost of reliance* is an appreciable part of the expectation interest." E. ALLAN FARNSWORTH, FARNSWORTH ON CONTRACTS § 12.16 (3d ed.

---

**12.** The law concerning "reliance interest" as a recognized alternative judicial remedy is well established in the RESTATEMENT and legal treatises, but the court has found little discussion about precisely how to determine reliance interest by federal or state trial courts. At least as to

the "black letter law" principles, however, the parties do not appear to contest the court's prior discussion thereof. *See* Pl. Pre–Trial Brief at 25–34; Pl. Post–Trial Brief at 59–63; Gov't Pre–Trial Brief at 33–37; Gov't Post–Trial Brief at 48–53.

2004) ("FARNSWORTH"). Therefore, the reliance interest "afford[s] a means for giving *some relief* when the full expectation interest is for some reason inappropriate." *Id.* (emphasis added). Therefore, where the injured party "may have changed [its] position in reliance on the contract by, for example, incurring expenses . . . in performing, . . . the court may recognize a claim based on . . . reliance[.]" RESTATEMENT § 344 and cmt. a; DOBBS, *supra,* § 12.3(1) ("The reliance recovery is a reimbursement for losses the plaintiff suffers in reliance on the defendant's contractual promise.").

■ The amount of the "reliance interest" is fixed at the time when an expenditure is made, although the cause of action for recovery of a reliance interest does not arise until a breach occurs. *See* 11 ARTHUR L. CORBIN, CORBIN ON CONTRACTS § 008 at 64 (1964 & Supp.1996) ("CORBIN") (reliance damages must be foreseeable by defendant "at the time he enters into the contract[.]"); RESTATEMENT § 351(1).

■ The RESTATEMENT recognizes at least two types of reliance interest: "essential reliance" and "incidental reliance" or "collateral reliance." RESTATEMENT § 349 cmt. a. Individually or collectively, these components ordinarily do not equal the plaintiff's "expectation interest," because a recovery based on the "reliance interest" excludes the injured party's lost profit. *Id.* at § 344 cmt. a. In other words, damages based on the "reliance interest" will never exceed an amount that would place the plaintiff in a better position, if awarded, than would be the case if the contract had been performed. *See* FARNSWORTH, *supra,* § 12.16; *see also* RESTATEMENT § 349 cmt. a (a "[l]oss in value and cost or other loss avoided are key components of [reliance] damages. . . . [However,] recovery for expenditures . . . may not exceed the full contract price."). Accordingly, as a matter of law, reliance damages seek to measure the injured party's cost of reliance on the breached contract. Therefore, an injured party cannot recover for costs incurred before that party made the contract. *See* FARNSWORTH, *supra,* § 12.16, at n.2; *see also* DOBBS, *supra,* § 12.3(1), at 56.

### 1. "Essential Reliance" Damages.

■ The law requires, where a breach of contract has occurred, an award of expenses based on a plaintiff's actual outlay of funds as special damages for "essential reliance," *i.e.,* those that are "necessary or essential for the plaintiff's performance of his promises under the contract. . . . Essential reliance expense would normally be within the contemplation of the parties, so its recovery would not be forbidden under the [foreseeability] rule limiting consequential damages." DOBBS, *supra,* § 12.3(2), at 58; *see also* RESTATEMENT § 349 cmt. a. "Essential reliance" damages also have been defined as "the 'price' that a party must pay for what it is to receive under the contract." FARNSWORTH, *supra,* § 12.1, at 153; *see also* L.L. Fuller and William R. Perdue, Jr., *The Reliance Interest in Contract Damages:* 1,46 YALE L.J. 52, 81 (1936) ("FULLER AND PERDUE") (" '[E]ssential reliance' consists of those acts which must occur before the plaintiff is entitled to the benefits of the contract and is therefore in a sense the 'price' of those benefits[.]"). Damages to compensate for "essential reliance" include: "the performance of express and implied conditions in bilateral contracts, the performance of the act requested by an offer for a unilateral contract, preparations to perform in both of the cases . . . mentioned[.]" FULLER AND PERDUE, *supra,* at 78.

### 2. "Incidental Reliance" Or "Collateral Reliance" Damages.

In addition, the RESTATEMENT has recognized that damages may be awarded where expenses are incurred in *"preparation for collateral transactions that a party plans to carry out when the contract . . . is performed* [.]" RESTATEMENT at § 349 cmt. a (emphasis added); *see also* FARNSWORTH, *supra,* § 12.1, at 153. Professor Corbin refers to these expenditures in a functional manner, describing them as "collateral" to the contract:

There are many expenditures made in reliance upon an existing contract that can not properly be regarded as having been made in part performance of it, or even as in necessary preparation for such performance. Such expenditures as these are not expected to be compensated directly by the

payments or other performance promised by the defendant, for they do not constitute a part of the agreed exchange. Nevertheless, the *net loss involved in such expenditures may be included in the damages awarded, if at the time the contract was made the defendant had reason to foresee that such expenditures would be made and that [its] own breach would prevent their reimbursement. These expenditures now referred to are collateral to performance of a contract* for breach of which the action for damages is brought; and the net losses resulting may readily be regarded as too remote from contemplation and too likely to be the result of other factors to justify their inclusion in the damages for breach. Whenever their inclusion is just, their amount is *an addition to the full contract price unpaid-that is, to the full value of the performance promised and not rendered by the defendant.* They are included in damages, not because they would have been directly reimbursed by the performance promised by the defendant (or by its 'value' as ordinarily measured), but because the defendant's breach has prevented probable future gains and has rendered determination of their amount impossible.

CORBIN, *supra,* § 1035 (footnotes omitted) (emphasis added); *see also* FULLER AND PERDUE, *supra,* at 78–84 (contrasting essential reliance damages with incidental or collateral damages).

■ Therefore, the RESTATEMENT § 349 endorses a black letter rule that allows damages to be awarded based on the promisee's reliance interest, *i.e.,* expenditures made in preparation for performance or in performance, including, but not limited to, recovery of expenditures invested in collateral transactions. *See* Robert A. Hudec, *Symposium: The Restatement (Second) of Contracts: Restating the "Reliance Interest,"* 67 CORNELL L. REV. 704, 723–28 (1982).

## C. The Court's Final Determination Of TFC's Reliance Interest Is $117.479 Million.

### 1. TFC Is Entitled To $126.479 Million, Based On The Government's Breach Of TFC's "Essential Reliance" Interest Or The Book Value Of Transohio Savings' Stock, As Of August 29, 1986, Minus The $9 Million Dividend Paid To AMCAP In Fiscal Year 1989.

#### a. The Court's Determination Of TFC's "Essential Reliance" Interest In *American Capital II.*

■ In this case, the "essential reliance" interest was fixed as the cost of performance for the August 29, 1986 Assistance Agreement, *i.e.,* what was "put on the table" by plaintiffs as consideration for FSLIC's agreement to convey to Transohio Savings: title to the assets and liabilities of Citizens and Dollar, which had a *negative* net worth of $130 million; a cash payment of $107.5 million, which also could be counted as a capital credit toward Transohio Savings' regulatory net worth; and permission to amortize approximately $50 million in supervisory goodwill, over a 25 year period using the straight-line method of depreciation. *See American Capital II,* 59 Fed.Cl. at 580 (citing Pl. Motion for Partial S.J. on Liability Appendix at 14–25, 228–92, 323–44).

Initially, plaintiffs claimed that they were entitled "under a reliance framework" either to $126.479 million, the value of Transohio Savings's equity at the time the Assistance Agreement was finalized,[13] or $216.1 million, an estimate of the "market value" of Transohio Savings' equity made by Professor Timothy Koch, an expert for the FDIC. *See American Capital II,* 59 Fed.Cl. at 581 (citing Pl. Motion for Partial S.J. on Damages Appendix at 680, 690–91); *see also* PX 24. The Government correctly argued that the "Assistance Agreement, FHLBB Resolution and Forbearance Letter make no mention of any contribution on the part of the plaintiffs

---

**13.** Transohio Savings' "Regulatory Statement of Financial Condition," reviewed by Transohio Savings' independent auditors, Peat, Marwick, Mitchell & Co., and submitted to the FHLBB on November 26, 1986, without subsequent objection, reports that the equity value of the stock of Transohio Savings as of August 29, 1986 was $126.479 million. *See* PX 24 at OAC001 6525.

to the transaction." *American Capital II,* 59 Fed.Cl. at 581 (citing Def. Resp. to Pl. Motion for S.J. on Damages at 20). Here, the Government relies on TFC and AM-CAP's SEC Forms 8–K, dated August 29, 1986, stating that " '[n]o consideration' was paid by either company or Transohio Savings in connection with Transohio Savings' acquisition of Citizens/Dollar." *See American Capital II,* 59 Fed.Cl. at 581 (citing Def. Resp. to Pl. Motion for Partial S.J. on Damages Appendix at 96–98). The August 29, 1986 Assistance Agreement, signed by plaintiffs, Transohio Savings, and FSLIC, however, specifically conditioned the FSLIC's obligations on the satisfaction of conditions previously discussed. *See American Capital II,* 59 Fed.Cl. at 581 (citing Pl. Motion for Partial S.J. on Liability Appendix at 238–41(§ 2)). In addition, FSLIC required, and received, legal assurance that Transohio Savings, Dollar, and Citizens had entered into "separate Merger Agreements and Plans of Merger... pursuant to which TRANSOHIO [SAVINGS] will succeed to all of the rights and liabilities of DOLLAR and CITIZENS, and all of the assets and property of every kind and character belonging to DOLLAR and CITIZENS will be vested in and become the property of TRANSOHIO [SAVINGS], except for covered assets purchased by the [FSLIC] as provided in this Agreement." *American Capital II,* 59 Fed.Cl. at 581 (citing Pl. Motion for Partial S.J. on Liability Appendix at 233–34 (Recital C)). The Assistance Agreement further provides, "In consideration of the mutual promises contained in this [Assistance] Agreement, the parties enter into the following agreement." *American Capital, II,* 59 Fed.Cl. at 581 (citing Pl. Motion for Partial S.J. on Liability Appendix at 234 (Recital F)). Therefore, although it is true that neither plaintiffs nor Transohio Savings paid any cash consideration when Citizens/Dollar were merged into Transohio Savings, TFC, Transohio Savings' sole shareholder, "put on the table" an ongoing business with equity valued at $126.479 million, which was the contract "price" paid as performance for the benefits set forth in the Assistance Agreement. *See* RESTATEMENT § 349.

The Government argued, however, that TFC's surrender of its equity in Transohio Savings was not an "expenditure" or "cost" in performance of the Assistance Agreement, and the only legitimate form of consideration must be either cash or real estate. *See* Def. Resp. to Pl. Motion for S.J. on Damages at 29–31. As the court stated, that is certainly not the holding in *Landmark Land Co. v. FDIC,* 256 F.3d 1365 (Fed.Cir.2001). *See American Capital II,* 59 Fed.Cl. at 581. In *Landmark,* the plaintiff real estate development company signed a contract with the FSLIC to acquire two failing thrifts and required plaintiff to make an initial contribution of not less than $20 million to one of the thrifts: "Landmark did this by contributing real estate and cash valued at $21.5 million. In exchange, the FSLIC agreed to allow [the newly capitalized thrift] to treat its shortfall in actual assets as supervisory goodwill, which could be applied to [its] regulatory capital maintenance requirements." *Landmark,* 256 F.3d at 1370. The Federal Circuit affirmed the trial court's award of approximately $21.5 million in restitution since that amount was required under the terms of the Assistance Agreement. *Id.* at 1373 ("[T]he entirety of Landmark's $21.5 million initial contribution constitutes performance under the Agreement[.]").

In this case, the FSLIC required that the owners of Transohio Savings agree to allow Transohio Savings, in which they held stock valued at $126.479 million, to acquire two failed thrift institutions with a negative net worth of $130 million, which would have wiped out plaintiffs' entire equity interest, but for the benefits promised by the Government that were intended to preserve plaintiffs' equity position in Transohio Savings. *See American Capital II,* 59 Fed.Cl. at 581 (citing Pl. Motion for Partial S.J. on Liability Appendix at 233–34 (Recital C)), 240 ("[FSLIC] shall receive certified copies of the corporate resolutions of AMCAP, TFC, and TRANSOHIO, as appropriate, authorizing the Mergers, the Merger Agreements and this Agreement, and the execution and delivery of the Merger Agreements, this Agreement, and any other agreements and stipulations which AMCAP, TFC, and

TRANSOHIO are required to execute pursuant to this Agreement and the resolutions of the BANK BOARD approving the Mergers, the Merger Agreement and this Agreement."), and Pl. Motion for Partial S.J. on Liability Appendix at 323 (stating that the fair value of liabilities assumed in the acquisition exceeded the fair value of assets acquired by approximately $56 million).

Although the RESTATEMENT does not define "expenditures," it clearly states that reliance damages are to be measured by the "loss" incurred by the non-breaching party "including [but not limited to] expenditures made ... *in performance* [.]" *See* RESTATEMENT § 349 at 124 (emphasis added); *see also* RESTATEMENT § 349 cmt. a at 124 (emphasis added) ("*Loss in value* and cost or other loss avoided are key components of contract damages."); *see also United States v. Behan,* 110 U.S. 338, 344, 4 S.Ct. 81, 28 L.Ed. 168 (1884) (emphasis added) (holding that the non-breaching party may always recover the "*loss* of actual outlay and expense."). Therefore, the actual outlay of TFC's equity in Transohio Savings was the "contract price" for the Government's cash contribution of $107.5 million to Transohio Savings, and the Government allowing Transohio Savings to amortize $50 million in supervisory goodwill over a 25 year period using a straight-line method of depreciation, which also could be counted as a capital credit toward Transohio Savings' regulatory net worth. *See American Capital II,* 59 Fed.Cl. at 582–82. Therefore, as a matter of law, the value of Transohio Savings' equity as of August 29, 1986 represents TFC's "essential reliance" interest. *See* PX 24. And, the loss of this amount, as a result of the Government's breach, if restored to TFC, will "put [TFC] in as good a position [in which it] would have been in had the contract not been made[.]" RESTATEMENT § 344.

On February 27, 2004, the court determined that TFC's "essential reliance" interest was $126.479 million, representing the equity value of the stock of Transohio Savings, as of August 29, 1986. *See American Capital II,* 59 Fed.Cl. at 580–82 (citing *United States v. Behan,* 110 U.S. 338, 344–45, 4 S.Ct. 81, 28 L.Ed. 168 (1884) (holding the

non-breaching party may always recover the "loss of actual outlay and expense.")); RESTATEMENT § 349 (the essential reliance may be equated with the contract price paid for performance). This valuation of Transohio Savings' stock was made at "book value" and was certified by Transohio Savings' independent auditors, Peat, Marwick, Mitchell and Co., and accepted by the FHLBB without objection at that time. *See* PX 24. On summary judgment, however, plaintiff argued that TFC's "essential reliance" interest should be measured by the "market value" of the Transohio Savings stock, but estimated that value as $216.1 million, based on a report by the FDIC's expert. *See American Capital II,* 59 Fed.Cl. at 580–81. The Government agreed that the "essential reliance" interest should be measured by "economic value," although the Government's estimate of what that amount should be was substantially less than plaintiffs. *Id.* Therefore, the court afforded both parties an opportunity to proffer expert testimony at an Evidentiary Hearing, so the court could consider whether to calculate plaintiffs' "essential reliance" interest by the book value or market value of Transohio Savings' stock. *Id.* at 582, 589.

### b. The Court's Determination Of TFC's "Essential Reliance" Interest By Book Value, Rather Than Market Value.

Prior to the Evidentiary Hearing, the Government argued that the court erred in relying on Transohio Savings' book value to ascertain TFC's essential reliance interest and indicated it would demonstrate at the Evidentiary Hearing that "economic value" was the proper measure of Transohio Savings' "equity value" in 1986. *See* Gov't Pre–Trial Brief at 30–31.

The following chart is a composite created by the court from documents admitted at trial. *See* DX 305 at PAC 087 1075 (Transohio Savings' Form SEC Form 10–K for the fiscal year ending December 31, 1989, summarizing the consolidated statements of Transohio Savings' equity for the years ending December 31, 1986, December 31, 1987, and December 31, 1988) and DX 613 at WON537 2242 (Transohio Savings' OTS

Form 10–K for the fiscal year ending December 31, 1991,summarizing consolidated statements of Transohio Savings' equity for the fiscal years ending December 31, 1990 and December 31, 1991). The data in this chart shows that on December 31, 1986, only three months after the August 29, 1986 Assistance Agreement was executed, Transohio Savings' shareholders' equity or book value was $177.437 million or $50.958 million more than the court's prior determination that TFC's "essential reliance" interest was $126.479 million. On December 31, 1989, only days after the December 7, 1989 breach, Transohio Savings' equity or book value was $167.152 million or $40.673 million more than the court's initial determination of TFC's essential reliance interest at $126.479 million.

### TRANSOHIO SAVINGS' SHAREHOLDERS' EQUITY FISCAL YEARS 1986–1991

| | Common Stock | Paid-in Capital | Retained Earnings | Other | Total Shareholders' Equity |
|---|---|---|---|---|---|
| Balance, December 31, 1986 | $4,200 | 66,471 | 106,901 | (135) | 177,437 |
| Net earnings | — | — | 13,198 | — | 13,198 |
| Payment of dividends | — | — | (4,000) | — | (4,000) |
| Change in net unrealized loss on marketable equity securities | — | — | — | (1,199) | (1,199) |
| Balance, December 31, 1987 | $4,200 | 66,471 | 116,099 | (1,334) | 185,436 |
| Net earnings | — | — | 18,525 | — | 18,525 |
| Payment of dividends | — | — | (8,000) | — | (8,000) |
| Change in net unrealized loss on marketable equity securities | — | — | — | (463) | (463) |
| Balance, December 31, 1988 | $4,200 | 66,471 | 126,624 | (1,797) | 195,498 |
| Net loss | — | — | (19,846) | — | (19,846) |
| Payment of dividends | — | — | (9,000) | — | (9,000) |
| Change in net unrealized loss on marketable equity securities | — | — | — | 500 | 500 |
| Balance, December 31, 1989 | $4,200 | 66,471 | 97,778 | (1,297) | 167,152 |
| Change in net unrealized loss on marketable equity securities | — | — | (44,299) | — | (44,299) |
| | — | — | — | 1,297 | 1,297 |
| Balance, December 31, 1990 | 4,200 | 66,471 | 53,479 | — | 124,150 |
| Net loss | — | — | (122,564) | — | (122,564) |
| Balance, December 31, 1991 | $4,200 | 66,471 | (69,085) | — | 1,586 |

DX 305 at PAC087 1075; DX 613 at WON537 2242.

At the Evidentiary Hearing, Professor Randall S. Kroszner of the University of Chicago, Graduate School of Business and a former member of the President's Council on Economic Advisors, advised the court that determining TFC's "essential reliance" interest by shareholders' equity should have been done by determining the "market value" of Transohio Savings' equity, as of August 29, 1986, which was $93.113 million. See Kroszner Direct 6 at ¶ 14 and Exhibit C at line [F]; TR at 1560. "Market value" was calculated as follows: TFC was listed and traded on the New York Stock Exchange, therefore, TFC's equity value was ascertained by multiplying the reported price per share by the number of outstanding shares as of a date certain. See Kroszner Direct 6 at ¶ 13. Since Transohio Savings was the principal asset of TFC, Transohio Savings' equity was determined by subtracting the value of TFC's assets and other non-Transohio Savings' assets from TFC's equity and adding TFC's liabilities. See Kroszner Direct 6 at ¶ 13 and Exhibit C; see also DX 90 at FAC011 2130 ("for planning purposes, the management of Transohio and TFC consider the two as a single entity[.]"); DX 90 at FAC011 2131 (Transohio Savings' Vice President Deborah Cook stated that "for most purposes, management as well as outside investors consider Transohio and TFC to be a single entity.").

The court does not question Professor Kroszner's methodology; however, recognized experts in the field of accounting have cautioned: "It is also erroneous to assume that there is a direct relationship between book value and the market price of a share of stock. Book value may be one factor affecting the market price, but market prices are influenced by many factors *which simply cannot be quantified.*" *See* FINNEY AND MILLER'S PRINCIPLES OF ACCOUNTING at 372 (8th ed.1980) (emphasis added); *see also* TR at 1857–59 (Professor Kroszner recognized that the drop in Transohio Savings' market value between 1986–1987 was caused by a "stock market break.").[14] The court is aware that the standard valuation of assets used in many contract cases is "market value in contradistinction to any peculiar value the object in question may have had to the owner.... However when the standard is applied to ... shares of stock that are not actively traded... the determination of market value is somewhat fictional." JOHN D. CALAMARI & JOSEPH M. PERILLO, THE LAW OF CONTRACTS § 14.12, at 582 (4th ed.1998) (citing MCCORMICK, DAMAGES § 44). As another leading scholar on contract damages also has observed: "[T]he 'market value' of property is often a matter of opinion or something even less certain than that.... [Thus,] when property values must be found in expert opinions which differ enormously, courts have been willing to say the value finally determined is ascertainable." DOBBS, *supra,* § 3.6(2), at 340. For this reason, Professor Kroszner testified that "market values tend to be forward looking... at the future revenue streams, the future cash flows that would be associated with the asset and the future value if you were to sell that asset, which could deviate from what the historical cost basis was." TR at 1741. Market value also includes a subjective element, because it is based on the "expectations of market participants." TR at 1745; *see also* TR at 1859–62 (Professor Kroszner testifying that "there is a lot of information about prospects and promises and possibilities with a lot of uncer-

tainty associated with [stock market values].").

As discussed in *American Capital II,* 59 Fed.Cl. at 575–76, and herein, the doctrines of certainty and foreseeability are common law limitations applicable to any determination regarding reliance interest. In the court's judgment, utilizing book value better satisfies these limitations for the reasons discussed in the following exchange with Professor Kroszner:

THE COURT: [Y]ou have instructed me is that in your judgment I have made an error in relying on the book value as a starting point of the shareholders contribution... I should have instead looked at [regulatory] market value. Now, I don't know if there is anything in the record I had at that point to look at market value but I do now. I have at least what you have and some other benchmarks. Is that true, that's the first mistake I made?

PROFESSOR KROSZNER: Your Honor, I wouldn't characterize it as a mistake. It is an alternative. And I think a more fruitful alternative in this case is to be focusing on the market value and decline in market values. As you said at the time you had only the accounting values.

THE COURT: I can't remember... whether anybody submitted anything on market value or not but I felt really comfortable going to a consolidated statement by the accountants that the regulators didn't question. No one questioned that that was an accurate number for the book value, so I felt that was a safe haven to go to.

PROFESSOR KROSZNER: Right. I don't want to say that it was a mistake. The key for me is that in both the market value numbers and the accounting value numbers, you see significant declines and as we have discussed earlier, negative tangible capital by 1992 and market value is trivial.

THE COURT: Let me ask it a different way. The reliance damages, the focus of

that in the law is basically to encourage people to contract, in other words—

PROFESSOR KROSZNER: Of course.

THE COURT: That they can depend upon the system basically to provide them with a remedy if things don't work out. In your judgment, looking from that perspective, about what the law intends, do you believe that—what is the advantage or disadvantage of looking, relying or using the book value versus market value?

PROFESSOR KROSZNER: Well, getting back to the earlier discussion, the market values tend to be more forward looking.

THE COURT: Forward looking.

PROFESSOR KROSZNER: Forward looking. And the market's evaluation of what is likely to be happening to an institution. And, you know, where the—what their aspects for profitability, cash flows are. And so I would tend to think that that would be valuable, it would be more valuable to be looking at market values. Here, in some sense we're in the lucky situation that in terms of the movements of the market value and the book value over the long horizon, there can be bumps and differences along the way, but by the time we get to seizure, the book value, the tangible capital is negative and the market value is trivial. And so we see this very, very sharp decline in both. So we have been marking down the assets over time in the book value sense and the markets have been reducing their, value the prospects—

TR at 1923–26.

In this case, the shareholders' equity was reported as the book value of Transohio Savings' stock in the financial documents submitted to all federal regulators, including the FSLIC, FHLBB, and SEC without objection at the time. Moreover, the FSLIC and FHLBB specifically relied on book value as the appropriate valuation of a portion of the amount of consideration Transohio Savings owed the Government for the terms set forth in the August 29, 1986 Assistance Agreement. *Compare* DX 222 at WOT970 0901 *with* TR at 1793 (Professor Kroszner explained to the court that the reason the FHLBB relied on the book value of Transohio Savings was because they were following FASB rules and accounting customs); *see also* RICHARD E. BAKER, VALDEAN C. LEMBKE, AND THOMAS E. KING, ADVANCED FINANCIAL ACCOUNTING 814 (5th ed. 2002) ("[B]ook value... is simply the total amount of the capital, which is also the difference between total assets and total liabilities. Book value is important because it serves as a basis for asset revaluations or goodwill recognition."). And, as Professor Kroszner testified, because "[b]ook values tend to focus on recording the *initial costs associated with purchasing of different assets*. And so they provide, typically... an historical record of what was paid... for various assets." TR at 1741 (emphasis added); *see also* TR at 1862 (Professor Kroszner describing book value as being a "backward-looking measure that looks at historical cost and then puts a variety of adjustments to that."). Moreover, as the Government conceded during the December 3, 2004 oral argument, it would be unfair for the court to deduct RESTATEMENT § 349 losses against an essential reliance interest determined by market value, since in this case those losses were listed on balance sheets wherein shareholder equity was stated by book value rather than market value. *See* Post Hearing TR at 122–23. Perhaps, for these reasons, the United States Court of Appeals for the Federal Circuit accepted without question the use of the book value of stock exchanged in determining the amount of restitution due to plaintiff in another *Winstar* case. *See Hansen Bancorp, Inc. v. United States,* 367 F.3d 1297, 1307, 1317 (Fed.Cir.2004); *see also Old Stone Corp.,* 63 Fed.Cl. at 80 (wherein the Government stipulated based on the facts in that case that book value and market value were the same, *see* Post Hearing TR at 121).

Accordingly, the court has determined that utilizing the book value of Transohio Savings' stock as of August 29, 1986 meets the certainty and foreseeability requirements of the RESTATEMENT and thereby provides a reliable basis for determining Transohio Savings' essential reliance interest.[15] In light of this

---

**15.** It could be argued that the record in this case

supports a determination that the market value

ruling, there was no need for the court to consider TFC's control or acquisition premium argument. *See, e.g.,* Pl. Pre–Trial Brief at 28; TR at 1565–81, 1757–63, 1864–72; *see also* James Direct at 13–14, 49–51.

### c. The Court's Final Determination Of TFC's "Essential Reliance" Interest.

At the Evidentiary Hearing, the court also reviewed documents and heard testimony about a $9 million dividend that Transohio Savings' Board authorized be paid to TFC/AMCAP in fiscal year 1989, the first year that Transohio Savings incurred net losses and without regard to the views of the regulatory authorities. For example, on March 15, 1989, FHLBB Supervisory Agent Doebereiner, advised Transohio Savings' Board: "We expect that advisable portfolio restructuring... will be timely and effectively implemented, even if the recognition of resulting accounting losses would adversely impact the institution's ability to pay dividends." PX 1114 at WON257 0380; *see also* PX 882 at 6 (May 17, 1990 Meeting Minutes of Transohio Savings' Board when FDIC Examiner Leonard also warned "about the likely pressure [from TFC] for dividends from Transohio."). At the Evidentiary Hearing, FDIC Examiner Leonard also testified that he considered this payment "an objectionable practice," given the low levels of capital. *See* TR at 472. He further explained that "normally regulators do not object to paying capital or paying dividends, if the purpose... is to ... pay the debt to acquire an institution... [but][i]f it was for some other reason, to a third party, like [AMCAP]'s cash flow problems, then we did have a problem with that." TR at 472–74; *see also* TR at 531, 572, 649–52 (the former Regional Director of

the FDIC's Chicago Office emphasized the payment of a dividend in 1989 led to the FDIC's decision in 1991 to prohibit Transohio Savings from paying any more dividends: "And one of the last things we were going to ... allow ... was to let more capital leave that institution at that point irrespective of... an agreement five or six years earlier or something like that.").

In addition, regarding the $9 million dividend paid in fiscal year 1989, Professor Kroszner advised the court:

> [W]hen you pay a dividend out, you are paying cash that the institution has out to the outside world that will directly reduce the equity of the firm.

> The shareholder is held the same because the firm is now $9 million, worth $9 million less, but that $9 million is now in the pockets of the shareholders. So they are fine.

TR at 1770; *see, e.g.,* DX 305 at PAC087 1093; DX 613 at WON 537 22456; *see also* TR at 1849–54. But for this dividend payment, Transohio Savings would have incurred a net loss on a consolidated basis of only $10.8 million in fiscal year 1989, instead of $19.8 million. *See* DX 305 at PAC087 1054, 95.

The court does not question Transohio Savings' legal obligation to pay dividends to shareholders as part of a prior agreement with the FHLBB. *See* DX 93 at WON018 2575.[16] TFC, however, may not ignore the fact that this payment imposed an actual loss on Transohio Savings that reduced the value of TFC's equity and hence reduced TFC's "essential reliance" interest from $126.479 million to $117.479 million. *See* ROBERT S. KAY & D. GERALD SEARFOSS, HANDBOOK OF

---

of Transohio Savings actually may have been higher than the book value. *See* PX42 at EAC066 1183 (showing that the $126.479 million book value of Transohio Savings on August 29, 1986 was less than the $153.842 million "net market value of [Transohio Savings'] assets, liabilities, swaps, and [deposit] premiums," reported in an internal company memo "Market Valuation and Interest Rate Sensitivity of Assets and Liabilities," as of September 30, 1987.). The court, however, rejected that assessment of TFC's "essential reliance" interest as not being foreseeable.

**16.** In fiscal year 1987, Transohio Savings had earnings of $13.198 million, from which it paid $4 million in dividends. *See* PX 1075 at PAC087 1075; TR at 2749. In fiscal year 1988, Transohio Savings had earnings of $18.525 million, from which it paid $8 million in dividends. *See* PX 1075 at PAC087 1075; TR at 2749–50. In fiscal year 1987 and fiscal year 1988, however, Transohio Savings did not incur net losses.

ACCOUNTING AND AUDITING at 2–10 (2d ed. 1988) ("HANDBOOK OF ACCOUNTING") ("Distribution to owners are decreases in net assets ... [and] decrease ownership interest or equity in an enterprise."). The court is mindful that our appellate court has ruled in another *Winstar* case that dividends should not be credited to the Government in restitution cases, unless the dividends were derived or due the Government. *See Landmark,* 256 F.3d at 1374. In this case, however, the court is not crediting the $9 million dividend payment to the Government, but instead deducting that amount from the court's determination of TFC's "essential reliance" interest. Moreover, in the court's judgment, to allow TFC to receive $9 million in dividends and the full amount of its "essential reliance" interest would result in a windfall. *See, e.g., Admiral Financial Corp. v. United States,* 378 F.3d 1336, 1345 (Fed.Cir.2004) (holding "[damages] should not be awarded if it would result in a windfall to the nonbreaching party."); *Hi–Shear Tech. Corp. v. United States,* 356 F.3d 1372, 1382 (Fed.Cir.2004) ("Determining the amount of damages to award ... is not an exact science, and the methodology of assessing and computing damages is committed to the sound discretion of [the trial court]."). Therefore, the court has determined that TFC's final "essential reliance" interest should be $117.479 million, which was lost as a direct result of the Government's breach of the August 29, 1986 Assistance Agreement.

### 2. TFC Is Entitled To $42.166 Million Regarding Its "Collateral Reliance" Interest, *i.e.,* The Capital TFC Transferred To Transohio Savings As A Result Of The December 31, 1986 Transohio Rights Offering.

■ The court analyzed plaintiffs' claim concerning the $42.166 million of capital that TFC contributed to Transohio Savings as a result of the December 31, 1986 Transohio Rights Offering in two ways. *See American Capital II,* 59 Fed.Cl. at 582–84. First, the RESTATEMENT recognizes that expenses incurred "in preparation for collateral transactions that a party plans to carry out when the contract is performed" may be recovered as "incidental reliance" or "collateral reliance"

damages. *See* RESTATEMENT § 349 cmt. a. As the United States Court of Appeals for the Federal Circuit has confirmed, there can be more than one type of reliance damages, because the "underlying principle ... is that a party who relies on another party's promise made binding through contract is entitled to damages for *any* losses actually sustained as a result of the breach of that promise." *Glendale,* 239 F.3d at 1382 (emphasis added); *see also* RICHARD A. POSNER, ECONOMIC ANALYSIS OF LAW ("POSNER") § 4.8, at 133 (5th ed.1998) (defining the "reliance loss-[as] the *sum* of the costs [the injured party] incurred as a result of the contract[.]") (emphasis added).

Although the August 29, 1986 Assistance Agreement did not require plaintiffs to provide Transohio Savings with any amount of capital after the acquisition of Citizens/Dollar, shortly thereafter plaintiffs executed plans previously discussed with the regulators to provide Transohio Savings with over $40 million of additional capital to support *"additional* growth and acquisitions of Transohio [Savings]." *See American Capital II,* 59 Fed.Cl. at 583 (citing Pl. Motion for Partial S.J. on Damages at 27 (emphasis in original)); *see also* DX 30 at PAC024 1574. In fact, the record evidences that the FHLBB had actual knowledge of these plans some time prior to June 1985, at the time AMCAP issued an $80 million subordinated debt offering, which the FHLBB conditioned so that a substantial portion of the proceeds would be available to be provided as capital to Transohio Savings after it merged with Citizens and Dollar. *See* DX 29 at WOT286 0074; Pl. P.H. Appendix at 736, 857–58.

The court also determined that, on August 29, 1986, when the Assistance Agreement was finalized, the Government had actual notice and therefore reason to foresee that an additional $42.166 million in capital would be made available to Transohio Savings as a result of a Transohio Rights Offering. *See American Capital, II,* 59 Fed.Cl. at 583 (citing Pl. Motion for Partial S.J. on Damages Appendix at 640, 648–49; DX 30; TR at 2677–83.) Again, the fact and amount of this additional capitalization are a matter of public record in plaintiffs' Securities and Ex-

change Commission disclosures. Moreover, they are not contested by the Government and meet certainty requirements. In addition, but for plaintiffs' reliance on the full benefit of the Government's contractual promises regarding the $107.5 million capital credit and amortization of the $50 million in supervisory goodwill, plaintiffs would not have gone forward with the $42.166 million Transohio Rights Offering. *See American Capital, II,* 59 Fed.Cl. at 583 (citing Pl. Motion for Partial S.J. on Liability Appendix at 9; Pl. Motion for Partial S.J. on Damages at 641; Pl. P.H. Appendix at 738 (May 6, 1986 FSLIC Application H-(e)3 of AMCAP, TFC and Transohio Savings re: Acquisition of Citizens/Dollar advising "Applicants view Federal Home Loan Bank Board approval of the applications and requests submitted in connection with the [Transohio] Rights Offering ... as integral to the acquisitions of Citizens and Dollar.")); *see also* DX 412 at WOT665 0016 (Sept. 27, 1990 letter to FDIC representing that the "$42.2 million of common equity has been contributed by [AMCAP] ... at a time when the Bank was unable to raise capital independently. Also, the regulators encouraged [AMCAP] to raise funds to enable it to acquire supervisory institutions. The issuance of the debt was reviewed and approved by the FHLBB.").

Therefore, plaintiffs demonstrated that the $42.166 million was made in a collateral transaction to support the implementation of the August 29, 1986 Assistance Agreement, as well as to finance other potential acquisitions to leverage Transohio Savings' regulatory net worth. As the United States Court of Appeals for the Seventh Circuit held in *Designer Direct, Inc. v. DeForest Redevelopment Authority,* 313 F.3d 1036, 1049 (7th Cir.2003), specifically relying on *Glendale,* "[t]he RESTATEMENT and case law are clear.... [R]eliance damages are not limited to those expenses made in relation to duties spelled out in the contractual agreement."

In the alternative, the court determined that the $42.166 million capital collateral in Transohio Savings resulting from the Transohio Rights Offering may be viewed as consideration and acceptance of the terms of the September 10, 1986 FHLBB Forbearance Letter. *See American Capital II,* 59 Fed.Cl. at 583 (citing Pl. Motion for Partial S.J. on Liability Appendix at 293–94). On October 31, 2003, the court held that the August 29, 1986 Assistance Agreement was breached by the enactment and implementation of FIR-REA with regard to the plaintiffs in this case. *See American Capital I,* 58 Fed.Cl. at 409. In doing so the court, like the United States Court of Appeals for the District of Columbia in a related case, did not consider whether the September 10, 1986 FHLBB Forbearance Letter was a part of the contract between the parties. *Compare American Capital I,* 58 Fed.Cl. at 408 *with Transohio Sav. Bank v. Director, Office of Thrift Supervision,* 967 F.2d 598, 618 (D.C.Cir. 1992). Therefore, even if the court has misconstrued the law regarding "collateral reliance," the court is well within existing precedent in granting summary judgment to Transohio Savings' sole shareholder for its "essential reliance" interest based on the separate agreement that arose as a result of the "post-contract" September 10, 1986 FHLBB Forbearance Letter and subsequent acceptance by TFC, by proceeding with the Transohio Rights Offering that resulted in a $42.166 million capital contribution to Transohio Savings. The factual circumstances here are unique. Transohio Savings was a party to the Forbearance Letter Agreement, but it only had one shareholder, TFC, that also was a signatory on the August 29, 1986 Assistance Agreement that established regulatory net worth requirements. *See American Capital II,* 59 Fed.Cl. at 584 (citing Pl. Motion for Partial S.J. on Liability Appendix at 265–66 (establishing "net worth maintenance" covenants binding TFC)). Therefore, in the court's judgment, TFC was entitled to the benefits of the September 10, 1986 Forbearance Letter as a third-party beneficiary. *See FDIC v. United States,* 342 F.3d 1313, 1319 (Fed.Cir.2003) (citing RESTATEMENT § 315) (quoting *Glass v. United States,* 258 F.3d 1349, 1354 (Fed.Cir.2001)) ("Third party beneficiary status is an 'exceptional privilege' and, to avail oneself of this exception privilege, a party must 'at least show that [the contract] was intended for his direct benefit.'").

Accordingly, the court has determined that the proper amount of TFC's "collateral reliance" interest is $42.166 million, the capital TFC transferred to Transohio Savings as a result of the December 31, 1986 Transohio Rights Offering, which was lost as a direct result of the Government's breach of the August 29, 1986 Assistance Agreement.

## D. Calculating Damages Based On The Reliance Interest.

■ Damages based on the reliance interest reimburse the injured party so that the party is "put in as good a position as he would have been in had the contract not been made[.]" RESTATEMENT at § 344; see also FARNSWORTH, supra, § 12.16, at 280 (stating reliance recovery may be reduced to the extent that the breaching party can prove "any benefit received [by the claimant] through salvage or otherwise."). Accordingly, after determining the amount of payments made by the plaintiff based on its total reliance interest, i.e., "essential reliance" plus "incidental reliance" or "collateral reliance," the court should first deduct any benefits "plaintiff receives from the expenditures in reliance." DOBBS, supra, § 12.3(1), at 51–52; see also FULLER AND PERDUE, supra, at 81 ("If a plaintiff should perform his side of the contract and then claim both compensation for the reliance involved in his performance and at the same time the full value of the defendant's performance, it would be obvious that he was asking too much.").

Therefore, the RESTATEMENT provides that further deductions should be taken for "any loss that the party in breach can prove with reasonable certainty the injured party would have suffered had the contract been performed." RESTATEMENT § 349; see also RESTATEMENT § 351. As the relevant comment to RESTATEMENT § 349 explains, the burden of establishing any losses defendant claimed would have been incurred by plaintiff, even if the contract had not been breached, falls squarely on the defendant. See RESTATEMENT § 349 cmt. a ("[I]t is open to the party in breach to prove the amount of the loss, to the extent that [it] can do so with reasonably certainty ... and have it subtracted from the injured party's damages."); see also POSNER,

supra, § 4.8 (since the "reliance measure [is] on the victim's loss from the breach," reliance damages may never exceed the plaintiff's "net reliance loss."); DOBBS, supra, § 12.3(1). For this reason, the "reliance measure of damages ... will tend, therefore, to understate the social costs of breach." POSNER, supra, § 4.8.

## E. Regulatory Enforcement Attitudes After FIRREA.

On December 7, 1989, FIRREA abolished the FSLIC and made the OTS the primary federal supervisory authority instead of the FHLBB. See Winstar, 518 U.S. at 856–57, 116 S.Ct. 2432. The FDIC was relegated to a "backup" supervisory role. Id.; see also TR at 557–58. At the Evidentiary Hearing, the court heard testimony illustrating the "sea change" in regulatory enforcement attitudes that occurred after the enactment and implementation of FIRREA.

For example, as previously discussed, on October 21, 1987, the FHLBB and the State of Ohio gave Transohio Savings' management a "2" rating and an overall institution composite rating of "3" for the period January 1986–May 1987. See DX 90. At the Evidentiary Hearing, FHLBB Supervisory Agent Benham, who conducted that Joint Examination, advised the court that after AMCAP acquired Transohio Savings the "institution itself seemed to take on a lot different risk profile ... also seemed like the Board of Directors didn't seem to be watching management as closely as we thought they had under the prior administrations." TR at 85. Because Supervisory Agent Benham's 2004 opinion of Transohio Savings' management's performance seemed in conflict with the October 21, 1987 "2" rating, the court interrupted the questioning to probe further:

GOVERNMENT'S COUNSEL: What position did Mr. Burstein hold in the organization to the best of your recollection?

MR. BENHAM: I think he was Chairman of the Board.

GOVERNMENT'S COUNSEL: And how qualified did you consider Mr. Burstein to run a thrift of Transohio's size?

MR. BENHAM: I didn't really think he was well qualified. He had been an ac-

countant by profession ... and his only exposure to banking was very limited just prior to the acquisition of Transohio.

COURT: Did you make those views known in writing?

MR. BENHAM: No.

THE COURT: Why?

MR. BENHAM: I was never asked to.

THE COURT: Okay. It was not part of your job responsibility? Is that what you are saying? To evaluate the professional merits of potential—

MR. BENHAM: As an agency, you only did that when the institution was in a troubled condition and was putting in executive officers. And at the time that American Capital acquired TransCapital and Transohio Savings, they were not in a troubled condition.

THE COURT: So as long as the institution is solvent, frankly the agency really doesn't care or do any due diligence about the board members; is that what you are saying?

MR. BENHAM: Normal board members, no. If you file an application to acquire someone, we do background checks, FBI checks, to see if there is anything that jumps out, but we really do not make—

COURT: Did anything jump out—

MR. BENHAM: No.

THE COURT:—regarding this individual at that time?

MR. BENHAM: —No. We don't make assessments as to their professional competence to run an institution.

TR at 93–95.

From May 1987 until March 1989, no regulatory agency ever conducted an overall institution examination of Transohio Savings. *See* DX 222. Shortly after September 6, 1989, a Joint Examination was issued for the period of March 30, 1989–September 6, 1989, wherein Transohio Savings received an overall composite rating of "3." Four months later, on February 20, 1990, the FDIC commenced an examination utilizing information as of the close of business December 31, 1989, wherein Transohio Savings received an overall composite rating of "5." *See* DX 323. When the FDIC Examiner–In–Charge of

that examination was asked about the agency's response to learning that Transohio Savings made a $9 million dividend payment in 1989, at a time when the institution first incurred net losses and despite the fact that Transohio Savings' Board had been warned not to pay out any dividends, he responded:

MR. LEONARD: I noted the problem.

THE COURT: Then what happen[ed]?

MR. LEONARD: Nothing. I mean, unless-you know, the capital is gone. They can't bring it back. Normally what the regulators do is if an institution is in serious shape or has significant problems, they initiate a corrective program and a corrective program may say: You will not pay dividends without the prior written approval of the FDIC or the—

THE COURT: But that didn't happen at this time.

MR. LEONARD: It didn't happen at this time, no.

TR at 474. What type of message did the OTS send Transohio Savings by not taking immediate action regarding the $9 million dividend payment?

As for the FDIC, the former Regional Director of the Chicago Office told the court that, if concerns were justified, the FDIC would issue a Cease and Desist Order, pursuant to Section 8–T of the Federal Deposit Insurance Act, allowing the FDIC to impose corrective action, even though it was not the primary regulator. *See* TR at 603–05, 613. In fact, despite Transohio Savings' composite rating of "5," based on the FDIC's February 20, 1990 examination, the former Regional Director of the FDIC's Chicago Office admitted that: "we believe[d] [that] the proposed corrective actions [were] sufficient to address the problems in evidence and that Section 8(a) action [was] premature ... we did not feel at this point in time that [Transohio Savings] was uninsurable... by the time we proceed with a Section 8(a) ... we really ... do not want to insure that institution any more." TR at 600; *see also* DX 355 at FAC009 1427.

The court had difficulty understanding how an institution with a "5" rating did not war-

rant the FDIC's immediate issuance of a Cease and Desist Order.

THE COURT: It seems to me that the—it wasn't just this institution ... after FIRREA, were kind of operating a little bit in a schizophrenic regulatory environment because the OTS were the primary regulators and the people they needed to satisfy first, I mean, their first priority had to be on those folks.

MR. MASA: Yes, Your Honor.

THE COURT: And then ... the FDIC comes in and they had what appeared to be a slightly distinct, different way of doing the analyses.

MR. MASA: Right.

THE COURT: Perhaps, if I can say so, more rigid or more—you were protecting the fiscal first; that was what you were worried about.

MR. MASA: Since 1933.

THE COURT: So you would look at things really with a much more, I would think, jaundice eye because you want to really protect the backside, and really looking to protect the Federal Government here, so if there was something on the margin you would be more conservative, if I may say so. Is that fair or am I being unfair?

MR. MASA: After a period, we had been in business since 1933. We feel we have been very successful, but I will say this.

THE COURT: Certainly Congress felt you were successful.

MR. MASA: Yes. I don't believe we would have gotten this responsibility if they didn't have faith in us and that we had done our job over many, many, many years. And I will also say this: We're looking at a very, very difficult situation here, failure.

\*     \*     \*     \*     \*     \*

THE COURT: I am not making value judgments. Exactly what I am trying to say [was] there really ... a schizophrenic regulatory picture?

MR. MASA: I cannot argue with that, Your Honor. It was a completely changed structure, that is true.

TR at 667–71. What type of message did the OTS send Transohio Savings by not immediately issuing a Cease and Desist Order after assigning the institution a "5" composite rating? In the court's judgment, the financial institution could only read the rating as being inflated to cover the regulators, in the event of a failure.

The FDIC examination noted that, on May 17, 1990, a meeting was held with Transohio Savings' board of directors and representatives of the FDIC, OTS, and Ohio Department of Commerce to discuss the findings of the FDIC examination. See DX 323 at FAC009 1721. The examination also noted that the board of directors was receptive to the regulators' comments and indicated that the board would take action to correct deficiencies. See id. Although the examination reveals that the FDIC's authority to terminate insurance and back-up authority to take formal Cease and Desist action was discussed at the meeting, the examination does not indicate that the FDIC told the board that it would pursue a Cease and Desist Order. See id. The examination only noted that the FDIC had indicated to the board that "that the Chicago Regional Office would be in close contact with the Cincinnati OTS to ensure that action was taken to improve the condition of Transohio and protect the depositors." Id.

One of the most vivid examples of the post-FIRREA schizophrenic regulatory environment is evidenced in the March 8, 1990 Minutes of a Joint Meeting of the Boards of AMCAP, TFC, and Transohio Savings with the top OTS regional officials and examiners, wherein it was reported that:

> Mr. Muldoon [OTS Executive Vice President of Regulatory Functions in the Cincinnati Office] advised the Boards that the OTS is being very tough. With respect to [Transohio Savings'] capital compliance, he indicated that the *primary* focus was on ... asset classifications. He advised the Boards that *this meeting was in the middle of the spectrum of various types of supervisory conferences in this District.* The purpose of the meeting was to advise

each Board of the regulatory concerns at the same time.

DX 331 at PAC065 2041 (emphasis added).

\* \* \* \* \* \*

Mr. Burstein asked Mr. Muldoon if the regulators wanted him to resign. Mr. Muldoon affirmatively stated that they do not want him to resign.

*Mr. Burstein then asked if there was any other specific action that would be required to make the regulatory authorities comfortable and Mr. Muldoon stated that there were no specific actions required. Mr. Muldoon reiterated that as far as supervisory conferences went, this meeting was middle of the road. When the regulators have "serious" concerns, they require action to be taken-they do not ask.* He said he has trained his staff to be hardnosed and cynical and this is what we had seen at the meeting. Thrift regulators had been severely criticized and they were very concerned that they act conservatively and take strong positions with the institutions they supervise.

[Francis] Coy [a member of the TFC Board of Directors] asked if the regulators would like any [AMCAP] affiliates to resign from the TFC Board and Mr. Muldoon replied in the negative. Mr. Coy also questioned Mr. Muldoon about the assignment of the [prior OTS] Macro rating of 3. Mr. Muldoon advised that there was concern with [AMCAP's] influence among his staff. However, the biggest problem was the poor performance in 1989. He advised the Board that the most positive step they could take was to produce a plan for good earnings and to bolster the capital of the institution. *He indicated that he was satisfied with the performance of management and that this confidence had been reflected in their approval of the Citizens and Dollar acquisitions and support for the AmeriFirst acquisition.* Mr. Muldoon recognized the problems caused by the C & D acquisition.

DX 331 at PAC065 2042 (emphasis added).

What type of message did the OTS send Transohio Savings by advising the institution that it was "in the middle of the road" and declining to address the institution's inquiry about specific steps that the OTS agency staff had been advocating internally to turn the situation around?

## F. The Arguments Of The Parties.

### 1. Summary Of The Government's Argument.

#### a. Causation.

The centerpiece of the Government's argument was the continuing argument that TFC failed to establish that "the breach was . . . the source of . . . Transohio's continuing losses." Gov't Post–Trial Brief at 2; *see also* Post Hearing TR at 123–52. The Government, however, misconstrued and misstated TFC's causation burden. The breach occurred on December 7, 1989, upon the enactment and implementation of FIRREA that no longer allowed Transohio Savings to count capital credits and supervisory goodwill toward meeting regulatory capital requirements, pursuant to the terms of the August 29, 1986 Assistance Agreement. At that time, the Government became liable to TFC for its reliance interests, fixed prior to that time, because the Government caused the breach and TFC was deprived of the full benefits of the August 29, 1986 Assistance Agreement. *See* RESTATEMENT § 235(2) (*"When performance of a duty under a contract is due any non-performance is a breach."*) (emphasis added); *see also Bluebonnet Sav.,* 266 F.3d at 1356 (holding that reliance damages are appropriate where the plaintiff shows that, but for the breach, plaintiff would not have agreed to the contract or that the breach "adversely affected the terms of the [contract]."); DOBBS, *supra,* § 12.4(2), at 65 (When plaintiffs claim consequential damages they must prove that the "breach in fact caused the loss they claim."). Thus, the causation-in-fact requirement "prevents the plaintiff's recovery for any losses not proven to have occurred at all, for losses which in fact occurred as a result of factors wholly other than the defendant's breach, and for losses which in fact occurred but which would have resulted even if the defendant had not breached." *Id.* at 66. Here, TFC would not have been a party to the August 29, 1986

Assistance Agreement nor the Transohio Savings' offering that raised and contributed $42 million to Transohio Savings as additional equity if it thought that the Government had liberty to breach the terms of the Assistance Agreement. *See* Pl. P.H. Appendix 738 (May 6, 1986 FSLIC Application H-(e) 3 of AMCAP, TFC, and Transohio Savings re: Acquisition of Citizens/Dollar).

Nevertheless, having determined that the Government was liable for the breach in *American Capital I*, 58 Fed.Cl. at 401 and that the loss of TFC's reliance interests was caused by the breach and that TFC's reliance interests were both foreseeable by the Government and certain in *American Capital II*, 59 Fed.Cl. at 576, the only legal determination to be made thereafter was to ascertain the amount of any RESTATEMENT § 349 losses and any credits due for benefits that Transohio Savings received from the Government prior to the breach.

### b. Transohio Savings' Net Losses.

In the alternative, the Government argued that for fiscal years 1989 until mid–1992, Transohio Savings lost approximately $200 million that would have been incurred irrespective of the breach. *See, e.g.,* DX 305 at PAC087 1054; DX 453 at WOT970 0515; DX 613 at WON537 2228; PX 715 at C–AC–K– 0031355; *see also* TR at 1120 (Dr. Hamm estimated between January 1, 1989 and June 30, 1992 Transohio Savings lost $218 million).

The Government identified the following individual and net losses incurred by Transohio Savings for each of the fiscal years 1989–1992, as reported in Transohio Savings' SEC Form 10–K and OTS Forms 10–K, and effectively employed the testimony of former regulators and experts in certain circumstances to describe why they believed those losses would have been incurred by Transohio Savings irrespective of the breach.

In fiscal year 1989, the Government argued that Transohio Savings lost: $9.4 million associated with the termination of the aborted AmeriFirst acquisition; $14.1 million associated with losses from downsizing and phasing out AmeriStar's mortgage banking business; and $4 million from having to write off losses from the sale of junk bonds. *See* Gov't Post–Trial Brief at 56–58. In addition, the Government implied that the $9 million dividend paid in fiscal year 1989 also should be treated as a loss for RESTATEMENT § 349 purposes. *See* Gov't Post–Trial Brief at 61.[17]

In fiscal year 1990, the Government argued that Transohio Savings lost $30.2 million relating to loan losses and $17.4 million in restructuring charges. *See* Gov't Post– Trial Brief at 61–67.

In fiscal year 1991, the Government argued that Transohio Savings lost "a staggering $122.6 million." Gov't Post–Trial Brief at 67 (citing DX 613 at WON537 2228). The components of that loss were $38.418 million relating to loan losses; $26.076 million of foreclosed real estate; $15 million in losses from increased amortizations; $26.7 million in mortgage servicing, including $9.7 million relating to Transohio Savings' I/O strips and $17 million for losses from the sale of securities that had to be recorded at the lower of cost or market ("LOCOM"); and an $18.3 million write off of remaining goodwill. *See* Gov't Post–Trial Brief at 67–72.

The Government argued that "absolutely none of these losses was caused by the phase-out of goodwill. Rather, these losses were caused by Transohio's own business decisions, combined with inadequate management and internal procedures, and external factors such as declining interest rates, increasing mortgage prepayments, and a deteriorating real estate market." Gov't Post– Trial Brief at 73; *see also* Kroszner Direct ¶ 19, at 9–10 (losses during the period 1990 through 1992 were caused by "operating factors, not the [b]reach."); Post Hearing TR at 154–207.

In advising the court how to conduct an analysis under RESTATEMENT § 349, the Government stated that the court first should focus on:

> [the] decrease in the value of the institution before the breach and further decreas-

---

17. For the reasons discussed earlier, the court has determined the $9 million dividend should be treated as a diminution of TFC's essential reliance interest, not as a loss. *See* HANDBOOK ON ACCOUNTING, *supra*, at 2–10.

es after the breach, [and determine that] the institution would have failed under the reliance theory of damages [and], the Plaintiffs shouldn't receive any damages ... [if] Plaintiffs [lost] their investment ... at any time. It doesn't matter if they would have failed on the date of FIRREA, the next day, because we're trying to think what would have happened in the real world. And if in the real world the Plaintiffs would have failed, if the Plaintiffs lost their investment in Transohio in the absence of the breach, then they ... lost their investment. We don't have to focus solely on would they have failed on the date of the breach.

TR at 816–17; *see also* TR at 825, 1228–29 ("[I]t is the Government's position that they certainly weren't seized in the real world when they lost their goodwill, so that couldn't have been the harm at the time of the breach[.]"); TR at 1232 ("Plaintiffs' expenditures were $168 million in reliance on the contract, we're saying that they would have lost those expenditures regardless of the breach. That's true whether you focus on the date of the breach, whether you focus on the date of seizure.... But [if] you focus on the date of seizure, you add back the good-

will, if you look at everything that happened in the interim, they would have been seized even in the absence of the breach."); *see also* TR at 1909–11 ("There is no dispute that [Transohio Savings] lost a lot of value. You can talk about whether they were worth 160 or 93 million in '86 but there is no dispute by 1992 all, virtually all of that was gone.... It doesn't matter whether you look at market value or book value.... There is precious little dispute that virtually all of these losses cannot possibly be linked to the phaseout of goodwill.... So their only link, their only hope is the toothfairy theory. Yes, we lost whatever value it was by 1992, probably we lost it for reasons that have absolutely nothing to do with the breach, but if you pretend that we would have stayed open, then you should also pretend that we would have regained that value back.").

Following the oral argument, at the court's request, the Government submitted the following charts summarizing its argument that all of the losses incurred by Transohio Savings in fiscal years 1989–1992 were not related to the breach, but were attributed solely to independent and unrelated actions by Transohio Savings.

### The Government's Summary of Plaintiffs' Investment Prior to the Breach and Losses Incurred Thereafter
(Footnotes 18–24 herein were authored by the Government)

| Plaintiffs' Investment At End Of 1989 | 1989–92 (Losses) | Losses Caused By The Breach |
| --- | --- | --- |
| $35.718 Million (market value) [18] | 1989—$19.8 Million<br>1990—$44.3 Million | − $712,000 (Shrink) [19] |
| | 1991—$122.6 Million<br>1992—$13 Million | $  0 (I/O LOCOM) [20]<br>$  0 (GW Write-off) [21] |
| Book Value Of Transohio At End Of 1988 | $199.7 Million | $  0 (1990 Restructuring) [22] |

18. Kroszner Direct Testimony at Ex. C.

19. Kroszner Direct at Ex. H (correcting Professor James's initial $20.1 million shrinkage calculation (PX 611)); Professor James's $58 million trial calculation ($43.7 million through 6/30/92) does not track Transohio Savings' shrinkage.

20. LOCOM adjustment simply reflects current market value, not a loss the breach caused; moreover, plaintiffs decided to sell I/O strips for business reasons (DX 236 at 1–2; PX 904 at WON095 2015–16; DX 634 at I–1, II–9).

21. Final write-off of goodwill was not a cash loss, and, in any event, was based upon the conclusion of Transohio and its auditors that the goodwill was not recoverable through future profitable operations (DX 613 at WON537 2238; DX 629 at 1).

22. Restructuring was "good irrespective of FIRREA" (DX 426 at FAC008 1228); moreover, the largest part of restructuring, closing of AmeriStar, was based upon continuing losses at AmeriStar (DX 431 at FAC008 1310); and small restructuring charge of $420,000, related to sale of Columbus branches (DX 453 at WOT970 0524), was more than offset by expected annual savings of $3.5 million (DX 420 at WON178 0958–59).

$195.498 M

$199.700 Million

$ 0 (Columbus GW) [23]

−$ .188 Million

$900,000 (Mortgage

−$199.512 M (Non–Breach Losses From

$199.512 Million [Net Losses Caused

Banking Income) [24]

1989–1992)

By Non–Breach

$ 188 Thousand

−$ 4.014 (remaining book equity at 6/30/92)

Factors]

### The Government's Reconciliation of Total Net Losses with Individual Items of Loss
### (Footnotes 25–34 herein were authored by the Government)

| YEAR | TOTAL NET LOSS | INDIVIDUAL ITEMS OF LOSS IDENTIFIED IN 10–K | NET GAIN OR LOSS ON OTHER ASPECTS OF BUSINESS |
|---|---|---|---|
| 1989 | $ 19.8 Million [25] | $ 9.4 M—Termination Of AmeriFirst Acquisition<br>$ 14.1 M—AmeriStar Losses<br>$ 4.0 M—Junk Bond Losses<br>$ 27.5 Million [26] | $7.7 Million Gain |
| 1990 | $ 44.3 Million [27] | $ 26.3 M—Provisions For Loan Losses<br>$ 17.4 M—Restruct. Charge<br>$ 43.7 Million [28] | $ .6 Million Loss |
| 1991 | $122.6 Million [29] | $ 38.4 M—Provisions For Loan Losses [30]<br>$ 26.1 M—Losses On Foreclosed Real Estate [31]<br>$ 15.0 M—Mortgage Banking Losses, Stemming From Increased Amortization [32]<br>$ 26.7 M—Losses On Mortgage Derivatives [33]<br>$ 18.3 M—Goodwill Write Off [34]<br>$124.5 Million | $1.9 Million Gain |

### 2. Summary Of TFC's Argument.

23. Columbus goodwill write-off was not a cash loss, and, in any event, was almost entirely offset by $13.1 million premium received upon sale. PX 223 at FAC008 1621.

24. All but $900,000 of foregone mortgage banking income was offset by corresponding savings. DX 613 at WON537 2237. Even the $900,000 figure is an over-estimate of breach-induced losses, since much of the lost mortgage banking income was due to closing of AmeriStar, which would have been closed even absent the breach.

25. DX 305 at PAC087 1054.

26. DX 305 at PAC087 1055.

27. DX 453 at WOT970 0515.

28. DX 453 at WOT970 0515.

29. DX 613 at WON537 2228.

TFC does not dispute the amount of the

30. DX 613 at WON537 2243. These provisions for loan losses appear to encompass the "net loan charge-offs," which are listed separately in DX 613 at WON537 2228, but are not included separately in Transohio Savings' Consolidated Statement of Operations, DX 613 at WON537 2243.

31. DX 613 at WON537 2243.

32. The amortization expenses related to Transohio Savings' mortgage banking operations, which are identified on page WON537 2228 of DX 613, are not separately broken out in Transohio Savings' Consolidated Statement of Operations, DX 613 at WON537 2243. The Consolidated Statement of Operations lists total mortgage banking losses of $15 million. DX 613 at WON537 2243.

33. DX 613 at WON537 2228, 43.

34. DX 613 at WON537 2228.

net losses incurred during fiscal years 1989–1992, but argued that most would not have been incurred if the regulatory capital benefits of the August 29, 1986 Assistance Agreement had been honored. *See* Pl. Post–Trial Brief at 74–75 ("[P]laintiffs have demonstrated that the breach caused more than $130 million in losses and foregone earnings. This analysis does not even take into account other losses caused by the breach that have not been quantified, such as Transohio's higher relative operating costs and costs of deposits, and unnecessarily aggressive asset writedowns that would likely not have been forced upon Transohio were it not for the capital problems stemming from the Government's breach.").

Since the Government had the burden of proof at the Evidentiary Hearing to establish with reasonable certainty any losses that Transohio Savings would have incurred irrespective of the breach, as a strategic matter, TFC did not directly rebut individual losses that were identified by the Government. Instead, TFC's briefs and arguments focused on three broad responsive themes. First, but for the breach, Transohio Savings would not have embarked on a strategy to survive FIRREA by selling off their most valuable assets or acquiesce to the insistence of the write off of other losses in a manner that improved Transohio Savings' earning capacity, but eventually imposed enormous loan loss reserves, other costs, and/or resulted in the "fire sale" of the thrift's remaining assets. *See* Pl. Post–Trial Brief at 73–75. Second, if the disallowed "contractual capital were simply added back to Transohio's balance sheet, Transohio's regulatory capital position would have been stronger than *any* bank seized in 1992." *See* Pl. Post–Trial Brief at 72–73. Third, Transohio Savings today would be worth substantially more than the $168.645 million in reliance interest, if the IMCR had not been imposed in May 1991. *See* Pl. Post–Trial Brief at 75–79.

TFC's COUNSEL: [S]tart with the proposition that . . . the reliance interest is the $168 million . . . [s]o the question . . . is would the Plaintiffs have lost their investment if the Government had kept its word and honored the contract? Now, we disagree with the Government on looking at what happened to the value during interim periods. We think that if the Court finds, Number 1, the bank would have survived if they had honored the contract, and, Number 2, the Plaintiffs' investment would be worth anything above the [$]168 [million] that the Court has already found was the reliance interest, then that's the recovery.

TR at 818.

\*     \*     \*     \*     \*     \*

TFC's COUNSEL: Just so we are clear . . . we actually have two alternative theories on this. One . . . if the regulatory contract had been there at the time, the business would have taken a better run through the economic [recession] . . . . The second line of analysis that's similar to but slightly separate from the business would have taken a better run through the recession is even if on a business basis, it just took the same run . . . with the regulatory capital, the capital ratios look a lot better . . . if we had, even if things weren't any better, and they would have been between '89 and '92 . . . with the additional cushion of the regulatory capital, a little bit more time would have been enough, we turn the corner[.]

TR at 820–22.

\*     \*     \*     \*     \*     \*

TFC's COUNSEL: Between 1989 and 1992, the losses would have been substantially less because there would have been a lot more earnings from the part of the bank that was lopped off in direct response to the breach, Number 1, and, Number 2, there would be a lot less regulatory backing and forthing that led to a lot of trouble. . . . Number 3 . . . that additional earning and that additional capital . . . would have been enough to keep the doors open as of 1992, . . . and after 1992, the thing would come back[.]

TR at 2384–87.

Professor Kroszner's testimony at the Evidentiary Hearing also was helpful in explaining why simply adding back the adjusted $120 million in contractual regulatory capital lost as a result of the breach would not have made Transohio Savings whole, either at the

time the IMCR was imposed in 1991 or in 1992, because:

> [t]he OTS's seizure decision is based on the risks that the institution poses to the Deposit Insurance Fund and ultimately the taxpayers. And so they make that assessment and then they look at the capital cushion that is there to protect against those losses.

TR at 1607–08. Regulatory capital was an accounting mechanism, not actual capital that would effect the risk to the insurance fund or absorb losses. *See* TR at 1614, 2329; *see also* TR at 2291 (regulatory capital would have "no impact on margins."); TR at 2366–68 (same). Nevertheless, Professor Kroszner testified in response to a question as to whether contractual regulatory capital had economic value: "It is necessary to meet capital requirements in order for an institution to stay open. So to the extent that regulatory capital can help an institution to meet its capital requirements, it can have value." TR at 1845.

The court agrees that simply adding back disallowed contractual capital at any given point after the breach was irrelevant to determining the RESTATEMENT § 349 losses that Transohio Savings would have incurred irrespective of the breach. Moreover, whether Transohio Savings would or would not have been profitable if it had been able to avoid the final cannibalization of its assets and earning capacity, inevitable after the imposition of IMCR, likewise was irrelevant to the RESTATEMENT § 349 loss determination.

On the other hand, in the court's judgment, the most effective of TFC's arguments and the subject of much of the Evidentiary Hearing was Transohio Savings' decision starting in mid–1989, in anticipation of FIRREA, to embark on an aggressive program to sell the most marketable parts of its portfolio in the attempt to meet FIRREA's new regulatory capital requirement and survive. Mr. Wooldredge, a former TFC and Transohio Director and CEO of Transohio Savings, summarized the malignant effect of the breach, which required the sale of Transohio Savings' most liquid and profitable assets to reduce asset size and costs to meet the new regulatory capital requirements.

MR. WOOLDREDGE: [The breach] had a major negative impact in that it withdrew or took away some regulatory capital or capital that counted towards regulatory capital. It really put us in a very severe bind. We had done an acquisition with a contract that we would be able to have that capital. And since that capital was removed, we were then saddled with an acquisition we, I don't think, ever would have made without that capital. Because there were some problem loans that came about, not surprisingly, in those acquisitions that hurt us, brought us about a lot of losses that we never would have had if we hadn't made that acquisition. We never would have made the acquisition, so I can be clear, without that regulatory capital. And that regulatory capital was the basis then for us to continue to grow or a basis when we lost that capital, it caused us to have to drastically, totally, really, 180 degrees, change our strategy. And in changing that strategy then had to take some decisions that had some, you know, major negative impacts on us.

TFC's COUNSEL: What types of decisions are you referring to?

MR. WOOLDREDGE: Well, we had to downsize. Since we no longer had that capital, we had to downsize. And in downsizing, we had to sell assets. And when you sell assets that you can sell, obviously, and those are some of our better assets and we had to do this fairly quickly, so we weren't always selling at the right time or in the right way we wanted to, so that we were hurt by this, major hurt, I would say.

TFC's COUNSEL: To what extent if any did that shrinkage impact Transohio's earnings?

MR. WOOLDREDGE: Oh, it materially impacted our earnings going forward negatively.

TFC's COUNSEL: And to what extent, if any, did that shrinkage have any impact on Transohio's cost structure?

MR. WOOLDREDGE: Well, that's a very interesting question because obviously we had built up a cost structure, G & A, whatever you want to call it, to bring about growth. And when we lost the regulatory

capital and had to start shrinking, we didn't need that structure any longer. Well, as a businessman, I can tell you, you cannot-when you change your direction quickly, you cannot, you know, eliminate or downsize your cost structure as fast. And so it hurt us in a major way. Again, it caused losses or helped cause losses we would not otherwise have had.

TFC's COUNSEL: And what effects if any did the shrinkage have on Transohio's ability to deal with any asset quality issues that might come up?

MR. WOOLDREDGE: Asset quality, can you tell me what you are trying to get-

TFC's COUNSEL: If you add troubled assets, for example.

MR. WOOLDREDGE: Well, if we had troubled assets, we had to deal with them sooner and perhaps in some cases have to, you know, get rid of real estate owned as an example at a time when we would not have been as propitious or as good for us.

TFC's COUNSEL: How did the loss of earnings, if any, related to the shrinkage relate to any problems with assets or bad loans?

MR. WOOLDREDGE: Well, when you lose the assets—well, when we had to downsize, we had to sell off assets, sometimes at a time when the price was not as good, and certainly it took away earnings that would have been there otherwise that would have helped offset some of the losses that we had in our, for instance, commercial real estate portfolio.

TR at 2490–93; *see also* TR at 2548, 2552, 2640–42, 47–48.

Mr. Cook, Director, Senior Vice President, and Chief Financial Officer of AMCAP and TFC and a former Director of Transohio Savings, also described the adverse effect of the breach in equally compelling terms:

TFC's COUNSEL: And how if at all did the loss of that regulatory capital, the disallowance of it, affect Transohio's business strategies after the enactment of FIR-REA?

MR. COOK: It was devastating. It was a material part of our total capital. We had placed a significant economic reliance on that in terms of our compliance. It was a very severe-it was material to every aspect of the bank. It impacted the reconsideration of each asset and liability and cost and revenue. That repudiation of the capital assistance was devastating to Transohio.

TFC's COUNSEL: And what if any options did the bank consider after the enactment of FIRREA with respect to this issue?

MR. COOK: Well, we brainstormed internally and communicated with the regulators and frankly initially instinctively felt that there would be some practical solution. At the end of the day, we were conceptually in favor of strengthening the industry but because we had effectively, you know, received economic value, we could not envision the, just the abandonment of those terms and so we went to the regulators and we asked them to consider alternatives. Could we substitute cash assistance? Could we give your shops back, the supervisory shops back? Those would be very difficult things but we discussed them. One that I was very hopeful that would be acceptable to them is we asked them if they would consider some kind of a stipulation, implementation, or provision whereby we would not grow until we became compliant with the regulatory standards. Again, the magnitude of that action was so severe to Transohio, we were— we felt that given the clear four corners of the documents and the fact that we had essentially helped them with an association they had trouble resolving, there might be ways to come up with a negotiated solution and so the no growth scenario was one I personally was hopeful to-it made sense that we would not go through this destructive, you know, changing of our business, our risks were what they were and to start peeling off earning assets was a very destructive and unnecessary process and we asked them to consider that. And so to make a long story short, although the regulators were sympathetic to our problem, you know, they indicated that the Congress had spoken and had apparently considered the implications of this action or the industry had extreme problems and as regulators, their hands were tied. So we

**352**

tried to come up with some ideas for the practicality. We got feedback, my general recollection is I felt initially that, you know, we worked through it together, but we were unsuccessful in getting any kind of relief or mitigation from them. And as the communications ensued, it became clear that we would be subjected to rigorous compliance with the, ... newly enacted regulations without regard to the economic assistance that we had previously relied on.

TR at 2727–29.

\*　　\*　　\*　　\*　　\*　　\*

TFC's COUNSEL: What strategy did the bank ultimately adopt in connection with disallowance of the goodwill and capital credit?

MR. COOK: Radical restructuring of our asset and liability composition in our operations.

TFC's COUNSEL: Why didn't the bank just raise additional capital?

MR. COOK: Very simple. To endure the repudiation of a capital contract with the Government for in excess of $100 million was such a turnoff to the financial community, both to our company and to prospective investors, that alone in my opinion was a show stopper. And in addition to that, the marketplace was horrible at this point in time. The thrift industry was perceived as deeply troubled, front page news. Frequently markets were conservative. There were, you know, certain submarkets such as the real estate market and the economy were troubled. It was the worst possible time to access the capital markets. And with our baggage of a heavy duty, you know, contractual assistance agreement and a breach, we were-it was not practicable to raise capital. . . . At least I would like to say it was not practical to raise enough capital to comply with FIRREA. Our sense was that we could raise probably some amount to show good faith, to show that we were viable, but our own investor group was ... asking what was next with this kind of a situation and so we would have been willing to put some capital on the table if we saw a total solution. For example, this is a little bit of a hypo-

thetical, but if the Government accepted our idea to not grow and in that situation, I believe we could have brought some capital to the table and then we could have brought some amount just to show our good faith. We could not have raised the FIRREA compliance capital with an unresolved question of contractual accounting treatment.

TR at 2732–34; *see also* PX 294 (evidencing efforts made by Transohio Savings to raise new capital or sell the entire institution); PX 322 at WOL235 0411 (same); PX 369 (Transohio Resolution Strategies).

\*　　\*　　\*　　\*　　\*　　\*

MR. COOK: Well, Transohio re-evaluated its asset liability composition and one of its primary objectives was to reduce its assets in a manner that would bring its quantitative capital ratios in line as closely as possible with the newly enacted legislation. Also try to consider obviously the, with less capital and with the different structure, is there—are there better ideas for the relative composition of the bank, the lines of business we should be in? Can we support mortgage banking? You know, how much should we have in mortgage securities? The role of, you know, retail versus wholesale. We re-evaluated each aspect of the business and attempted to manage our radical shrinking as best possible. The decisions of how to shrink were integrally related to the cost composition and the need to balance cost and so the availability for cost cutting conforming to, you know, asset shrinkage was another ingredient that went into the decision-making process.

TFC's COUNSEL: What do you mean when you say the decisions to shrink and how to shrink were integrally related to cost issues? Is that what you say?

MR. COOK: Yes, yes. Transohio had built up a cost structure, a G & A structure to support growing bank with diversified operations. Mortgage banking is probably the best example of that. We had an enormous computer infrastructure and personnel infrastructure, we had a very big servicing department. Those kinds of

things have to be done typically years in advance of fully generating revenues and so specifically with respect to mortgage banking, there was an opportunity to, a decision to cut both costs, both assets, a significant block of assets, as well as cost, and the bank was grappling with cost issues, administration and so we tried to integrate that decision-making process. What is a revised picture that's manageable to comply with these new capital guidelines?

TFC's COUNSEL: Generally speaking, what types of assets did Transohio sell or get rid of as part of the shrinkage strategy?

MR. COOK: Well, we certainly sold a very large amount of mortgage-backed securities. The primary consideration there was the liquidity and the expedited nature under which we could do this. We wanted to get compliant as quickly as possible. And if you sell loans or retail assets ... that has to be done, file by file. Mortgage-backed securities can be done efficiently through an established broker/dealer marketplace. And that was the first element of our sales.

TFC's COUNSEL: And what was the effect on Transohio's earnings of selling the mortgage-backed securities?

MR. COOK: It materially, it reduced the earnings corresponding to the assets sold. Although we try to balance, you know, the hedging and the sales and the assets and the liabilities to come up with matched portfolios, the reality is that to liquidate quickly did result in some, some degree of inefficiency. It was efficient in the sense that we peeled off big amounts of assets quickly, and, you know, got us very close to a compliant plan. We were looking for a total solution, but it was inefficient in the sense that we had these, this earning asset base that we had to forfeit.

TFC's COUNSEL: How if at all did the shrinkage strategy relate to Transohio's branch system?

MR. COOK: Well, basically it put—our concept was to reemphasize retail lending in the branches and to save as many branches as possible and they would be-come a more important part of the total pie. There were some branches that we had acquired in the supervisory acquisitions, Dollar Savings of Columbus, that we identified for shrinkage because they were marginal performers. When we acquired them, Columbus was a market we very much were interested in and it was a vibrant area of the northeast economy. Prior to Dollar Savings, we had not been in Columbus. We had always wanted to be there and our plan was to build it up. We also had a branch system in Cincinnati that was a similar thing. It was a very, very desirable market, had some good branches but not enough and the economics were such that, you know, in the context of looking for opportunities to shrink, those were natural targets. And I think we sold some Cleveland area branches also.

TFC's COUNSEL: What did you mean when you say Columbus and Cincinnati were marginal performers?

MR. COOK: They were—I don't remember exactly where they stood, but they weren't strong contributors to profitability in the business plan subsequent to the restructuring, if you will. They were more marginal and they were consuming capital and management resources and administrative resources and so we thought without weakening and impairing our Cleveland branches, which was our primary branch system, we could make that sacrifice. And they were making a marginal contribution to profits of the bank, but we felt that we could give those up in the context of, you know, the shrinkage program. It was an acceptable balance.

TFC's COUNSEL: What was the basic economic climate like for Transohio in the early 1990s as far as real estate markets or that financial economy?

MR. COOK: Right. The markets had gone through what I would call turbulence. In the financial markets there was some degree of volatility with interest rates going up for a period and then starting to come down. Of significance to Transohio was the commercial real estate market in northeast Ohio and pretty much nationwide, had gone into at least a mini-depres-

sion. The market conditions were depressed. There was a lack of liquidity in the market, lack of supply/demand and balance of properties, and commercial real estate was an area that was cyclically depressed.

TFC's COUNSEL: How if at all did that economic climate relate to Transohio's profile with respect to the loss of its contractual capital?

MR. COOK: Well, obviously to—I like to say that we had what would be under any circumstances turbulence. When you combine, when you combine the turbulence of an economy with the contractual repudiation, it became, you know, the perfect storm, if you will. And so when we most needed the capital cushion that we had bargained for and were relying on, it was, you know, it was taken off the equation, in addition to losing, you know, the earnings that would be available otherwise to absorb real estate losses.

TFC's COUNSEL: I'm sorry, losing the earnings?

MR. COOK: Earnings from the anticipated asset growth that that capital would support, it was a devastating confluence of events.

TR at 2735–40; *see also* DX 303 at WOL246 0160; DX 412 at WOT665 0017.

Nor were the regulators passive bystanders in the decisions made as to what assets to sell and what assets to hold.

THE COURT: I wanted to explore with the witness a bit here, did you-what did the regulators know about your decision to proceed with shrinkage? Did you discuss it with them before you embarked on it?

MR. COOK: Absolutely. Absolutely.

THE COURT: Okay.

MR. COOK: I did mention we had had general discussions as to whether there was some way we could avoid shrinkage. I my own mind, I can't get off the topic of how destructive that was in the sense that it didn't really impact our risk, whatever risks were there remained with the bank, but there was a mandate to comply with FIRREA. And I think as Mr. Brafman testified, that, you know, shrinkage is

something that banks do to come into compliance with capital. And so shrinkage was included in the business plans that were presented prior to, you know, beginning to take off the assets and—

THE COURT: And did the Government see these business plans?

MR. COOK: Yes. All of our business plans we submitted to the Government, you know, prior to executing transactions. So they were, you know, generally supportive of it. And frankly we were all hopeful that we could use some responsible degree of shrinkage to find some practical solution that would show compliance, if you will, and let us survive. And so unquestionably the Government was advised, aware of, and everything I know says that they were in agreement with our plans to shrink.

THE COURT: But that's going where I was going to go next. Did they suggest to you an alternative way particularly of coming into compliance with FIRREA other than shrinkage?

MR. COOK: Well, they certainly suggested in addition to shrinkage that we raise new capital. That was clearly—

THE COURT: And you explained at great length why you made efforts to do that but it was impossible in the environment?

MR. COOK: That's correct.

TR at 2799–2801; *see also* DX247 at PAC082 1599; DX 247; DX 259; DX 276; DX 305; DX 323 at FAC009 1714, 32; PX 102 at WON107 2187; *see also* TR at 3311–42.

During the Evidentiary Hearing, the court asked OTS Regional Director Brafman to discuss the soundness of Transohio Savings' decision to try to keep in capital compliance by shrinking assets:

THE COURT: Based on your considerable experience … in your judgment, was management's decision to—we have heard the word "shrink," but reduce the—the size of their assets a rational approach to meeting the new FIRREA capital requirements?

MR. BRAFMAN: Yes, and it was–it was a generally accepted method … this wasn't unique to Transohio, their own unique

idea. Others were doing it. It was a practice at that time.

THE COURT: There wasn't anything inherently cavalier or risky about proceeding in that way?

MR. BRAFMAN: In . . . concept, no.

TR at 982–83.

\* \* \* \* \* \*

MR. BRAFMAN: The options that you have, if you sell the nonearning assets, you're correct, you—you have to sell them at market value, and that value may well be below the value that you have been carrying them at, in which case it does impact capital. The other alternative is you sell the earning assets, you don't impact capital but you impact earnings. . . . I was asked whether this was a unique practice to Transohio. The answer is no. All associations we were shrinking to comply, and that was a rather widespread practice[.]

TR at 993–94; *see also* DX 393 (On February 10, 1991, OTS concluded an examination recognizing as of July 1989 Transohio Savings' management decided to "reduce the size of the institution as a means of meeting the capital requirements. Transohio's total assets declined by approximately $1.4 billion."); *see also* TR at 981.

Following oral argument, at the court's request, TFC submitted the following chart that was used as a demonstrative summarizing its argument that Transohio Savings incurred a $136 million loss as a result of the breach.

| Plaintiffs' Investment at the End of 1989 | 1990–92 (losses) | Losses Caused by the Breach |
|---|---|---|
| 167 Million | 1990—44 Million | 59 Million (shrink) |
| 21 Million (Dividends) | 1991—123 Million | 17 Million (I/O LOCOM) |
| 188 Million | 1992—13 Million | 18 Million (GW Writeoff) |
| | 180 Million | 17 Million (1990 Restructuring) |
| | | 14 Million (Columbus GW) |
| | 180 Million | 11 Million (Mortgage banking |
| 188 Million | − 136 Million | income) |
| − 44 Million | 44 Million [Maximum | 136 Million |
| 144 Million | losses potentially caused by non-breach factors] | |

## G. Overview Of The Court's RESTATEMENT § 349 Analysis.

■ Neither of the parties nor the court was able to identify any federal trial or appellate court that has addressed to date how to conduct a RESTATEMENT § 349 loss analysis. Therefore, the court constructed the following analysis to make that determination.

To ascertain what losses,[35] if any, plaintiffs would have incurred if Transohio Savings had been allowed to continue to amortize and count the $107.5 million capital credit and $50 million supervisory goodwill acquired toward the institution's regulatory capital requirement, on the terms set forth in the August 29, 1986 Assistance Agreement, the court first analyzed Transohio Savings' financial condition for fiscal years 1989—1991 utilizing SEC Form 10–K and OTS Forms 10–K, as reflected in the following composite chart of Transohio Savings' Consolidated Statements of Operation prepared by the court:[36]

**35.** Although the RESTATEMENT § 349 does not define losses, the court has utilized the definition cited in the treatise relied on by the United States Supreme Court in *Winstar:*

*Losses* are decreases in equity (net assets) from peripheral or incidental transactions of an entity and from other transactions and other events and circumstances affecting the entity during a period, except those that result from expenses or distributions to owners.
HANDBOOK OF ACCOUNTING, *supra,* 2–10.

**36.** At the Evidentiary Hearing, in briefs, and at the post hearing oral argument, the Government characterized the cause of the individual losses

## Transohio Savings' Consolidated Statements of Operations

| | 1989 | 1990 | 1991 |
|---|---|---|---|
| Interest income: | 2.9825820841e+16 | 2.6869114895e+16 | |
| Loans | | | $217,380 |
| Mortgage-backed and related securities | | | 151,706 |
| Investments | | | 18,117 |
| | 549960 | 444517 | 387203 |
| Interest expense: | 279230205002 | 260889112072 | 198458120696 |
| Deposits | | | |
| Borrowings | | | |
| | 484232 | 372961 | 319154 |
| Net interest income Provision for possible losses on loans | 657283405 | 7155630198 | 6804938418 |
| Net interest income after provision for possible losses on loans | 62323 | 41358 | 29631 |
| Non-interest income: | | | |
| Loan related fees | 5,981 | 6,708 | 5,516 |
| Mortgage banking activities | 33,835 | 21,805 | (14,993) |
| Gains (losses) on investment securities, net | (6,005) | (4,120) | (380) |
| Gains (losses) on mortgage-backed and related securities, net | 3,958 | (2,598) | (26,743) |
| Gain (loss) on branch sales | — | (161) | 2,410 |
| Other | 11,848 | 9,798 | 11,950 |
| | 49617 | 31432 | −22240 |
| Non-interest expense: | | | |
| Salaries and employee benefits | 48,527 | 43,885 | 35,884 |
| Premises and occupancy costs | 11,911 | 10,435 | 7,746 |
| Federal deposit insurance premiums | 6,920 | 7,077 | 6,996 |
| Losses on foreclosed real estate | 13,274 | 7,301 | 26,076 |
| Goodwill amortization and write-off | 4,416 | 3,683 | 20,351 |
| Provision for restructuring loss | — | 11,642 | — |
| Acquisition termination costs | 14,304 | — | — |
| Other | 44,695 | 37,111 | 31,902 |
| | 144047 | 121134 | 128955 |

exactly as reported in the SEC Form 10–K and OTS Forms 10–K. Of course, at the time that Transohio Savings made financial disclosures of these losses it was years before the Supreme Court's decision in *Winstar* recognized a cause of action for breach where contractual terms include the Government's assumption of the risk of regulatory change. Therefore, the SEC Form 10–K and OTS Forms 10–K did not describe losses in terms of legal causation, but rather in terms of business events and accounting requirements.

| | | | |
|---|---:|---:|---:|
| Income (loss) before income taxes (benefit) and extraordinary items | (32,107) | (48,344) | (121,564) |
| Income taxes (benefit) | (12,261) | (6,540) | 1,000 |
| Income (loss) before extraordinary items | (19,846) | (41,804) | (122,564) |
| Extraordinary items | — | (2,495) | — |
| Net Loss | $(19,846) | −44299 | −122564 |

DX453 at WOT970 0531; DX 613 at WON537 2243.

Next, the court reviewed Transohio Savings' audited financial statements, internal documents and reports, and regulatory agency examinations and internal agency documents. After considering this "hard" financial data, the court reviewed and weighed the testimony of state and federal regulatory authorities and/or Transohio Savings' management and any relevant testimony of the Government's or TFC's experts. Then, the court made a final determination as to whether the Government met its burden of proof to establish with reasonable certainty which of the net losses for fiscal years 1989–1991 would have been incurred by Transohio Savings irrespective of the breach. Finally, the court re-examined the effect of the common law limitations of foreseeability and certainty and evaluated the Government's argument that it was entitled to a credit for benefits allegedly received by TFC prior to the breach.

**H. Overview Of The Experts.**

The court clearly stated that the purpose of the Evidentiary Hearing was to determine whether:

> [A]ny loss that plaintiffs would have suffered, if Transohio Savings would have been allowed to count the [capital credit and supervisory goodwill toward regulatory capital, where] the burden is on the Government to establish any such loss with "reasonable certainty."

*American Capital II,* 59 Fed.Cl. at 585 (citing RESTATEMENT § 349). In the court's judgment, however, much of the direct testimony of both the Government's and TFC's experts did not address this inquiry, but was more general in nature or addressed other issues.[37] Nevertheless, the court has decided to provide an overview of the direct testimony of each of the experts in this Section.[38] To the extent specific testimony addressed the requirements of RESTATEMENT § 349, that testimony is discussed in the court's final determination of the net losses that the Government established with reasonable certainty would have been incurred by Transohio Savings, irrespective of the breach during fiscal years 1989, 1990, and 1991.

**1. Overview Of The Government's Experts.**

**a. Professor Kroszner.**

Professor Randall S. Kroszner of the University of Chicago's Graduate School of Business and former member of the President's Council of Economic Advisors was one of the Government's expert witnesses. His report and direct testimony summarized four opinions:

- The value of Plaintiffs' investment in TFC declined substantially prior to the proposal or enactment of FIRREA and its implementing regulations: on December 31, 1988, the market value of Trans-

---

**37.** In this regard, the court does not fault the experts, all of which made substantial contributions to the court's understanding of how to determine RESTATEMENT § 349 losses and related issues. The court was well served by the caliber of expert testimony proffered in this case by both parties.

**38.** The court required the parties to submit direct testimony in writing. *See* March 10, 2004 MANUAL FOR COMPLEX LITIGATION, FEDERAL JUDICIAL CENTER at 22.51 (3d ed. 1995) ("[W]hen the evidence is complicated or technical, the court may order that the direct testimony of witnesses under the parties' control be presented in advance of trial."). The Government objected. *See* March 10, 2004 Pre–Trial Conference at TR at 27–29.

ohio was approximately $54 million. The decline in market value prior to December 31, 1988 cannot be attributed to the Breach.

- While the value of Transohio declined by approximately $18.4 million during 1989 (the year FIRREA and its implementing regulations were proposed and enacted), this decline can be attributed to factors other than the Breach, namely Transohio's net loss of $19.8 million and the $9 million in dividends that Transohio paid to TFC during the year.

- The Breach did not cause Transohio to fail. Transohio was in compliance with FIRREA's new capital requirements when they became effective and Transohio's management anticipated that it would be able to remain in compliance notwithstanding the Breach. Instead of the profits that management had projected, however, Transohio experienced substantial operating losses during 1990, 1991 and 1992 which eroded its capital, and rendered it unable to comply with both FIRREA's capital requirements and its IMCR.

- The data show that even in the absence of the Breach, Transohio would not have been in compliance with its capital requirements by December 31, 1991 and is likely to have failed subsequently. Therefore, Plaintiffs would not have obtained any additional return on their investment in the Bank in the absence of the Breach.

Kroszner Direct ¶ 12, at 5–6. None of these opinions, other than the third, however, directly addressed the issues raised under RE-STATEMENT § 349.

Exhibit E of Professor Kroszner's Direct depicts what is described as the "Primary Causes of Transohio's Operating Losses," incurred from 1990 through the first quarter of 1992:

**Kroszner Exhibit E**
**Primary Causes of Transohio's Operating Losses, 1990–1992: 1Q**
**(per Management's Discussion and Analysis)**
**($ Millions)**

| Source | 1990 | 1991 | 1992:1Q | Total |
|---|---|---|---|---|
| Provisions for possible losses on loans | $30.2 | $38.4 | $6.2 | $ 74.8 |
| Losses on foreclosed real estate | $ 7.3 | $26.1 | $7.1 | $ 40.5 |
| Restructuring program | $17.4 | — | — | $ 17.4 |
| Amortization of excess servicing fees and purchased mortgage servicing rights | $ 7.6 | $39.7 | — | $ 47.3 |
| Losses on mortgage derivative instruments (I/O strips) | $2.6 | $26.7 | — | $ 29.3 |
| | | | | $209.3 |

Kroszner Direct at Exhibit E. At the Evidentiary Hearing, Professor Kroszner testified that "[t]he purpose of Exhibit E was to take the description from the official SEC document about what the primary causes of losses were." TR at 1693. Professor Kroszner also testified that

the amortization and excess servicing fees, those were largely driven by changes in the interest rate environment which I argue had nothing to do with FIRREA. On the IO strips it is precisely the same thing. The provision for possible loan losses ... they made a number of choices to expand in businesses that turned out quite poorly for them.... Those were choices they made that I believe had nothing to do with FIRREA. The restructuring program ... although there may have been some of it, I believe they would have undertaken independent of FIRREA.... I believe that the poor performance in Ohio of the real estate market and choices they made were independent of FIRREA.

TR at 1670–72.

During the Evidentiary Hearing, Professor Kroszner, however, admitted that the losses listed on Exhibit E were not net of any gains. See TR at 1672. In addition, Dr. Kroszner testified that he did not undertake an analysis as to how Transohio Savings' portfolio would have been different had it not been for the breach. See TR at 1675. Instead, Professor Kroszner measured Transohio Sav-

ings' actual performance against Transohio Savings' business plans, rather than analyze the effect of the shrinkage that the regulators acknowledged was undertaken to comply with FIRREA's capital requirements. Professor Kroszner indicated that most of the shrinkage appeared to come from the family mortgages and mortgage-backed securities for 1988–1991. *See* TR at 1655–63; *see also* TR at 1677–81. Nevertheless, Professor Kroszner concluded that the choices made by Transohio Savings "seem to have nothing at all to do with the breach." TR at 1721. Contrary to the Government's argument that Transohio Savings would have failed irrespective of the breach, Professor Kroszner testified at the time of the enforcement of FIRREA, Transohio Savings "had sufficient capital even under the new FIRREA definitions." TR at 1731. Dr. Kroszner also testified that "supervisory goodwill or contractual regulatory capital is of economic value to the shareholders because in that circumstance . . . it makes a difference between the thrift being seized or staying open and staying in business." TR at 1846.

### b. Dr. Hamm.

Dr. William G. Hamm, Managing Director of the Public Policy Practice of LEGG, LLC, an economic accounting firm, was engaged by the Government to answer five questions:

- Would Transohio Savings "have failed if there had been no breach?"
- "Did the breach cause the OTS to place Transohio in receivership during 1992?"
- "Did the breach cause [TFC] to lose the value of its equity in Transohio [Savings]?"
- "How did the benefits that Transohio [Savings] received from the contract compare with the plaintiffs' out-of-pocket expenditures in reliance on the contract?"
- "What was the economic value of the plaintiffs' contribution to the contract?"

Hamm Direct ¶ 25, at 12.

Dr. Hamm reached the following opinions regarding these questions:

- It is virtually certain that if the breach had not occurred, Transohio would have failed its capital requirements and been placed in receivership.
- Transohio failed-and the but-for Transohio would have failed-for reasons having nothing to do with the breach.
- TFC lost the value of its equity in Transohio for reasons having nothing to do with the breach.
- When the benefits that Transohio received from the contract are taken into account, there is no evidence that the plaintiffs incurred *net* out-of-pocket expenditures in reliance on the contract.
- The economic value of the plaintiffs' contribution to the Citizens and Dollar acquisitions was considerably less than the book value of Transohio's directly.

Hamm Direct ¶ 27, at 13 (emphasis in original).

Question 3, however, was at least tangentially relevant to the RESTATEMENT § 349 inquiry: *i.e.,* "Did The Breach Cause the Plaintiffs to Lose the Value of Their Equity in Transohio?" Dr. Hamm concluded that the breach did not "cause" the loss of the "entire value of Transohio's pre-acquisition equity, as well as TFC's $42.1 million capital infusion into the thrift," because the decline in TFC's (and Transohio Savings') equity value was "caused by factors *other than* the breach. Consequently, the plaintiffs would have lost all, or nearly all, of their equity interest in Transohio even if the contract had been performed." Hamm Direct ¶ 336, at 121. Dr. Hamm's conclusion was based on two premises:

1.) TFC (and, by implication, Transohio [Savings]) lost well over one-half of its pre-acquisition equity value while the contract was being performed.

2.) Factors other than the breach *can easily explain* the disappearance of Transohio's remaining equity value after the breach.

Hamm Direct ¶ 336, at 121 (emphasis added).

Regarding Dr. Hamm's opinion that most of Transohio Savings' equity was lost "while the contract was being performed," first he determined that "TFC's share price dropped sharply" between August 29, 1986 and August 8, 1989. Hamm Direct ¶ 338–39, at 121–

22. Then, Dr. Hamm posited that the trend of TFC's stock during the acquisition period declined 57% below the stock's closing price on August 29, 1986, during the period that the Government still was in compliance with the August 29, 1986 Assistance Agreement. *See* Hamm Direct ¶ 339, at 122. As previously discussed, many factors can influence the market price of stock, including, in this case, the fact that the public was on notice since at least February 1989 that significant regulatory changes likely were going to be imposed by Congress that would devalue the stock of Transohio Savings, as well as all thrift institutions, at least for an initial period of time.

Regarding Dr. Hamm's conclusion that FIRREA "had—at most—a minimal impact on TFC's equity value—and perhaps no adverse impact at all," he noted that TFC's share price declined from $6.625 on August 9, 1989 to $0.25 on July 13, 1992. *See* Hamm Direct 2 at 122, Hamm Direct ¶¶ 345–46, at 123. In fact, Dr. Hamm admitted that during this latter period, "it is possible . . . the breach caused investors to lower their estimates of Transohio's future earnings, thereby contributing to the decline." Hamm Direct ¶ 346, at 123–24. Dr. Hamm also testified that the breach "could not have caused the post-breach loss of TFC's equity value" because: 1) the breach "did not bring Transohio [Savings'] survival into question;" and 2) "non-breach related factors can easily explain the subsequent fall in TFC's stock price." Hamm Direct ¶¶ 345–355, at 123–26.

In sum, Dr. Hamm concluded that Transohio Savings' losses were caused by factors other than the breach, because "the regulators, Transohio [Savings'] management, or investors . . . all . . . expected Transohio [Savings] to survive . . . the phase-out of the thrift's forbearance capital." Hamm Direct ¶ 347, at 124.

A central element of TFC's argument is that in order to attempt to stay in capital compliance, without the benefit of the regulatory capital conveyed by the Assistance Agreement, Transohio Savings was forced to sell assets or undergo a substantial "shrinkage," which led to losses.

DR. HAMM: [E]ven if the contract had been performed, they could not have avoided shrinking. They couldn't have avoided it because of the losses that they took and because of the nonbreaching portions of FIRREA that significantly increased their capital requirement and reduced . . . the amount of regulatory capital they had without breaching any contract.

TR at 1261.

\* \* \* \* \* \*

GOVERNMENT's COUNSEL: I'd like to turn to the issue of shrinkage. You have testified that you do not believe or that you believe that the shrink would have occurred even in the absence of the breach. How can that be? Transohio lost regulatory capital as a result of the breach; isn't that correct?

DR. HAMM: Yes.

GOVERNMENT's COUNSEL: Is its asset size for a thrift determined by the amount of capital that it has?

DR. HAMM: Well, I would put it differently. It is limited by the amount of capital that it has but asset size is not determined by the amount of capital because that also is a reflection of what's available in the market. There are plenty of thrifts sitting around even today that have capital that they'd like to leverage but can't find profitable assets to put it into. But if I can just change your question from determined to limited, yes, regulatory capital is extremely important in setting an upper limit of what the size of the thrift can be.

GOVERNMENT's COUNSEL: Then why didn't the loss of some of Transohio's regulatory capital cause it to shrink?

DR. HAMM: Because Transohio's regulatory capital went down for so much for nonbreach related factors that even if the phase out hadn't occurred it still would have been forced to shrink. In my direct testimony I have, I believe it's table 21 and chart, or figure 27, that reflect my analysis of all of the factors that caused Transohio's risk-based capital position or its capital position to deteriorate between September 1989 and June 1992. And based on my analysis the breach accounted for less than 12 percent of the decline in Transohio's

regulatory capital position. In other words, nonbreach related factors accounted for more than 88 percent of the decline. Now, to put that in numbers, Transohio lost 360 million dollars in regulatory capital over this nearly three-year period for reasons having nothing to do with the breach. That's a staggering amount of regulatory capital to lose and it would have forced Transohio to shrink even if it could have continued to count its forbearance capital toward its requirements.

TR at 3074–76.

\* \* \* \* \* \*

GOVERNMENT'S COUNSEL: Now, are you testifying that the phase out of goodwill had absolutely nothing whatsoever to do with any shrinkage?

DR. HAMM: No. As I indicated a few minutes ago, and as shown on DX 1003, the breach did reduce the amount of regulatory capital that Transohio had available to support assets. It can't be ignored. It pales in comparison to the nonbreach related factors that are discussed in table 21 and figure 27 that caused deterioration in Transohio's regulatory capital position. But you can't ignore it. I do think, however, that you can pretty much ignore it after 1989. Any effect that the breach had on shrinkage it had in 1989 if it had any effect at all.

TR at 3085.

\* \* \* \* \* \*

DR. HAMM: No. I don't believe so. Number one, as I just testified, the shrinkage was primarily caused by nonbreach related factors, again the breach may have been a factor in 1989 but for the most part the cause of the shrinkage was nonbreach related factors. Number two, the distribution of loan assets that shows up in the 1991 column of table 15 of my direct testimony reflects decisions made by management as to how to shrink the balance sheet. Those decisions weren't made by accident. They were made by management based on various analyses that undoubtedly were conducted. But management made those decisions. It could have if it had wanted to decided that it was going to shrink both traditional loans and higher risk loans by the same percentage. In fact, it could have decided to reduce the overall risk profile of the thrift and shrink higher risk loans by more than, in percentage terms, than it shrank traditional loans but it chose not to do that. It chose instead to shrink traditional loans by more than higher risk loans and as a consequence that caused the change in its risk profile. Now, I think as we established on cross about half that change occurred prior to the breach. I mean, this process of engaging in more risk taking began I think back in 1984 and in fact you can see from the table on page 7 of DX 613 if you take a look at the top line single family conventional or 1 to 4 family residential other than construction conventional and FHA VA both categories of what are referred to in the thrift industry as plain vanilla loans shrank in 1988 and this was well before the FIRREA was even introduced and well before anybody had any idea what its contents would be. So the process of shifting in the direction of higher risk lending began well before FIRREA was a consideration. But the important fact is that management could have done it differently. It chose to do it the way that is displayed in table 15.

TR at 3089–90.

\* \* \* \* \* \*

GOVERNMENT'S COUNSEL: Dr. Hamm, as a matter of economics what, if any, damages do you believe that TFC and AmCap suffered as a result of the breach?

DR. HAMM: As a matter of economics, ... I don't believe that TFC and AmCap suffered any damages.

GOVERNMENT'S COUNSEL: Why is that?

DR. HAMM: Well, because if the government had fully performed its obligations under the contract Transohio would still have been significantly out of capital compliance and even more importantly than that it lacked the necessary qualities to be viable on a going forward basis. It didn't have sufficient interest earning assets to cover its interest bearing liabilities, it didn't have a reasonable spread on its as-

sets. It had excessive operating expenses and a lot of problem loans. And in my opinion if the government had fully performed the contract Transohio would have been seized, the investors would have lost their investment in Transohio and as a consequence any award of damages to the plaintiffs in this case would put them in a better economic position than they would have been in had the contract been performed. In other words, it would give them a windfall.

TR at 3167–68.

### c. Mr. Larry Johnson.

Mr. Larry Johnson, Managing Partner of the accounting firm of Johnson Lambert & Company and CEO of VERIS, a consulting firm, was engaged by the Government to review and evaluate the report of Timothy W. Koch, Ph.D., the FDIC's expert witness. *See* Johnson Direct ¶ 5, at 2, ¶ 6, at 3; Exhibit A. Since Dr. Koch was not proffered by plaintiffs at the Evidentiary Hearing, the court has not considered Mr. Johnson's opinions regarding Dr. Koch's conclusions, however, the court did consider Mr. Johnson's opinion of "the fundamental causes of Transohio's failure and to evaluate the economics of its acquisition of Citizens and Dollar." Johnson Direct at ¶ 5, at 2. In addition, Mr. Johnson also advised the court that:

- The capital failures that occurred and led to the demise of Transohio were not caused by the impact of FIRREA's reduction of regulatory capital attributable to the capital credit and goodwill related

to Transohio's acquisitions of Dollar and Citizens.

- Subsequent to its acquisitions of Dollar and Citizens, Transohio experienced erosion of its capital in excess of $278 million attributable to matters unrelated to the enactment of FIRREA.
- The aforementioned erosion of Transohio's capital subsequent to its acquisitions of Dollar and Citizens substantially exceeded the identification of reliance damages described in this Court's earlier opinion [in *American Capital II* ].

Johnson Direct ¶ 13, at 5.

Mr. Johnson placed a great deal of weight on the fact that Transohio Savings met the new regulatory capital requirements of FIRREA both in 1989 and 1990 and reasoned that Transohio Savings' failure also to meet these requirements in 1991 and 1992 could not have been caused by FIRREA. *See* Johnson Direct ¶¶ 14–15, at 6–7. Instead, Mr. Johnson advised the court that what "caused Transohio [Savings] to fail was its continuing operating losses independent of the goodwill and capital credits it recorded in conjunction with its acquisitions of Citizens and Dollar." Johnson Direct ¶ 16, at 7; *see also* TR at 1942 ("based upon my analysis of the financial statements and the implications of FIRREA ... this company had losses unrelated to FIRREA and would have failed its capital requirements without regard to FIRREA.").

Mr. Johnson calculated that the "capital erosion" [39] Transohio Savings experienced was caused by "operating losses," as depicted in the following exhibit:

---

**39.** Mr. Johnson testified that "capital erosion" does not refer to or equal "net losses." TR at 1943. Mr. Johnson also clarified that "capital erosion" was "not a measure of the net aggregate decrease in Transohio's capital[.]" TR at 1944.

| Transohio Savings Bank Summary of Losses Unrelated to FIRREA | | | | | | |
|---|---|---|---|---|---|---|
| Amount (in 000's) | | | | | | |
| | 1987 | 1988 | 1989 | 1990 | 1991 | Total |
| Description | | | | | | |
| Speculative investments (a)(c) | $ 1,829 | $ 2,630 | $ (3,342) | $ (5,688) | $ (26,743) | $ (31,314) |
| Interest rate swaps (a)(c) | -8976 | -1451 | 6153 | 804 | -9219 | -12689 |
| Losses on loans and real estate owned (a)(d) | -12051 | -12227 | -16679 | -37499 | -64494 | -142950 |
| AmeriStar (b)(e) | -4709 | -9587 | -16088 | -8311 | | -38695 |
| Restructuring (a)(e) | | | | -11642 | | -11642 |
| Termination of AmeriFirst acquisition (a)(f) | | | -14304 | | | -14304 |
| Dividends paid to parent (a)(g) | -4000 | -8000 | -9000 | | | -21000 |
| Capital erosion unrelated to FIRREA | $ (27,629) | $ (28,635) | $ (59,914) | $ (62,336) | $ (100,456) | $ (272,970) |
| Net income (loss) before taxes as reported by Transohio (a) | $ 20,779 | $ 27,236 | $ (32,107) | $ (50,839) | $ (121,564) | $ (156,495) |
| Tax expense (benefit) as reported by Transohio (a)(h) | 7581 | 8711 | -12261 | -6540 | 1000 | -1509 |
| Net income (loss) after taxes as reported by Transohio (a)(i) | $ 13,198 | $ 18,525 | $ (19,846) | $ (44,299) | $ (122,564) | $ (154,986) |

Johnson Direct at 8 (footnotes omitted, however, all amounts for 1987 through 1990 were obtained from data reported in Transohio Savings' audited financial statements), as corrected. *See* TR at 1938–40, 1944; DX 821 at WON169 1657; DX 822 at WON029 1572.

Mr. Johnson's analysis also confirmed that Transohio Savings was "capital compliant in 1989 and 1990," nevertheless, he concluded that Transohio Savings' losses and "not the breach ... caused Transohio's capital non-compliance." TR at 1946–47. On cross-examination, Mr. Johnson stated that he was not providing an expert opinion on what Transohio Savings' losses would have been if the regulatory capital contract provisions had not been breached. *See* TR at 1945. Instead, he concluded that the losses Transohio Savings incurred, and not the breach, caused the capital non-compliance. *See* TR at 1947.

Finally, at the Evidentiary Hearing, Mr. Johnson concluded:

MR. JOHNSON: [The causes of] the losses in 1990, '91, and I identified the increased exposure.... the lack of proper underwriting as is identified by regulators and KPMG. The third element is ... the company's contemporaneous reports, the real estate market subject to downturn during that period. So when you combine a circumstance in which you put on a lot of these loans, you don't properly underwrite them and value them and manage them, and a bad market hits, all of that results in the kind of losses that we're seeing there. And none of that, I believe, is attributable to FIRREA.

TR at 2094–95.

### 2. Plaintiffs' Expert.

#### a. Professor Christopher James.

Plaintiffs' expert witness was Professor Christopher James, the William H. Dial/Sun-Bank Eminent Scholar and Professor of Finance at the University of Florida. *See* James Direct I at 1; PX 1296 (Sur–Rebuttal Report). Professor James' initial assignment was "to offer opinions" on the following questions:

- Absent the Government's breach of the regulatory capital contract, how much additional capital would Transohio Savings Bank ("Transohio" or "TSB") have enjoyed during the period between the enactment of FIRREA and the seizure of the bank?
- Absent the Government's breach of the regulatory capital contract, how would Transohio's financial performance have differed from its actual financial per-

formance between the enactment of FIR-REA and July 1992, when the bank was actually seized?

- Absent the Government's breach of the regulatory capital contract, would Transohio have been seized?

- Absent the Government's breach of the regulatory capital contract, would plaintiffs' investment in Transohio be worth more than the $168.645 million in reliance expenditure found by the Court in the February 27, 2004 Opinion?

- Does the $126.579 million book value of Transohio, utilized by the Court to determine plaintiffs' reliance expenditure in the February 27, 2004, Opinion, when added to the $42.2 million in cash invested by plaintiffs, fairly and reasonably measure the value of plaintiffs' investment in the contract?

James Direct II at 2. In addition, Professor James was asked to review and comment on certain testimony presented by the Government's experts.

The court considered Questions, 1, 3, and 4 irrelevant to the RESTATEMENT § 349 loss inquiry. Regarding Transohio Savings' financial performance from 1990 to the seizure, Professor James advised the court that the net losses "would have been substantially mitigated, if not eliminated entirely, had Transohio [Savings] enjoyed the benefit of the contractual regulatory capital. The loss of that capital caused Transohio [Savings] to lose income it otherwise would have earned and it caused Transohio [Savings] to incur expenses it otherwise would not have incurred." James Direct at 4.

As to lost earnings, Professor James testified that the "most significant impact" was that the breach "forced the thrift to substantially shrink its asset size ... from $6.3 billion at the end of 1988 to $3.99 billion at the end of 1991, and $3.4 billion at June 30, 1992, shortly before the thrift was seized. This reduction consisted almost entirely of mortgage backed securities ('MBSs') and single family residential mortgages. Between the end of 1988 and the end of 1991, Transohio [Savings'] MBSs decreased from $2.53 billion to $1.46 billion, while single family residential and FHA/VA insured mortgages

decreased from $2.14 billion to $1.16 billion." James Direct at 4–5 (citing DX 613 at 7).

In addition, Transohio Savings incurred what Professor James labeled as "breach-induced expenditures" that significantly contributed to the net losses in 1990 to 1992, including: $17.4 million of restructuring charges in 1990 associated with the sale of the Columbus branches and disposition of AmeriStar; $13.6 million restructuring charges in 1990 associated with the write-off of goodwill resulting from the sale of the Columbus branches; an unspecified amount of operating expenses associated with the "breach-induced" shrink; an unspecified amount of higher cost of funds due to fewer deposits resulting from the thrift's shrinkage and adverse publicity resulting from the breach; $6.8 million in 1990 and $4.6 million in 1991 in lost origination and servicing income resulting from the divestiture of the AmeriStar mortgage banking business; $17.4 million of LOCOM adjustments on I/O strips that had served to hedge Transohio Savings' HMI portfolio; $68.6 million of additional loan loss reserves in 1990 and 1991 that the regulators required to be booked to cover capital shortfalls; and a $18.3 million loss of goodwill that was required to be charged off of Transohio Savings' books in 1991 because of outside accounting firm concerns about the ongoing viability of the financial institution. *See* James Direct at 5–9.

I. **Final Determination Of Net Losses That The Government Established With Reasonable Certainty That Transohio Savings Bank, FSB Would Have Incurred Irrespective Of The Breach.**

1. **January 1, 1989–December 31, 1989.**

   a. **The Financial Condition Of Transohio Savings Bank, FSB And Net Losses Incurred.**

The court was fortunate to have several different perspectives of Transohio Savings' financial condition and the net losses incurred during fiscal year 1989: company documents; and two SEC Forms 10–K; and two regulatory agency examinations, *i.e.*, a Joint Examination conducted by the State of Ohio

and FHLBB for the period March 30, 1989–September 6, 1989, providing Transohio Savings with a composite "3" MACRO rating and the FDIC's Examination for the fiscal year January 1, 1989–December 31, 1989, providing Transohio Savings with a composite "5" CAMELS rating.

The differences between these regulatory examinations can only be characterized as stark. What happened between September 6, 1989, the date the Joint Examination was concluded, and February 20, 1990, the date that the FDIC Examination commenced utilizing information as of December 31, 1989, was the enactment and implementation of FIRREA on December 7, 1989.

### (1) Transohio Savings Bank, FSB's SEC Forms 10–K And Internal Documents.

On March 15, 1989, Transohio Savings' SEC Form 10–K for fiscal year 1988 contained a reference to federal legislation introduced in February 1989 that, in large part, later was enacted as FIRREA. *See* DX102 at PAC086 0483–84. Transohio Savings' management anticipated that the impact of these proposed regulatory changes would require:

> further clarification by the FHLBB, and because the draft does not specify the manner of computing the interest rate risk component of required capital, management of the Company is not yet able to assess definitively the likely effect of the proposal on Transohio. However, it appears that Transohio's minimum capital requirement would probably increase significantly but that Transohio would have sufficient regulatory capital.... *The proposed regulations are expected to require FSLIC-insured institutions without large amounts of collateralized borrowings to maintain total capital of approximately 8% of risk weighted assets by 1993, which exceeds the present capitalization of most such institutions.* If Transohio maintains its present relative level of collateralized borrowings, its expected required capital

ratio may be higher, depending upon the impact of the interest rate risk component. DX 102 at PAC086 0482 (emphasis added).

In June 1989, an internal Transohio Savings' document confirmed that to meet the new regulatory capital requirements a "shrinkage strategy currently [is] being actively pursued[.]" PX 102 at WON017 2187; *see also* DX 323 at FAC009 1732 (In fiscal year 1989, Transohio Savings' "management continued its strategy of shrinking the institution's asset base by reducing its investment purchases ... by approximately 37% from the previous year. The resulting decline in the average balance of investments, excluding mortgage backed securities, attributed to the decrease in interest income on investments from approximately \$50.2 million in 1988 to approximately \$48.8 million in 1989.").

On July 13, 1989, the Minutes of the Investment Committee of Transohio Savings reflected that Transohio Savings was well aware of the likely imposition of new "regulatory developments regarding capital standards" that would affect "various types of assets ... [so that] goodwill [was expected to] be down to \$10–12 million in 4 or 5 years." Consequently, management anticipated that Transohio Savings "might have to shrink in size in order to satisfy the pending minimum and risk capital requirements." DX 247 at PAC082 1599. The Investment Committee also discussed a reduction in the institution's regulatory capital and supervisory goodwill and the anticipated sale of wholesale securities assets, primarily mortgage-backed securities, even though this would make the interest only certificates vulnerable in a low interest rate environment. *See* DX 247 at PAC082 1599–60; *see also* TR at 3317–24. On August 21, 1989, Transohio Savings informed federal regulators of the shrinkage of the HMI portfolios. *See* DX 259; *see also* DX 276 (September 13, 1989 internal memo indicating \$346 million in securities were sold in 1989 to reduce the interest rate risk profile, but it was hoped no further shrinkage would be necessary); *see also* DX 236; TR at 3326–36 (reflecting that Mr. Snider hoped the I/O portfolio could be kept intact).

On December 31, 1989, Transohio Savings recorded a "net loss" of $19.8 million for fiscal year 1989, which was a marked change from net earnings of $18.5 million in fiscal year 1988 and net earnings of $13.2 million in fiscal year 1987. *See* DX 305 at PAC087 1054. As Transohio Savings' 1989 SEC Form 10–K itemized, those losses included: $9.4 million after tax write-offs in costs related to Transohio Savings' termination of efforts to acquire AmeriFirst Bank; $14.1 million losses attributed to AmeriStar's mortgage banking business; and $4 million after tax losses "caused by valuation adjustments on high-yield corporate bonds." *See* DX 305 at PAC087 1055; *see also* DX 31 at WON251 1146; DX 222 at WOT970 0903; DX 305 at PAC087 1057 (Transohio Savings' SEC Form 10–K reported that "the *decline in the average balances of loans and mortgaged-backed certificates during 1989 result[ed] from management's decision during the second half of 1989 to decrease Transohio's asset base in order to facilitate its ability to satisfy the new capital regulations required by . . . FIRREA.*") (emphasis added); DX 323 at FAC009 1714 (total assets were reduced from $6.3 billion as of December 31, 1988 to $5.4 billion as of December 31, 1989); DX 323 at FAC009 1732; DX 325; DX 751 at EAC060 0742; DX 821 at WON169 1657; DX 822 at WON029 1572; DX 823 at CAC379 0117; PX 791 at AC–AMCAP–0010200–01; PX 870 at AC–AMCAP–0009483–84; *see also* TR at 102–06, 318–31, 454–55, 469–71, 632, 662–63, 2860–79, 2947–50, 3011–12, 3039–40, 3271–73.

> **(2) The Supervisory Authorities' Joint Examination For The Period March 30, 1989–September 6, 1989.**

Almost two years transpired after the May 1987 Joint Examination of the Supervisory Authorities until another Joint Examination was conducted covering the period March 30, 1989–September 6, 1989 ("1989 Joint Examination Report"). This was the last Joint Examination conducted by the Supervisory Authorities of the entire institution before FIRREA was enacted and new regulatory requirements issued and were implemented. *See* DX 222. As was the case in the prior Joint Examination, Transohio Savings received an overall "3" composite rating. *See* DX 222 at WOT970 0879. In this Joint Examination, however, for the first time the Regulatory Authorities provided more context to the rating in comments:

> The composite rating of '3' means that the institution exhibits a combination of weaknesses ranging from moderately severe to unsatisfactory.

> Although its overall strength and financial condition make failure a remote possibility, *the institution is only nominally resistant to the onset of adverse business conditions and* its financial condition could easily deteriorate if corrective action is not taken. Noncompliance with laws and regulations is significant.

DX 222 at WOT970 0879 (emphasis added).

Each of the following MACRO factors summarizes the conclusions of the Supervisory Authorities regarding the viability of Transohio Savings three months prior to FIRREA's enactment.

> **(aa) Transohio Savings—Management.**

The 1989 Joint Examination reviewed the activities of officers and directors "to ascertain the extent and impact of influence exerted by . . . [TFC], on management; to assess management's ability to formulate and adjust operating strategies to ensure profitability and maintenance of adequate capital levels; to determine their effectiveness in developing and implementing policies and procedures which comply with regulatory requirements; and, to assess the effect of changes in management." DX 222 at WOT970 0880. The primary focus was on three management activities: *i.e.,* general-personnel; the May 24, 1988 proposed acquisition of AmeriFirst; and the August 14, 1989 proposal to merge AMCAP and TFC with Transohio Savings. *Id.*

As of September 30, 1989, the overall management rating, asset rating, and capital rating was reduced from a composite of "2" to a "3." *See* DX 302 at WON050 0487; *see also* TR at 112.

### (i) General–Personnel.

In December 1988, Transohio Savings' Chairman, Jack D. Burstein,[40] was found guilty of fraud in a civil suit filed in California by private entities alleging that Chairman Burstein and two other AMCAP directors breached promises to provide disbursements subject to a partnership agreement concerning a personal real estate transaction. *See* DX 222 at WOT970 0881. In addition, Chairman Burstein, Samuel J. Adler, a Transohio Savings' Director, and "several other affiliated persons" were reported as being subject to an SEC investigation regarding "possible insider trading violations relating to AmeriFirst stock purchases." DX 222 at WOT970 0882. The circumstances underlying these transactions, however, did not directly involve Transohio Savings and subsequently the SEC closed this matter. *See, e.g.,* DX 210 at PAC078 0071; DX 222 at WOT970 0881–82; DX 302 at WON850 0490–91; DX 430 at FAC008 1314.

In April 1989, Mr. Leo Schmidt withdrew from being considered for re-appointment to Transohio Savings' Board, leaving a vacancy in violation of the terms of August 29, 1986 Assistance Agreement. *See* DX 222 at WOT970 0883. Although the FHLBB temporarily waived that requirement, the 1989 Joint Examination took note of "significant changes" in Transohio Savings' senior management, including in the positions of Executive Vice President and Treasurer, a Senior Vice President responsible for management of investments, and the promotion of the Controller to the position of Senior Vice President of Finance. *See* DX 222 at WOT970 0882. The Supervisory Authorities, however, concluded that none of these "transitions ... adversely affected the institution." DX 222 at WOT970 0882.

On a positive note, the 1989 Joint Examination reported that Transohio Savings' Board "takes an active role in establishing short– and long-term goals and developing strategies to achieve desired operating re-

sults." DX 222 at WOT970 0882. For example, in early 1989, when assumptions in the business plan no longer appeared valid, the Board "reassessed operating strategies and adopted a revised business plan" to develop a capital plan that would "accurately reflect Transohio's ability to meet future minimum capital requirements." DX 222 at WOT970 0882. Nevertheless, the Regulatory Authorities concluded that certain key operating policies, that had been approved by the Board, contained "deficiencies and weaknesses in policy content and [management's lack of] adherence to the policies." DX 222 at WOT970 0882.

Overall, it was concluded that AMCAP and TFC "have taken a more visible role in the management of the institution [and that] ... influence has had, in some instances, a negative impact on Transohio's operating results and capital levels." DX 222 at WOT970 0880; *see also* TR at 335–36.

### (ii) The Aborted AmeriFirst Acquisition.

On May 24, 1988, at the "behest" of TFC, Transohio Savings' Board approved an agreement to purchase all of AmeriFirst's common stock and certain unexercised options for $236,579,160 on or before March 21, 1989. *See, e.g.,* DX 130; DX 201; DX 222 at WOT970 0880; DX 325; PX 59; PX 854; *see also* TR at 301, 304, 318–20, 2716–18. In addition, Transohio Savings agreed to place a $25 million non-refundable deposit in escrow so that, in the event the agreement was terminated or regulatory approval was not secured, AmeriFirst would receive 1/12th of the deposit accrued from May 24, 1988. *See* DX 222 at WOT970 0880.[41] During the most recent examination, AmeriFirst received an overall "2" rating. *See* TR at 365–66. If the merger was approved, however, the deposit would apply toward the purchase price. *See* DX 222 at WOT970 0880. On March 10, 1989, the FHLBB staff prepared a "best case" scenario for approving Transohio Savings' acquisition of AmeriFirst, although the

---

40. Mr. Burstein also served as President and CEO of AMCAP and TFC.

41. During the Evidentiary Hearing, FHLBB Supervisory Agent Benham testified that he was

"concerned" about the non-refundable $25 million fee and due diligence efforts of AMCAP, but later admitted, "I really was not involved in it." TR at 104–06.

staff recommended against approving the merger. *See, e.g.*, DX 128; DX 216; *see also* TR at 382–392. On March 21, 1989, Transohio Savings gave AmeriFirst notice of an intent to terminate, alleging that AmeriFirst was responsible for a "material breach of a material representation and warranty." DX 222 at WOT970 0880.

On May 8, 1989, the FHLBB ultimately gave Transohio Savings approval to purchase AmeriFirst provided that 15 conditions would be satisfied before the merger was consummated. *See* DX 222 at WOT970 0881. These conditions included "a substantial reduction in the purchase price, ... that all affiliated persons transfer any shares in AmeriFirst to Transohio (Savings), and ... that Mr. Burstein and other related parties resign from any positions with Transohio (Savings) or its affiliates if the civil fraud judgment was not rebutted to the satisfaction of supervision." DX 222 at WOT970 0881; *see also* DX 325. Neither of the private parties agreed to these terms and the merger did not proceed. *See* DX 325 at WON316 0410. On May 22, 1989, Transohio Savings reached a settlement under which AmeriFirst received $10,416,667 of the $25 million deposit, plus $960,833 in accrued interest. *See* DX 222 at WOT970 0881. Although the $14,583,333 balance was returned, Transohio Savings was required to write-off $2,257,494 in previously capitalized acquisition costs and $573,001 for related legal expenses, resulting in a pre-tax loss of $14,204,994. *See* DX 222 at WOT970 0881.

### (iii) The Aborted Consolidation Of AMCAP And Transcapital Financial Into Transohio Savings.

On August 14, 1989, shortly after the proposed AmeriFirst merger failed, Transohio Savings applied to consolidate AMCAP, TFC and Transohio Savings with Transohio Savings being the surviving entity and assuming the assets and liabilities of both AMCAP and TFC. *See* DX 222 at WOT970 0883. According to the Supervisory Authorities and an outside consulting firm hired by the FHLBB, the merger would have had a detrimental effect on Transohio Savings, because it would be required to assume a minimum of $65 million of additional liabilities, without counting additional debt from subordinated notes. *See* DX 222 at WOT970 0884. The bottom line is that after the merger Transohio Savings' assets would have exceeded liabilities by only $14 million. *See* DX 222 at WOT970 0884. On the other hand, Transohio Savings would be relieved of obligations to pay dividends of approximately $6.6 million per year and nominally would be in a better position to raise additional capital. *See* DX 222 at WOT970 0884–85. Nevertheless, the Supervisory Authorities concluded that this transaction would not be in Transohio Savings' best interest because of the projected increase in goodwill from $50 million to $83 million, which would have a "detrimental effect on tangible capital;" the acquisition of unprofitable AMCAP real estate losses; and increased cash demands necessary to serve the new subordinated debt and preferred stock. *See, e.g.*, DX 154; DX 222 at WOT970 0884–86; *see also* TR at 301–03, 306–17. At the Evidentiary Hearing, FHLBB Supervisory Agent Doebereiner also expressed "serious concerns about the motives and integrity of [AMCAP] management. I think the holding company fold-down application was such an egregious example of self-serving motivation at the expense of a federally insured institution that one would have to question the integrity of management." TR at 336.

In this section of the 1989 Joint Examination, the Regulatory Authorities reported that Transohio Savings was implementing a policy to "'shrink' its balance sheet so as to improve the capital ratio." DX 222 at WOT970 0885; *see also* TR at 206–08.

### (bb) Transohio Savings—Asset Quality.

### (i) Asset Classification Policies And Procedures.

The 1989 Joint Examination credited Transohio Saving's management and board with "attempting to accurately classify assets, [but observed that they] do not have a good understanding of classification regulation." DX 222 at WOT970 0886. After a detailed audit, the Regulatory Authorities concluded that $66.98 million of Transohio Savings' assets were classified as "substand-

ard;" $11.94 million as "doubtful;" and $18.58 million as a "loss." *See* DX 222 at WOT970 0887. Overall, Transohio Savings' classified assets to total assets, however, was considerably lower than the 3.1% ratio of its peers. *See* DX 222 at WOT970 0887.

### (ii) Composition Of Classified Assets.

Transohio Savings' "criticized" assets increased .7% or $64.550 million from the prior Joint Examination. *See* DX 222 at WOT970 0890. Of this amount, $16.01 million represented major assets acquired in conjunction with the supervisory merger with Dollar. *See* DX 222 at WOT970 0890.

### (iii) Loan Underwriting.

During the review period, 223 commercial real estate loans were approved in the amount of $417.678 million. *See* DX 222 at WON970 0890. Of these, the Regulatory Authorities test sampled 16 commercial real estate loans in the aggregate amount of $132.554 million and 8 construction loans in the aggregate amount of $87.765 million, and "no major deficiencies were noted[.]" DX 222 at WOT970 0890. After a review of 20 of the 108 commercial loans approved in the aggregate amount of $40.345 million, the Joint Examination reported: "loan policies, procedures, and practices are adequate and are in accordance with applicable rules and regulations." DX 222 at WOT970 0890. A representative sample of 40 of Transohio Savings' 14,937 consumer loans in the aggregate amount of $71.7 million, however, revealed "instances where the [underwriting] policy did not address required documentation and/or prudent lending practices, and cases where the adopted policies were not consistently applied." DX 222 at WOT970 0891. Apparently, these deficiencies did not result in any losses, but were noted by the Regulatory Authorities. *See, e.g.,* DX 222 at WOT970 0891; DX 216 at WOL236 2430 (OTS internal memo noting Transohio Savings' low delinquency rate reflecting "good underwriting and strong management of distressed real estate.").

### (cc) Transohio Savings—Capital Adequacy.

The analysis of Capital Adequacy included: "an evaluation of the trend in regulatory, GAAP, and tangible capital; a determination of compliance with current and future capital requirements; a review of capital composition; an analysis of Transohio's dividend payment practices; a review of general ledger accounts; and discussions with management regarding internal capital plans and an analysis of these plans." DX 222 at WOT970 0891.

The 1989 Joint Examination reported that Transohio Savings exceeded minimum capital requirements, but warned that "its ability to meet future, more restrictive requirements is questionable. The composition of capital combined with the downward trend in the level of capital warrants supervisory concern." *See, e.g.,* DX 222 WOT970 0891; DX 323 at FAC009 1714 (reflecting Transohio Savings' management's plan to shrink total assets from $6.3 billion to $5.4 billion as of December 31, 1989: "While this reduction was for the most part controlled, further reductions may prove to be more difficult in terms of sale of assets and restructuring assets and liabilities without having a negative impact on future earnings."); *see also* TR at 632.

Special concern was noted about the amount of capital that the Regulatory Authorities anticipated would be needed to support Transohio Savings' risk-controlled arbitrage activities. *See* DX 222 at WOT970 0891. The fact that, as of March 31, 1989, Transohio Savings had a mark-to-market loss of $75,980,000, representing a balance sheet decrease in the net market value of assets, was viewed as problematic although the level of its regulatory capital at that time was viewed to be adequate to absorb these losses because "Transohio's overall asset quality is considered good." DX 222 at WOT970 0891; *see also* DX 222 at WOT970 0879. A $14.5 million loss was recorded for the quarter ending June 30, 1989 and a $1.5 million dividend payment contributed to a further reduction of regulatory capital to $289.5 million or 4.6% of total assets. *See* DX 222 at WOT970 0893. The 1989 Joint Examination clearly anticipated the regulatory changes "in

recently passed legislation" and predicted that in the future "this loss could not be absorbed if only tangible capital is considered." DX 222 at WOT970 0891, WOT970 0893. Transohio Savings' tangible capital during this period was only 1.7% of total assets; the minimum requirement was 1.5%. *See* DX 222 at WOT970 0891.

#### (dd) Transohio Savings—Risk Management.

#### (i) Interest Rate.

Although Transohio Savings approved a formal interest-rate-risk policy on June 29, 1989, as required by Insurance Regulation 563.17–6(c), the Regulatory Authorities found the policy deficient, because it did not reference the actual market value of Transohio Savings' portfolio equity:

> The maximum permissible change in the market value of Transohio's portfolio equity is expressed as a percentage of GAAP capital rather than as a percentage of the market value of portfolio equity as required by Thrift Bulletin 13. As of May 31, 1989, GAAP capital was $175.4 million, while the market value of portfolio equity was a negative $46.0 million. By using GAAP capital as the reference point, management is not focusing attention on Transohio's negative portfolio equity.

DX 222 at WOT970 0895; *see also* DX 289 at FAC008 0563 (questioning whether Transohio's risk management position was prudent).

#### (ii) GAP Hedging Activities.

In addition, the Supervisory Authorities noted that Transohio Savings' negative gap position increased since the last examination from a negative 14.25% annually to negative 29.87% annually. *See* DX 222 at WOT970 0896. Although hedging activities reduced the annual percent to negative 19.46%, $100 million of annual liabilities resulted. *See* DX 222 at WOT970 0896.

#### (iii) Risk–Controlled Arbitrage–Hedged Mortgage Investment ("HMI").

During 1985, Transohio Savings initiated a risk-controlled arbitrage program, *i.e.,*

Transohio Savings purchased mortgage-backed securities funded by borrowings such as loans from the FHLBB in Cincinnati that were hedged with interest-rate swaps. *See* TR at 338–40. When the prior Joint Examination was conducted, Transohio Savings' HMI portfolio included $1,037,112,000 in assets, which increased $601.5 million by 1989. *See, e.g.,* DX 222 at WOT970 0897; PX 1114; *see also* TR at 338–40.

The Regulatory Authorities noted that the existence of an inverted yield curve required Transohio Savings to undertake some portfolio restructuring by purchasing interest-rate caps on superfloater swaps. *See* DX 222 at WOT970 0897. "*[I]n order to comply with proposed risk-based capital requirements [anticipated by FIRREA],*" however, Transohio Savings was reducing the size of its HMI portfolio, which to date resulted in a net gain of $2.7 million. *See* DX 222 at WOT970 0898 (emphasis added).

The 1989 Joint Examination also included portions of two independent expert reports requested by the FHLBB to evaluate Transohio Savings' HMI and hedge activities: the Lindquist Enterprises (PX 1114) and the Capital Market Support Team. The Lindquist Report stated:

> The risks [of the HMI program] are not inappropriate for an investment portfolio. More typical thrift assets would be at greater risk and would be less easily hedged. The management of Transohio has shown itself to be aware of the risks posed by the portfolio and capable of managing and hedging those risks. We were impressed with the style and sophistication of management and their ability to obtain quality reports in a timely manner. Since this is a large and complicated portfolio we would be concerned if there were a management turnover. It is our feeling that it would take a new management considerable time to fully grasp the risk issues of the portfolio.

DX 222 at WOT970 0897.

The Capital Market Support Team Report stated, in part:

> Our overall conclusion is that management has the expertise and ability to monitor the

swap portfolio to provide effective protection from interest rate risk.

DX 222 at WOT970 0897; *see also* TR at 347–62; *but see* PX 1114 at WON257 0379 (emphasis added) ("While [the FHLBB staff] did not find any of Mr. Lindquist's findings overly negative, we believe you will agree there are substantial risks in the portfolio which are being compounded by the continuing inverted yield curve and rising rates.... Given the risks of the portfolio and the unfavorable economic environment, we are requesting a board resolution stating the HMI portfolio will not be increased until approved[.] *We do not intend this to limit restructuring* and *in fact encourage any necessary restructuring.*").

### (iv) Other Hedging And Trading Activities.

Although the Transohio Savings' Board of Directors authorized covered call positions on mortgaged-backed securities, the policy was clear that the purpose was to increase yield on securities held in the investment portfolio. *See* DX 222 at WOT970 0900. During the examination period, however, only two transactions occurred for a total of $2.0 million. *See* DX 222 at WOT970 0900. One transaction was called and the other expired resulting in a "very minimal" gain. DX 222 at WOT970 0900. Post examination transactions appear to have been a wash. *See* DX 222 at WOT970 0900. Transohio Savings also was engaged in actively trading common stocks, which as of March 31, 1989 had a book value of $12,824,050. *See* DX 222 at WOT970 0901. During the period January 1, 1988 to March 31, 1989, Transohio Savings had profits on these investments of $1,606,517. *See* DX 222 at WOT970 0901.

Shortly after the examination date ended, the Regulatory Authorities noted that Transohio Savings engaged in four other "short sale" transactions, on which it incurred losses of $20,000. *See* DX 222 at WOT970 0901.

### (v) Secondary Market Activities.

The Supervisory Authorities' principal concern about Transohio Savings' secondary market activities was the fact that the institution's Board of Directors had not adopted policies or procedures regarding secondary market activities. *See* DX 222 at WOT970 0901.

### (vi) Liquidity Risk.

The Joint Report stated, as of March 31, 1989, that Transohio Savings had a "liquid asset ratio of 5.99 percent, which meets regulatory requirements ... [and] it has maintained sufficient liquidity for the period October 1988 to March 1989." DX 222 at WOT970 0902. Nevertheless, Transohio Savings was advised that "close supervision is warranted because Transohio participates in a variety of intricate investments and borrowings which require assets to be pledged and unavailable for liquidity." DX 222 at WOT970 0902. In particular, a $200 million line of credit to AmeriStar was of concern because, if used, it could reduce Transohio Savings' liquidity. *See* DX 222 at WOT970 0902. In sum, however, the Joint Examination liquidity risk evaluation was a positive, concluding that Transohio Savings' "contingent sources of funding ... [is approximately] $500 million ... through FHLBB advances, lines of credit, and brokered deposits. [Therefore,] Transohio [Savings] appears to have sufficient resources, both internal as well as external, to meet its liquidity needs." DX 222 at WOT970 0902.

### (ee) Transohio Savings—Operating Results.

Operating Results were determined by an analysis of operating results from June 30, 1987–March 31, 1989; FHLBB Thrift Financial Reports, including portions of the June 30, 1989 Report; the "most recent independent" Audit Report; Annual Reports; Securities and Exchange Commission filings by AMCAP; internal financial reports and accounting records; and Transohio Savings' business plan and revised *pro forma* financial statements. *See* DX 222 at WOT970 0902.

The Supervisory Authorities noted a concern about a "change in the *composition of earnings* from 1987 to 1988 and a [subsequent] deterioration in earnings during the first half of 1989." DX 222 at WOT970 0903. As for the latter half of 1989, the "interest-rate environment," *i.e.,* "wherein short-term

interest rates rose more quickly than long-term rates, depressed the earnings of Transohio and increased the losses of its wholly-owned subsidiary, AmeriStar." DX 222 at WOT970 0903. The Supervisory Authorities, however, noted "[m]ore significantly, the May 1989 write off of a deposit" concerning the unsuccessful attempt to purchase Ameri-First resulted in an after tax loss of $9.4 million. *See* DX 222 at WOT970 0903.

On the other hand, Transohio Savings' net income in 1987 increased from $12 million to $17.4 million in 1988. *See* DX 222 at WOT970 0903. And, in 1988, net earnings "were favorably affected by increased net interest income and substantial nonoperating gain." DX 222 at WOT970 0903. The Supervisory Authorities concluded, however, that earnings were "hampered by a decrease in loan fee income created ... by the Financial Accounting Standards Board (FASB) Statement No. 91," but also as a result of an (unqualified) "increase in losses of wholly-owned subsidiaries." DX 222 at WOT970 0903.

Transohio Savings' net income for the first quarter of 1989 was reported at $1.1 million, contrasted with $4.1 million for the first quarter of 1988. *See* DX 222 at WOT970 0903. The increase in "net interest income" in the first quarter of 1989, as opposed to the 1988 period, however, was "overshadowed by a decline in nonoperating profits.... The $14.5 million loss incurred during the quarter ended June 30, 1989, is tied to the events described previously." *See* DX 222 at WOT970 0903. The $12.9 million increase in net income was attributed to interest-rate swaps, an increase in the level of mortgage-backed securities, and an increase in the level and yield of mortgage loans, which together increased income by $89.6 million. *See* DX 222 at WOT970 0903.

### (3) The FDIC Examination For The Period January 1, 1989–December 31, 1989.

After the enactment of FIRREA, the FDIC assumed responsibility for conducting savings and loan association examinations in connection with the FDIC's role "as insurer [but] not primary regulator[.]" DX 323 at FAC009 1712. On February 20, 1990, the FDIC announced its first examination of Transohio Savings for the period January 1, 1989–December 31, 1989, in part overlapping the March 30, 1989–September 6, 1989 Joint Examination conducted by the Supervisory Authorities previously discussed. *See* DX 323. The FDIC Examination "focused [solely] on [Transohio Savings'] *viability and the component areas impacting that assessment, namely capital, asset quality, management, earnings, and liquidity.*" DX 323 at FAC009 1712 (emphasis added).[42] The FDIC's bottom line was that Transohio Savings' financial condition had deteriorated significantly since the March 30, 1989–September 6, 1989 Joint Examination was conducted and Transohio Savings' continued viability now was uncertain. Consequently, only four months after Transohio Savings received an overall "3" rating from the Supervisory Authorities, the FDIC concluded that "Transohio's Uniform Composite rating is 5." DX 323 at FAC009 1722; *see also* TR at 414.[43]

---

**42.** In 1989, the FDIC replaced the MACRO five-element composite rating system with CAMELS ratings, comprised of the following six elements: "Capital Adequacy," "Asset Quality," "Management," "Earnings," "Liquidity," and "Sensitivity to Market Risk." *See* TR at 412; Hamm Direct at 20. The CAMELS ratings also were based on a system of 1 through 5, with 1 being the highest rating. The former Examiner–in–Charge of Transohio Savings testified that:

> Generally a 1 and 2 is considered satisfactory. A 3 is a rating given to an institution that is starting to have some defined weaknesses. A 4 is an institution that has ... severely defined deficiencies. And a 5 is the worst rating that we assign.
> TR at 413.

CAMELS ratings also were used by the Office of the Comptroller of the Currency and the Federal Reserve Bank. *See* TR at 414; *see also* TR at 564 (defining a "5" rating as "reserved for institutions with an extremely high immediate or near-term probability of failure. The volume and severity of weaknesses or unsafe and unsound conditions are so critical as to require urgent aid from stockholders or other public or private sources of financial assistance. In the absence of urgent and decisive corrective measures, these situations will likely require liquidation and the payoff of depositors, disbursement of insurance funds to insured depositors, or some form of emergency assistance, merger or acquisition.").

**43.** A "5" rating was defined in the ... [FDIC's] Law, Regulations and Related Acts, as follows:

As with MACRO ratings, CAMELS ratings also included a subjective component, as the former Regional Director of the FDIC's Chicago Office testified:

> We would look at the severity of all the categories, the severity of the ratings and make our best judgment as to how severe certain things were. And, as an example, management is obviously a critical component in all institutions, all businesses, financial institutions and otherwise. And if there were really severe situations related to management but the other ratings might be better, we might weigh management higher because of certain things we saw in that area, and that could affect the composite rating.
>
> So it would be a judgment how severe things were, how low is capital, how much the classifications are in the asset area, how bad are the earnings situation? How intractable is it? What does it take to get out of it? You would look at all of those things and just make a judgment as to what the composite rating should be with also the idea being that what is the potential for failure? That's the ultimate interest and goal of the FDIC, to prevent failures.
>
> And considering everything, all those CAMEL[S] ratings, if we felt there was an elevated degree of failure, it would be in the 4 to 5 range, and then we would just make a judgment as to is it more severe or less severe, and 5 being the most severe.

TR at 561–62.

#### (aa) Transohio Savings—Capital.

The FDIC's 1989 examination also reported that:

> Tangible and core capital totaled $95,320,000 and $175,174,000 representing 1.79% and 3.29% of the total tangible assets of $5,322,461,000, respectively. *Although both ratios exceed the minimum requirements established by FIRREA,*

Transohio's capital protection is dangerously low and given the current condition of *the bank will unlikely be able to meet future phase in requirements.*

DX 323 at FAC009 1714 (emphasis added).

In response to Transohio Savings' clear need for increased capital, the FDIC acknowledged:

> management [had] initiated a plan to shrink total assets; reducing total assets from approximately $6,360,390,000 at December 31, 1988 to $5,419,245,000 at December 31, 1989 ... [, however,] further reductions may prove to be more difficult in terms of sale of assets and restructuring assets and liabilities without having a negative impact on future earnings. Reasons for concern are the increasing volume of low quality assets, strained liquidity position and high amount of depreciation in the securities portfolio ... [which] (includes mortgage backed securities) ... [,*i.e.*,] $60,108,000 or 63.1% of tangible capital.

DX 323 at FAC009 1714.

Of particular concern to the FDIC was Transohio Savings' $45,070,000 of purchased mortgage servicing rights, included in tangible and core capital, because it was anticipated that a proposed regulation would be implemented to limit the amount of purchased mortgage servicing rights that could be included in the calculation of capital. *See* DX 323 at FAC009 1714. At that time, $45,070,000 or 47.3% of Transohio Savings' core capital consisted of such purchased mortgage servicing rights. *See* DX 323 at FAC009 1714.

The FDIC also flagged three Transohio Savings' subsidiaries that were engaged in unspecified "impermissible activities:" AFC Insurance Services Corp., a life and property insurance company; Cambridge Homes, Inc., real estate development; and Transohio Brokerage & Financial Services, Inc., a full-service brokerage services contractor. *See*

---

This category is reserved for *institutions with an extremely high immediate or near term probability of failure.* The volume and severity of weaknesses or unsafe and unsound conditions are so critical as to require urgent aid from stockholders or other public or private sources of financial assistance. In the absence of ur-

gent and decisive corrective measures, these situations will likely require liquidation and the payoff of depositors, disbursement of insurance funds to insured depositors, or some form of emergency assistance, merger or acquisition.

DX 323 at FAC009 1722 (emphasis added).

DX 323 at FAC009 1714. The FDIC reported that July 1, 1990 was the "trigger date ... when institutions must take [under FIRREA] 10% of the investments in and advances to subsidiaries engaging in impermissible activities and deduct that amount when determining capital." DX 323 at FAC009 1714.

The FDIC assigned a "5" rating to Transohio Savings' capital situation. *See* DX 233 at FAC009 1969; *see also* TR at 416.

### (bb) Transohio Savings—Asset Quality.

By the end of 1989, 4.26% of Transohio Savings' assets or $229,629,000 were classified as "adverse;" $204,541,000 or 214.58% of tangible capital as "substandard;" and $25,088,000 or 4.26% of total assets classified as a "loss." *See* DX 323 at FAC009 17161; *see also* TR at 416.[44] In addition, the amount of loans subject to adverse classifications was $159,838,000 and equaled 5.79% of total non-mortgage backed securities loans. *See* DX 323 at FAC009 1716.

The amount of loans rated with a "substandard" classification was $150,089,000 and $9,749,000 was classified as a "loss." DX323 at FAC009 1716.[45] In addition, the FDIC reported $117,844,000 of other "internally classified" loans and $31,953,000 in the "Special Mention" category. *See* DX 323 at FAC009 1717.

> Classified other real estate totals $28,188,000, $25,863,000 Substandard and $2,325,000 Loss. Properties classified include single family residences, office buildings, strip malls, undeveloped land and various other income producing real estate. In most instances stale appraisals were found and/or stale appraisals existed prior to acquisition. Four Cardinal properties were taken into other real estate during the examination. Executive Vice President Bender indicated that appraisals have been ordered and any deficient balance would be charged off. In addition, a current appraisal should be obtained when property is acquired.

> A total of $28,621,000 in various other assets has been classified: $16,928,000 Substandard and $11,693,000 Loss.

DX 323 at FAC009 1717.

The FDIC further reported that Transohio Savings held: $12,982,000 in high yield corporate bonds (junk bonds); *i.e.,* "classified securities," of which $11,661,000 were categorized as "substandard" and $1,321,000 as a "loss." DX 323 at FAC009 1717. In accordance with FIRREA, however, Transohio Savings adopted a divestiture plan to monitor the junk bond portfolio and sell it as soon as possible. *See* DX 323 at FAC009 1717.

The FDIC assigned a "5" rating regarding Transohio Savings' overall asset quality. *See* DX 233 at FAC009 1716, 1969; *see also* TR at 416.

### (cc) Transohio Savings—Management.

The FDIC assigned a "4" rating to Transohio Savings' management, rather than a "5." *See* DX 323 at FAC009 1969; *see also* TR at 475–76. A "4" rating was intended to convey to management there are significant "well defined problems" and "well defined deficiencies" that "if not corrected could result in a more serious problems." TR at 476–77. As FDIC Examiner Leonard testified at the Evidentiary Hearing:

> [T]here were a lot of things [Transohio Savings] did very well; a lot of things they didn't do very well at all. The lending activity, loan administration, very poor. Earnings, ... very poor. Dealing with its interest rate risk in the short-term, pretty good. They made commitments that they

---

44. FDIC Examiner Leonard testified that although he conducted Transohio Savings' examination in a "black box," "just because I classify an asset in the report of examination doesn't mean it is a bad piece of property." *See* TR at 427–29. The FDIC, however, did consider the credit worthiness of the borrower in determining whether the asset should be classified. *See* TR at 429–37. The FDIC, however, made no special analysis of whether the loans that it was examining were part of the 1986 supervisory mergers or came to Transohio Savings otherwise. *See* TR at 444.

45. The largest volume of loss was $7,300,000 attributed to the installment lending area. *See* DX 323 at FAC009 1717.

would correct these particular items and address these deficiencies. I had no reason to doubt that they would correct those problems, so I gave them the 4 instead of the 5 because I thought they would do the job necessary to correct the problems.

TR at 475–76.

Mr. Leonard's primary criticism at the time was of the oversight by Transohio Savings' Board of Directors, which he characterized as being "very lax on its responsibilities.... They didn't adopt and approve policies and procedures that need to be put in place for management to follow.... For example, the loan policy hadn't been reviewed in two years when we got there." TR at 477; *see also* TR at 575–80 ("We didn't see the board had an active involvement regarding their fiduciary responsibility, not the active management part but their fiduciary responsibility for the protection of the shareholders and the institution and the depositors, too."); TR at 603.

### (dd) Transohio Savings—Earnings.

In 1989, Transohio Savings' net losses of $19,846,000 were attributed "primarily due to erosion in the net interest margin, termination of the [A]cquisition [A]greement with AmeriFirst Bank ... losses suffered by Ameristar Financial Corporation, a mortgage banking subsidiary and adjustments on high-yield corporate bonds (junk bonds)." DX 323 at FAC009 1715; *see also* TR at 454. Of the $19,846,000 net loss, $7,993,000 was attributed to the erosion in net interest margin, the aborted AmeriFirst transaction, and adjustments on junk bonds. *See* DX 323 at FAC009 1715. With poor earnings into 1990, net losses of $387,000 on a consolidated basis were reported through February 28, 1990. *See* DX 323 at FAC009 1715. The FDIC cautioned, however, that the $19,846,000 losses for 1989 were:

> believed to be understated because of inadequate provisions for loan losses. Due to the asset/liability mix, Transohio has an extremely low net interest margin, 1.23% compared to a peer average of 2.21% for 1989 ... caused by a large volume of high cost funds (borrowings, and brokered and jumbo CDs) resulting in an overall high

interest cost [of] 8.49% compared to peer average of 8.08%.... This is coupled with a low yield on interest earning assets, 9.82% compared to a peer average of 10.34%.... Transohio's net interest income is not sufficient to cover overhead expenses. Although the institution has gone to great lengths to manage interest rate risk, this has had the effect of locking in a slim net interest margin. In order to generate income the institution is heavily involved with noninterest producing activities; primarily mortgage servicing and secondary marketing. The prospects of Transohio to generate future earnings appears in doubt at this time. Transohio is dependent on a favorable interest rate environment that would allow a restructuring of assets and liabilities.

DX 323 at FAC009 1715.

The FDIC assigned a "5" rating regarding Transohio Savings' earnings. *See* DX 233 at FAC009 1716, 1969; *see also* TR at 416.

### (ee) Transohio Savings—Liquidity.

The FDIC concluded that liquidity and dependency ratios also "are reason for concern," because including mortgage-backed securities to meet real estate lending requirements "distorts" Transohio Savings' liquidity position since the institution had to keep a large portion of these assets to "maintain its qualified thrift lender status." DX 323 at FAC009 1718. As of December 31, 1989, the aggregate of Transohio Savings' use of borrowings, brokered deposits, repurchase agreements, and large volatile deposits totaled $1,714,227,000, representing 31.8% of total assets. *See* DX 323 at FAC009 1718. Although Transohio Savings' management indicated that it would continue to reduce the amount of Hedged Mortgage Investment and Mortgage–Backed Securities, the FDIC examination advised: "Caution must be taken since the securities portfolio ... has depreciation of $60,108,000 representing 63.1% of tangible capital. Any reduction through the sale of MBS's *should not be motivated by gains that could be taken.*" DX 323 at FAC009 1718 (emphasis added).

The FDIC also reported that Transohio Savings' business plan calls for:

sale of various branches and deposits during 1990 totalling approximately $470,000,000. Projections indicate that funding would be facilitated by a substantial increase in the use of brokered deposits, jumbo CD's, reverse repos and FHLB advances. Throughout the year borrowings would be reduced through the sale of assets and natural run off of loans and MBS. While reductions in total assets were accomplished without placing additional strains on liquidity, further reductions may well result in damage to liquidity that will impact earnings and adequacy of capital protection.

DX 323 at FAC009 1718.

The FDIC assigned a "4" rating regarding Transohio Savings' liquidity. *See* DX 233 at FAC009 1716, 1969; *see also* TR at 416.

### (4) Post–FIRREA.

On December 7, 1989, the statutory provisions of FIRREA became effective. Neither party proffered evidence as to Transohio Savings' exact financial condition as of December 7, 1989, the date of the breach. As of December 7, 1989, however, Transohio Savings could no longer utilize the remaining capital credits to meet core and risk-based regulatory requirements. In addition, Transohio Savings was no longer able to utilize any of the remaining goodwill to meet FIRREA's regulatory requirements. *See* PX 1075 at PAC087 1065–66; *see also* TR at 1950–52. Therefore, on December 7, 1989, Transohio Savings was in a position where its regulatory capital was reduced overnight by almost 50%. *See* DX 305 at PAC087 1038–39, 1066; *see also* TR at 1949–50.

### b. Analysis And Opinions Of The Government's Experts.

### (1) Professor Kroszner.

Professor Kroszner testified that the $18.4 million loss in equity value during 1989 was not attributed to the announcement and passage of FIRREA, but rather to: $9 million in dividends paid to TFC; $9.4 million attributed to the write-off of costs related to the termination of efforts to purchase AmeriFirst Bank; $14.1 million loss from Transohio Savings' mortgage subsidiary, AmeriStar; and $4.0 million loss caused by "valuation adjustments on investments in high yield corporate bonds." *See* Kroszner Direct ¶ 15, at 7; *see also* DX 305 at PAC087 1054–55.

### (2) Dr. Hamm.

On direct, Dr. Hamm testified that factors unrelated to the breach put downward pressure on TFC's stock during the period February 3, 1989–August 9, 1989. *See, e.g.,* Hamm Direct ¶ 343, at 123 ("Unfavorable earnings reports often prompt investors to lower their estimates of the company's future earnings, causing the company's share-price to decline."). For these reasons, Dr. Hamm concluded that the anticipation of FIRREA had only a "modest impact on TFC's equity value during the period February 3, 1989 through August 9, 1989, and may have had no impact at all-or even a favorable impact." Hamm Direct ¶ 344, at 123; *see also* Hamm Direct ¶ 59, at 23 ("Transohio did not lose any real assets or take on liabilities as a result of the breach ... While the breach prevented Transohio from counting a portion of its forbearance capital toward its regulatory capital requirements, this capital has no intrinsic economic value."); Hamm Direct at ¶¶ 340–41, at 122 (TFC's equity "remained intact" prior to the enactment of FIRREA). By Dr. Hamm's own analysis, however, TFC lost 10% of its equity value immediately prior to the enactment of FIRREA.

Dr. Hamm placed great weight on TFC's 1989 Annual Report that "applaud[ed] FIRREA ... [as] the most comprehensive piece of legislation to affect the savings and loan industry since the formation of the Federal Home Loan Bank System in the 1930s." Hamm Direct ¶ 342, at 122–23 (citing DX 303 [TFC's 1989 Annual Report] at 3). Dr. Hamm also relied on Transohio Savings' statement that "FIRREA's new capital standards became effective December 7, 1989 at which time TRANSOHIO [Savings] exceeded all three standards. The Company expects to continue to exceed all three tests in 1990." Hamm Direct ¶ 342, at 122–23 (quoting DX 303 [TFC 1989 Annual Report] at 3). Dr. Hamm's view of TFC's praise of FIRREA and anticipated compliance, however, did not

begin to address what specific losses, if any, Transohio Savings would have incurred irrespective of the breach caused by FIRREA.

At the Evidentiary Hearing, however, Dr. Hamm testified that the $9.4 million loss relating to the aborted effort to acquire AmeriFirst Bank had no relationship to "[t]he phase out of goodwill in the forbearance capital." TR at 3009. He also testified that the $14.1 million loss relating to Transohio Savings' mortgage banking subsidiary, AmeriStar, had "no connection [with the phase out of goodwill]. AmeriStar was wound down because it was losing money.... In 1989 Transohio made the business decision that it was going to close a number of offices[.]" TR at 3009. Regarding the $4 million net after tax loss on valuation adjustments made on high yield corporate bonds, Dr. Hamm attributed those losses to a FIRREA requirement that such instruments be divested by December 31, 1994. *See* TR at 3011–12. In addition, under GAAP, all thrifts were required to account for such instruments at the lower of cost or market value, because they could no longer be held to maturity. *See* TR at 3011–12.

### (3) Mr. Johnson.

Mr. Johnson testified that Transohio Savings incurred $59.914 million of "capital erosion" in fiscal year 1989 comprised of: $3.342 million "speculative investments;"[46] $16.679 million of loan and real estate losses; $22.742 million attributed to AmeriStar's mortgage origination business; $14.304 million concerning the termination of the AmeriFirst acquisition; and a $9 million dividend paid to AMCAP. *See* Johnson Direct at 8.

### c. The Government Established With Reasonable Certainty That Transohio Savings Bank, FSB Would Have Incurred Net Losses of $19.846 Million In Fiscal 1989 Irrespective Of The Breach.

In fiscal year 1989, Transohio Savings incurred net losses of $19.846 million. *See* DX

305 at PAC087 1054, 74. It is not clear whether plaintiffs' counsel may have stipulated that all pre-FIRREA net losses should be deducted from plaintiffs' reliance interest. *See* TR at 2386 ("Our losses pre-FIRREA, I admit, count on his side of the ledger."); *see also* James Direct at 16 ("Transohio's results in 1989 were largely (though not entirely) unaffected by the breach ... [n]one of these negative developments arose from the breach of Transohio's regulatory capital contract."); DX 323 at FAC009 1717 ("The decline in earnings is primarily due to erosion in the net-interest margin, termination of the acquisition agreement with AmeriFirst Bank ..., losses suffered by Ameristar Financial Corporation, a mortgage banking subsidiary and adjustments on high-yield corporate bonds (junk bonds)."). Nevertheless, the court independently has determined that the Government established with reasonable certainty that the $9.4 million net after tax loss caused by Transohio Savings' aborted acquisition of AmeriFirst cannot be attributed to the Government's breach of the August 29, 1986 Assistance Agreement. *See* DX 222 at WOT970 0903; DX300; DX 303 at WOL246 0188, 90; DX 305 at PAC008 1018–19; DX 323 at FAC009 1713; DX 325; TR at 1772, 3009; *see also* TR at 55, 102–06, 302, 318–31, 326, 478; Post Hearing TR at 153–54, 165, 168–57, 170–71.

In addition, the Government established with reasonable certainty that the $14.1 million after tax losses associated with AmeriStar's mortgage business would have been incurred irrespective of the breach, because an independent decision was made by Transohio Savings' management to downsize or exit AmeriStar's mortgage banking business prior to the enactment of FIRREA. *See, e.g.,* DX 210 at PAC0078 0068–69; DX 222 at WOT970 0879; DX 303 at WOL246 0161; DX 453 at WON970 0515; DX 751; DX 821 at WON169 1657; DX 822 at WON029 1572;

---

**46.** In the notes to the "Summary of Losses Unrelated to FIRREA 1987–1991," Mr. Johnson clarified that he considered "investments in junk bonds, mortgage-backed securities, collateralized mortgage obligations, and I/O strips" to be speculative investments. Mr. Johnson acknowledged

that "mortgage-backed securities (MBS) are generally not considered speculative investments for thrifts to hold, [however], Transohio was using its MBS to engage in speculative activities." Johnson Direct at 9 note (c).

DX 823 at CAC379 0117–23; DX 826 at PAC112 0502; PX 791 at AC–AMCAP–0010200–01; PX 860 at AC–AMCAP–0009222; PX 864 at WON068 1280; PX 870 at AC–AMCAP–0009483; PX 871 at AC–AMCAP–0009492–94; *see also* TR at 1772, 2740–45,2860–84, 3009–10, 3233, 3239–40, *see also* DX 305 at PAC087 1054–55. Mr. Snider initially testified that the decision to sell AmeriStar did not have anything to do with the loss of regulatory capital. *See* TR at 3383–84. Although the transcript later reflects that Mr. Snider testified to the contrary (*see* TR at 3384), the court believes the witness was distinguishing between the decision to sell AmeriStar's business from the decision to sell Columbus and Cincinnati branches-the former having nothing to do with the breach, but the latter being motivated by the breach.

The court also is satisfied that the Government established with reasonable certainty that the $4 million after tax loss related to valuation adjustments on high yield corporate bonds would have been incurred irrespective of breach, because one of the provisions of FIRREA unrelated to the treatment of regulatory capital required savings institutions to divest noninvestment grade corporate securities by the end of 1994. *See* DX 305 at PAC087 1061; DX 323 at FAC009 1717; DX 453 at WOT970 45, 522–23; DX 753 at PAC086 0122; DX 754 at PAC086 0232; *see also* TR at 470–71, 1772–73, 2142–42, 2334–35, 2942–50, 3011–12, 3271–73, 3621.[47]

Therefore, the court has determined that Transohio Savings would have incurred losses of $27.5 million in fiscal year 1989 irrespective of the breach, however, because only net losses affect equity, the amount of losses that the Government established for RE-STATEMENT § 349 purposes is $19.846 million.

### 2. January 1, 1990–December 31, 1990.

#### a. The Financial Condition Of Transohio Savings And Net Losses Incurred.

##### (1) Transohio Savings' OTS Form 10–K And Internal Memoranda.

By the end of fiscal year 1990, Transohio Savings incurred net losses of $44.3 million. *See* DX 453 at WOT970 0515; *see also* TR at 1532, 3012, 3621. Transohio Savings' 1990 OTS Form 10–K reported that these losses were "primarily attributable" to a $30.2 million provision for "possible losses on loans" ($26.3 million after taxes) and $17.4 million after taxes for restructuring charges and were the result of the continued downturn of the economy and real estate markets. *See, e.g.,* DX 453 at WOT970 0018–19, 25, 515, 557; DX 339; DX 613 at WON537 2228; *see also* TR at 1532, 3012, 3372–82, 3384–85, 3621.

On March 8, 1990, OTS regulators convened a meeting with the Board of Directors of AMCAP, TFC, and Transohio Savings to discuss Transohio Savings' "operating problems" and AMCAP's "debt service" problems. *See, e.g.,* DX 331; DX 332; *see also* TR at 117–120. As the court noted during the Evidentiary Hearing, this appears to be the first internal OTS memorandum reflecting a serious concern existed about Transohio Savings' Board and management, but the regulators did not provide Transohio Savings' Board or management with a copy of their evaluation. *See* TR at 131–34. On March 29, 1990, Transohio Savings' Board

---

**47.** The court has made no determination as to whether plaintiffs may be able to recoup this $4 million amount as a regulatory taking in this action. *See Penn Central Transp. Co. v. New York*, 438 U.S. 104, 124, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978) (regulatory takings analysis is *ad hoc* and fact intensive requiring an analysis of the "economic impact" of the relevant statutory provision, whether it interfered with "reasonable investment backed expectations," and the "character of the governmental action."); *see also Yee v. City of Escondido*, 503 U.S. 519, 523, 112 S.Ct. 1522, 118 L.Ed.2d 153 (1992); *Kaiser Aetna v. United States*, 444 U.S. 164, 175, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979). Our appellate court has not yet had an occasion to consider *en banc* the viability of regulatory takings claims that arise independent of any contract rights in *Winstar* cases. *See Bailey v. United States*, 341 F.3d 1342, 1347 (Fed.Cir.2003) (holding no regulatory taking because plaintiff was not deprived of a contractual remedy for the Government's breach to recover the thrift's assets). Implicit in the court's determination that the $4 million loss incurred regarding the sale of the high yield corporate bonds, is the corollary determination that TFC did not have a contractual remedy for this loss.

discussed the need to sell the Columbus and Cincinnati branches to try to achieve capital compliance. *See* DX 339; TR at 3372–82, 3384–85.

On June 1, 1990, the OTS Regional Director recommended the imposition of an Order to Cease and Desist, based on the February 20, 1990 Report of Examination revealing "serious deficiencies." DX 353. The OTS staff also concluded that Transohio Savings had "problems throughout, irrespective of FIRREA and goodwill and well-defined problems that needed to be corrected." TR at 594; *see also* DX 354 at WON237 0085 (reporting Transohio Savings' view that "[t]he rules have changed; FIRREA took away their capital ... TSB's margins are rising but earnings are hurting due to downsizing to meet the capital requirements. Historical margins are attributable to the speed and type of growth. TSB had no choice but to grow after the acquisition; in hindsight, the acquisition was the worst choice TSB has ever made considering the rule change."); DX 370 at WON420 0224 (July 26, 1990 OTS internal memo as reflecting Transohio Savings' view that it "built a balance sheet based on a set of rules that are no longer in place, *i.e.*, OTS, IRS, and FASB regulations/statutes/statements that have been amended or removed. [Transohio Savings has] had to sell $1.3 billion of [our] best assets to meet their capital requirements.") On August 10, 1990, OTS issued a notice to Transohio Savings deeming it a "troubled institution." *See* PX 196. On September 17, 1990, the OTS required Transohio Savings to receive approval of "all transactions with affiliates and affiliated persons." PX 196.

On September 27, 1990, Transohio Savings' Board focused on the potential sale or closure of the remaining portions of AmeriStar's business. *See* DX 413; *see also* TR at 3382–89. As of September 30, 1990, 3.4% of Transohio Savings' assets, or $169.3 million, were listed as "classified," of which $39.1 million, or 23.1%, were assets that Transohio Savings acquired from the 1986 Citizens and Dollar acquisitions. *See* DX 393 at FAC010 1174; *see also* TR at 698, 983.

On October 11, 1990, OTS staff again recommended the imposition of an IMCR concluding that Chairman "Burstein has had a detrimental impact on the safe operations of Transohio [Savings]. An IMCR could be helpful in executing the [cease and desist] order, thereby eliminating ACC's dominance over the thrift.... [and] trigger the filing of a capital plan which would allow the district to exert more control over an operation that has exposed the insurance fund to great risk." PX 205 at FAC008 1733; *see also* DX 359; DX 416; DX 419; TR at 951.

On October 19, 1990, Transohio Savings decided to sell the Columbus branches, which generated a $5.1 million book loss. *See* DX 420. On November 2, 1990, the OTS was informed of plans to divest AmeriStar, sell other assets, and pre-pay "high cost liabilities and interest rate swaps" and incur a "restructuring provision for downsizing and exiting certain businesses." PX 193 at WON022 2723.

On November 8, 1990, the OTS Regional Director made a formal recommendation to initiate cease and desist procedures. *See* DX 430. A November 26, 1990 internal memo also indicated that the OTS had suggested to Transohio Savings that it further shrink the HMI portfolio, even though it already had reduced book value from $1.6 billion to $1.05 billion in the past 18 months. *See* PX 202. Transohio Savings' 1990 OTS Form 10–K attributed many of the losses that year to FIRREA, *i.e.*, "Transohio has reduced its asset base over the last 18 months in order to facilitate its ability to satisfy the capital regulations required by FIRREA." *See* DX 453 at WOT970 0516. Specifically, the decline of interest, *i.e.*, $18.9 million, on loans and mortgage-backed and related securities was "primarily the result of the asset dispositions as noted previously[,]" and "the continued application of more conservative methodologies of the regulatory agencies," but does not attribute the precise amount caused by overall economic indicators or the precise amount attributed to the impact of FIRREA on its loan portfolio. *See* DX 453 at WOT970 0517–18.

On November 29, 1990, another internal OTS memo recommended holding off imposing an IMCR stating that the agency "may be able to use the capital issue as a bargain-

ing chip to resolve all issues between OTS and [Transohio Savings]." PX 206. All of the regulatory agencies, however, were very much aware of the lawsuit Transohio Savings filed against FDIC and OTS concerning the "inclusions of goodwill and a FSLIC contribution in its capital as a result of its acquisition of two insolvent thrifts. The lawsuit alleges that the exclusion of these items is a breach of contract." PX 190 at WON022 0679.

### b. Analysis And Opinion Of The Government's Experts.

#### (1) Professor Kroszner.

Professor Kroszner testified that the loan loss provision for commercial real estate loans, including construction loans, was caused by "deteriorating economic conditions during 1990, which caused a weakening of real estate markets, softening of collateral values and increases in non-performing loans." *See* Kroszner Direct ¶ 19, at 10; *see also* TR at 3013–14. Professor Kroszner did not opine on whether the restructuring charges would have been incurred irrespective of the breach, but rather that such losses were "largely unexpected." Kroszner Direct ¶ 19, at 10 n. 11.

#### (2) Dr. Hamm.

Dr. Hamm's direct testimony also did not specifically address whether Transohio Savings' $30.2 million loan losses during fiscal year 1990 would have occurred irrespective of the breach. Nor did Dr. Hamm's direct testimony address that issue regarding Transohio Savings' $17.4 million restructuring losses. Instead, Dr. Hamm generally concluded for the two year period 1990–1992, Transohio Savings' total loss of $190 million "could not possibly have caused any portion of this devastating change in Transohio [Savings'] fortunes, since management made its $103.5 million earnings prediction in early 1990–at least five months after FIRREA became law. This fact also conclusively establishes that factors *other than the breach* caused Transohio [Savings] to fail." Hamm Direct ¶ 351, at 125 (emphasis in original). Dr. Hamm further testified that the breach "reduced Transohio's regulatory capital by

an amount ranging from $23 million to $47 million during the 1990–92 period. When a thrift's regulatory capital goes down, the maximum volume of interest-earning assets that the thrift can hold and still remain in capital compliance goes down as well." Hamm Direct ¶ 65, at 26; *see also* ¶¶ 71–74, at 29. Dr. Hamm also concluded that the 77% decline of TFC's market price from August 31, 1989 to $1.50 per share on December 31, 1990 was not related to the breach since "the anticipated effects of the breach would have been fully reflected in TFC['s] share-price by August 31, 1989[.]" Hamm Direct ¶ 354, at 126.

At the Evidentiary Hearing, Dr. Hamm testified that there was "absolutely no connection" between the $30.2 million loan losses and "the phase out of goodwill," including the time that the loans were made. *See* TR at 3013. Moreover, Dr. Hamm testified that even if some of these losses were attributed to loans Transohio Savings obtained through the supervisory mergers with Citizens and Dollar "it doesn't matter[.]" TR at 3014. Regarding the $17.4 million in restructuring losses, Dr. Hamm simply testified that there was "no relationship ... between the phase out of goodwill and the decision to make Transohio more profitable." TR at 3015; *see also* TR at 3016–17.

#### (3) Dr. Johnson.

Mr. Johnson testified on direct that Transohio Savings incurred $62.336 million of "capital erosion" in fiscal year 1990 comprised of: $5.688 million "speculative investments;" $37.499 million of loan and real estate losses; $8.311 million attributed to AmeriStar's mortgage origination business; and $11.642 million restructuring charges. *See* Johnson Direct at 8.

### c. The Government Established With Reasonable Certainty That Transohio Savings Bank, FSB Would Have Incurred Net Losses of $11.69 Million In Fiscal 1990 Irrespective Of The Breach.

In fiscal year 1990, Transohio Savings recorded net losses of $44.3 million, of which

$30.2 million ($26.3 million after tax) were provisions for "possible losses" on loans. *See* DX 453 at WOT970 0515; *see also* Post Hearing TR at 154–55, 165–67. The Government attributed Transohio Savings' $30.2 million loan losses in 1990 to: the expansion of its commercial and construction loan portfolio prior to 1989; a poor loan classification system; and the failure to dispose of real estate "promptly." Gov't Post–Trial Brief at 63 (citing PX 1074 at 6; TR at 2089–95, 2560, 2565–66). At the Evidentiary Hearing, the Government focused on demonstrating the inadequacy of Transohio Savings' internal controls, as identified by the FDIC, OTS, and Transohio Savings' auditor, KPMG, as the cause of the loan losses. *See* Gov't Post–Trial Brief at 63–65; *see also* DX 323 at FAC009 1717; DX 453 at WOT970 0517; DX 570 at FAC011 1852; DX 599 at WOL590 0517, 19, 24–25; *see also* TR at 450–51, 499–503, 513, 778, 783, 791, 1849, 1857, 2103–16, 2123–26, 2129–37.

It is true that Transohio Savings' 1990 OTS Form 10–K reported that:

> The majority of the loan loss provision in 1990 relates to commercial real estate loans, including construction loans. Deteriorating economic conditions during 1990 have caused a weakening of real estate markets, softening of collateral values and increases in non-performing loans, necessitating an increase in loan loss provisions. Other loan types such as consumer and mobile home loans also experienced higher delinquencies as a result of poor economic conditions and required additional loan loss provisions. Transohio's methodologies for determining the adequacy of its loan loss allowance has also been influenced by the current stringent regulatory environment.
>
> \* \* \* \* \* \*
>
> Transohio's management agreed [with OTS] that additional loss allowances were prudent[.] ... In addition to the downturn in commercial real estate, Transohio has also been negatively impacted by the deterioration of such installment loans, particularly in regards to its mobile home loan portfolio. With the continued downward trend in real estate markets and the economy in general and uncertainty as to

when a recovery will occur, Transohio established approximately $12.1 million of additional general loss allowances.

DX 453 at WOT970 0518–19.

But it is also true that, as FDIC Examiner Farrell testified at the Evidentiary Hearing, the loan loss reserves were established with the concurrence of regulators and do not reflect actual dollar losses, but losses anticipated based on the portfolio's performance, *i.e.*, "anticipated losses ... over the next year up to maybe three years." *See* TR at 1085; *see also* DX 512 at WOL235 0847 (a large portion of the $44.3 million losses were attributable to one time charges associated with FIRREA).

Recognizing that simply reciting the disclosures in Transohio Savings' 1990 OTS Form 10–K would not satisfy the "reasonable certainty" requirements of RESTATEMENT § 349, the Government later attempted to finesse the failure to identify any specific components of the $30.2 million "possible losses" and whether they were incurred irrespective of the breach by simply asserting that it is irrelevant whether Transohio Savings "originated the loans for which it recorded provisions for possible losses, or ... inherited those loans from Citizens or Dollar ... [since] Transohio would have suffered the same losses in the absence of the breach[.]" Gov't Post–Trial Brief at 62. The court has determined that the source and the timing of the loans that generated losses is relevant, *e.g.*, the record reflects that as of September 30, 1990, $39.1 million of Transohio Savings' "classified" assets were derived from the 1989 merger with Citizens and Dollar. *See* DX 393 at FAC010 1174. Moreover, the Government's role in the calculation and decision to book certain losses rather than others is relevant. Likewise, the fact that the $30.2 million losses at issue were "possible" not actual losses is relevant. As the United States Court of Appeals for the Federal Circuit has recognized in *Hansen*:

> the commingling of assets as a result of the ... merger[s] and the subsequent activities of [plaintiff] may make it difficult to 'unwind' the transaction between the [plaintiff] and the government for purposes of determining the appropriate amount, if

any, that can be restored through [damages]. We do not agree with the government, however, that this difficulty, on its own prevents the [plaintiff] from recover[y].

*Hansen,* 367 F.3d at 1318–19.

In addition, the Government did not contest that the amount of the shrinkage in 1990 was $1.3 billion (*see* Post Hearing TR at 191), but the Government did not identify how much of the $30.2 million in "possible" loan losses was attributed to that shrinkage. *See Old Stone Corp.,* 63 Fed.Cl. at 73 ("The bank found it necessary to shrink after the breach to meet required capital ratios. . . . A bank may improve its capital ratio either by increasing capital . . . or shrinking the bank's assets. That is, sell assets that often serve as the bank's primary source of earnings. Either strategy creates a higher capital ratio. As banks sell their best assets to raise capital, however, their income drop dramatically.").

The United States Court of Appeals for the Federal Circuit has cautioned against "keying an award to a liability that was at most a paper calculation[.]" *Glendale Federal Bank v. United States,* 239 F.3d 1374, 1383 (Fed.Cir.2001); *see also Glendale Federal Bank v. United States,* 378 F.3d 1308, 1312 (Fed.Cir.2004) ("the framework for the calculation of reliance damages as articulated by the Federal Circuit focus on actual out-of-pocket losses, not paper calculations of losses."). Since the $30.2 million in "possible" loan losses in fact were paper losses incurred with the knowledge and consent of the regulatory agencies, the court has determined that the Government did not meet its burden to establish with reasonable certainty that the $30.2 million in loan losses (or any portion thereof) would have been required to be booked by Transohio Savings in fiscal year 1990 irrespective of the breach.

In fiscal year 1990, Transohio Savings' OTS Form 10–K also reported a $17.4 million after-tax loss "due to Transohio's restructuring program." DX 453 at WOT970 0515; *see also* DX 426 at FAC008 1227–28; DX 431 at FAC008 1309; DX 474 at PAC117 0035; DX 777 at WOT970 1368; PX 193 at WON022 2723; *see also* TR at 2866, 2874, 3014–18, 3480–81, 3809–10. The 1990 OTS Form 10–

K identified three categories of "restructuring" losses: 1) "extraordinary charges to operations for the early extinguishment of debt related to . . . restructuring" in the amount of $2.5 million, *see* DX 453 at WOT970 0518; 2) "charges to operations approximating $3.0 million relating to [LOCOM] adjustments on . . . [I/O] strips and collateralized mortgage obligations . . . of $1.5 million [of that amount] is included in the [losses] on mortgage-backed and related securities . . . [and] investments in bond market funds of $1.5 million," DX 453 at WOT970 0522–23; and 3) "non interest expenses" of $11.6 million including: $8.6 million relating to the divestiture of 35 AmeriStar branches; a $2.6 million general charge relating to "overall strategy to phase-out underperforming functions," and $420,000 relating to the Columbus branch sale. *See* DX 453 at WOT970 0524. The Government argues that all of these restructuring charges were undertaken to improve Transohio Savings' "bottom line" and had nothing to do with the breach.

In addition, included in the $4.1 million loss on investment securities reported in Transohio Savings' 1990 OTS Form 10–K is a $2.2 million credit allowance on high-yield corporate bonds (junk bonds) that suffered permanent impairment of value. *See* DX 453 at WOT970 0523; *see also* TR at 2141–42; 2949–50. In addition, market value declines of approximately $890,000 were recorded on the non-investment grade corporate bond portfolio (junk bonds). *See* DX 453 at WOT970 0523; *see also* TR at 2141–42. Therefore, the total loss in 1990 attributable to junk bonds was $3.09 million.

Transohio Savings' 1990 OTS Form 10–K is not clear as to several items. First, the sum of the three categories of restructuring charges is $17.1 million, not $17.4 million. Second, it is not clear whether the $1.5 million of the "charges to operations for I/O strips and CMOS" is included in the $2.6 million "non interest" expenses relating to the "phase out of underperforming assets." *Compare* DX 453 at WOT970 0523–24 *with* DX 613 at WON537 2228; *see also* TR at 2973, 3443–47. The court has ascertained no other evidence in the record provides further details.

Therefore, the court has determined that the Government established with reasonable

certainty that $8.6 million of the $17.4 million restructuring charges associated with AmeriStar would have been incurred irrespective of the breach. *See* DX 303 at 32; DX 305 at PAC087 1041, 55; DX 326 at 1; DX 431 at 2; DX 432 at FAC008 1245; DX 453 at WOT970 0523–24; DX 751; PX 791 at 2–3; PX 860 at 2; PX 870 at 3–4; PX 871 at 3; *see also* TR at 2874, 3637–40, 3646. In addition, the Government established with reasonably certainty that a $3.09 million loss taken regarding Transohio Savings' high yield corporate bonds would have been incurred irrespective of the breach. *See* DX 420 ($600,000); DX 453 at WOT970 0523, 31–33; *see also* TR at 2863–66, 2870–77, 2948–50.[48]

On the other hand, the court has determined that the Government did not establish with reasonable certainty that the $420,000 of restructuring charges associated with the sale of the Columbus branches would have been incurred irrespective of the breach. As Mr. Snider testified: "[W]ithout the disallowance of the capital, we would have had substantial resources to penetrate the Columbus market and produce some profitability out of those branches[.]" TR at 3502; *see also* DX 31 at 1–2; DX 368 (notifying OTS on July 24, 1990 of the plan to sell the Columbus branches); DX 420 at 1–2; DX 453 at WOT970 0524; *see also* TR at 3052–58, 3810–12, 3495–3502. In addition, the court has determined that the Government did not establish with reasonable certainty that $2.5 million of "extraordinary charges" related to the early retiring of debt, $3.0 million of LOCOM adjustments on the sale of I/O strips[49] and collateralized mortgage obligations; or $2.6 million of non-interest expenses would have been incurred irrespective of the breach.

Therefore, the court has determined that Transohio Savings would have incurred losses of $11.69 million in fiscal year 1990 irrespective of the breach. *See* DX 426 (Transohio Savings advising the OTS on November 6, 1990 of proposed restructuring costs and "[t]he need for restructuring was driven by FIRREA.").

### 3. January 1, 1991–December 31, 1991.

#### a. The Financial Condition Of Transohio Savings And Net Losses Incurred.

On January 18, 1991, the OTS notified Transohio Savings of its intent to impose an

---

**48.** The court also made no determination as to whether plaintiffs may be able to recoup this $3.09 million amount as a regulatory taking in this action. *See Penn Central Transp. Co. v. City of New York*, 438 U.S. 104, 124, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978) (regulatory takings analysis is *ad hoc* and fact intensive requiring an analysis of the "economic impact" of the relevant statutory provision, whether it interfered with "reasonable investment backed expectations," and the "character of the governmental action."); *see also Yee v. City of Escondido*, 503 U.S. 519, 523, 112 S.Ct. 1522, 118 L.Ed.2d 153 (1992); *Kaiser Aetna v. United States*, 444 U.S. 164, 175, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979). Our appellate court has not yet had an occasion to consider *en banc* the viability of regulatory takings claims that arise independent of any contract rights in *Winstar* cases. *See Bailey v. United States*, 341 F.3d 1342, 1344 (Fed.Cir.2003) (holding no regulatory taking because plaintiff was not deprived of a contractual remedy for the Government's breach to recover the thrift's assets). Implicit in the court's determination that the $3.09 million loss incurred regarding the sale of the high yield corporate bonds, is the corollary determination that TFC did not have a contractual remedy for this loss.

**49.** I/O strips were interest only instruments that were purchased by Transohio Savings to hedge the Hedged Mortgage Investment ("HMI") portfolio. As Dr. Hamm explained, two types of losses occurred in 1990–1991 regarding the I/O strips. *See* TR at 3028–29. Once a decision was made to sell the I/O strips, Transohio Savings was required to mark the strips to market or take what was known as a LOCOM adjustment. *See* TR at 3028–29; *see also* Kroszner Direct ¶¶ 20, 31, at 10–11, 17 (testifying that Transohio Savings recorded losses in fiscal year 1990 for $3 million in LOCOM adjustments (Kroszner Exhibit E reports that amount as $2.6 million) and losses in fiscal year 1991 concerning $27.1 million of adjustments to account for $9.7 million to conform to undiscounted estimated future cash flow and $17.4 million of required LOCOM adjustments because of plans to sell those strips (which he reported as $26.7 million rather than $27.1 million)); DX 735 at WON015 1311; Hamm Direct ¶¶ 173–76, at 62–63. In addition, if the instrument's value was impaired, an appropriate adjustment was required. *See* TR at 3028–29. Both of these adjustments were required by GAAP, not FIRREA. The court is satisfied that Transohio Savings would not have sold the I/O strips that resulted in the LOCOM adjustments. *See* DX 817; *see also* TR at 3323–24, 3329–47, 3354–57.

Individual Minimum Capital Requirement ("IMCR")[50] on Transohio Savings, although it was in minimal compliance with FIRREA's more stringent minimum capital requirements and Transohio Savings' Regulatory Plan indicated that between December 31, 1990 and March 31, 1991, the classification of troubled assets "seems to have stayed fairly stable." TR at 698; see also DX 416; DX 419; DX 462 (January 18, 1991 letter from OTS to Transohio Savings proposing an IMCR requiring an increase of capital by $100 million within six months); PX 216; see also Transohio Sav. Bank v. Director, Office of Thrift Supervision, 1991 WL 201178, *4 (D.D.C.1991). The FDIC's decision to recommend the imposition of an IMCR, however, actually occurred several months earlier, as reflected in a November 8, 1990 memorandum concluding that Transohio Savings must increase its tangible capital by $120 million because of: "[r]apid growth funded by large liabilities and the self-serving tendencies of [American Capital's] Chairman Burstein, coupled with lax supervision by the board of directors and the financial demands of the institution's two-tiered holding companies, have resulted in inadequate capital, excessive volume of classifications, negative earnings, insufficient loan valuation reserve and unacceptable liquidity." DX 430 at FAC008 1313; see also DX 419 at WOT970 1349 (October 11, 1990 OTS Memorandum indicating that an "IMCR could be helpful in . . . eliminating ACC's dominance over the thrift."); PX 206 (November 29, 1990 OTS Memorandum observing that "the IMCR has been signed. . . . [W]e are currently in negotiations with Transohio's attorneys and may be able to use the capital issue as a bargaining chip to resolve all issues between OTS and the institution.").

A January 18, 1991 OTS internal memorandum reflected, however, that American Capital's Chairman Burstein was "adamant that the $100 million or more of additional capital cannot be raised. However, he may be able to raise [$]10- to $15 million. . . . The board may force Burstein to go if he gets some consideration, and they do not become

bound by a capital obligation that seems impossible to meet. OTS would then pursue the capital requirement through an IMCR which would give Transohio's directors an opportunity to plead their case in court that a lower capital level is acceptable." DX 465 at WOT290 0294; see also TR at 954, 956.

At the evidentiary hearing, Mr. Stuart Brafman, former Executive Vice President of the OTS Regulatory Functions in the Chicago Office, explained there was no relationship between the imposition of the IMCR and Mr. Burstein's relationship to Transohio Savings:

> [W]hatever problems I may have had with Mr. Burstein running [Transohio Savings], I regarded him as a sophisticated financial entrepreneur, who despite his disclaimer, might be able to raise the amount of money and/or might be able to find a buyer for the company who would put in the capital. So we proceeded on this basis to give him the opportunity to do that, rather than merely forego it and not give him the opportunity.

TR at 859–60; see also DX 468.

On February 21, 1991, Transohio Savings filed a response to the IMCR detailing the adverse impact on Transohio Savings and imposition of additional "possible losses." PX 230 at WOL371 0193–216. On February 22, 1991, KPMG issued a "material weakness" letter to Transohio Savings' Board. See DX 477. On February 26, 1991, Transohio Savings signed a consent order requiring a majority of directors be outside directors and prohibiting Transohio Savings from paying dividends to AMCAP without OTS approval. See DX 732. Shortly thereafter, Chairman Burstein resigned. See TR at 971. On March 19, 1991 the OTS advised Transohio Savings that: "[t]he decision to impose an IMCR is independent from any consideration of supervisory goodwill. Transohio . . . is in dire need of tangible capital, not accounting entries, to protect the insurance fund and offset its . . . negative to poor earnings, poor interest margins, excessive classified assets and a financially precar-

---

**50.** See DX 488 (March 14, 1991 OTS Memorandum discussing the criteria for imposition of an IMCR); see also TR at 2276–87.

ious holding company." DX 491 at WON179 0902. On May 7, 1991, the OTS issued its final determination with respect to imposing the IMCR on Transohio Savings. *See* DX 507.

On May 14, 1991, an OTS internal memorandum to Mr. Brafman recognized that: "[s]ince the enactment of FIRREA, Transohio has shrunk $1.4 billion in order to maintain capital compliance. Moreover, during 1989 and 1990, Transohio sustained losses of $19.8 million and $44.3 million respectively. A large percentage of these losses were attributable to one-time charges... detailed in the report of examination." DX 512 at WON235 0847; *see also* DX 512 at WON235 0847, 55 ("[The OTS's] primary concern is Transohio's erosion of capital and its ability to replenish capital through earnings. Although an IMCR was recently issued, a capital infusion is unlikely. Transohio currently [May 14, 1991] meets all three minimum capital standards. However, since the enactment of FIRREA, Transohio has shrunk $1.4 billion in order to maintain capital compliance.... Shrinkage may have enabled Transohio to meet the new capital standards. However, its percentage of earning assets decreased and impaired the institution's ability to increase its interest margin.... Transohio is not currently a candidate for the RTC. However, Transohio's size and the risk inherent in its balance sheet may pose a future threat to the insurance fund if earnings do not improve as projected and/or recapitalization does not occur."); TR at 991–92, 994, 1662. On May 21, 1991, the State of Ohio Superintendent of Savings and Loan Associations strongly criticized the OTS's imposition of the IMCR. *See* PX 262; *see also* PX 329 (September 12, 1991 OTS internal memorandum discussing the need to clarify regulatory policy and noting that Washington OTS is reluctant to impose an IMCR to remedy asset quality).

On May 23, 1991, OTS issued a final notice requiring Transohio Savings to increase its tangible capital within 30 days by the greater of $100 million or an amount that would increase its tangible capital level to 4.5% of its tangible assets, however, Transohio Savings was unable to meet the IMCR. *See* DX 465; DX 468; DX 519; *see also* TR at 215–224, 877–78. The former Regional Director of the FDIC's Chicago Office candidly testified that the FDIC was not concerned about the reality of whether that amount of capital could be raised:

Again, that, to be frank, that was not paramount in our mind. Our job was to identify the problems here, thoroughly analyze the situation, thoroughly discuss it, and give the institution our best thoughts as to what it took to turn the situation around and prevent a failure. I believe we well recognized it would not be easy to sell that amount of capital, but the fact of the matter is that would not have prevented us from making the recommendation. Our job was to try to prevent the failure here. And that was one of the 16 provisions we felt was necessary to turn the situation around. So, again, that was not paramount in our mind whether they could or could not do it.

TR at 605–06.

An August 7, 1991 note was sent by Mr. Brafman to Mr. Benham, now employed at the OTS as a Field Manager, questioning: "[S]hould we force a further writedown of capital to make our receivership case easier?" PX 309; *see also* TR at 904. An August 29, 1991 memorandum from Mr. Frank Lepa, Manager, OTS–Cleveland to Mr. Brafman stated: "I am more convinced than ever that additional litigation while the institution meets the minimum capital requirements will only result in counter litigation and a protracted conclusion. During the examination we will focus on the adequacy of valuation allowances for the commercial real estate portfolio and management's ability to manage and/or dispose of the portfolio. In my opinion we should refrain from pursuing any additional litigation until after the examination is complete." PX 322.

In September 1991, a scope examination was prepared by Mr. Farrell, now also at the OTS, to "focus [the examination] on certain areas[.]" *See* TR at 714; *see also* PX 303 (July 29, 1991 internal correspondence to OTS Examiner Farrell from his OTS Manager Mr. Lepa suggesting that the examination should "focus on management's attempt to

deal with ... the viability of their strategies to reduce non-earning assets and to increase the institution's level of capital."). The September 9, 1991 FDIC Examination that followed rated Transohio Savings a "5" overall, although liquidity improved from a "4" to a "3." DX 570 at FAC011 2021; see also DX 571; TR at 485. At the Evidentiary Hearing, OTS Examiner Farrell confirmed that the purpose of this examination was to review only enough assets to justify finding Transohio Savings out of capital compliance. See TR at 1095; see also PX 300 at WON069 2202 ("Leonard Farrell [was asked] to reduce to writing the discussions that we have had concerning the scope of the upcoming Transohio examination ... [that] will accomplish what all parties want without the need for additional, time-consuming litigation. When the new capital regulation becomes effective, it is unlikely ... Transohio will be in compliance ... [they] will be $50 million short of the requirement even if they are successful in their law suits."); see also TR at 720, 727.

On October 8, 1991, OTS issued a Supervisory Directive requiring Transohio Savings to establish a troubled asset department and hire an outside firm to operate it and for the accounting department to calculate the net present value of the troubled real estate and RCA investment portfolio. See DX 579; see also TR at 122–125. Shortly thereafter, Mr. Wooldredge became CEO of Transohio Savings. See TR at 125.

By the end of fiscal year 1991, Transohio Savings' net losses were $122.6 million, which Transohio Savings attributed in part to the "decreasing interest rate environment." DX 613 at WON537 2228; see also TR at 1532–33, 3018, 3023–29, 3622. Transohio Savings' OTS Form 10–K for 1991 reports that of the $122.6 million, $38.418 million was for "possible losses on loans" and $26.076 million for foreclosed real estate. See DX 613 at WON537 2243; see also TR at 3019–20. In addition, Transohio Savings incurred $26.7 million in losses on its mortgage-backed se-

curities and related securities portfolio. See DX 613 at WON537 2228; see also TR at 2940–41. Of that amount, $9.7 million was attributed to the decline in value of Transohio Savings' I/O strips because the mortgages backing the strips were pre-paid, requiring Transohio Savings to write them down under GAAP. See DX 613 at WON537 2236; see also TR at 2147–54, 2941–42, 3025–29, 3222, 3451–53. An additional $17.4 million was attributed to the sale of other securities and I/O strips for which a LOCOM adjustment was required. See DX 613 at WON537 2236; see also TR at 3025–29, 3041–42.

b. Analysis And Opinion Of The Government's Experts.

(1) Professor Kroszner.

Professor Kroszner was unable to specify how much of the loan loss provisions and foreclosed real estate listed on Transohio's OTS Form 10–K for 1991 was imposed by the OTS. See TR at 1666–67. Professor Kroszner, however, testified that the foreclosed real estate losses were $39.7 million, rather than $26.076 million, as reported in Transohio Savings' OTS Form 10–K. Compare Kroszner Direct Exhibit E with DX 613 at WON537 2243. He concluded, however, that the $17.4 million write down or the LOCOM adjustment on the I/O strips was required by Transohio Savings' auditors, because Transohio Savings did not have sufficient capital to continue to carry them on their books as an investment. See TR at 1683–85. Professor Kroszner did not count the $18.3 million in goodwill that was back-dated in fiscal year 1991 at the request of the regulators.

(2) Dr. Hamm.

At the Evidentiary Hearing, Dr. Hamm testified that of the total $122.6 million net losses that Transohio Savings incurred in fiscal year 1991, the $38.4 million that was booked as loan losses [51] had "no connection"

---

51. Dr. Hamm referred to these "loan losses" as a "net loan charge-off" and explained:

  when you actually incur a loss and you incur it on a cash basis and you reduce the reserves that you have set aside for losses in order to cover the loss that you are recognizing at that

point. The reason it's net is sometimes thrifts will estimate that they will recover a certain amount of money from the sale of the foreclosed property or that for whatever reason they end up recovering more money and so that would be an offset to the charge-off. So it's a

to the phase out of goodwill. *See* TR at 3019–20; *see also* DX 613 at WON537 2243. Likewise, Dr. Hamm testified that the $26.1 million losses from foreclosed real estate were not related to the breach, because these losses "are recognized for income statement purposes when the loan is in effect terminated and Transohio forecloses on the borrower[.] ... [The breach] didn't cause the loan that went bad to be made. It didn't cause the borrower to default. It didn't cause the value of the collateral supporting the loan to drop collectively by $18.8 million[.]" TR at 3020–21; *see also* DX 613 at WON537 2243. Regarding a $26.7 million net loss on mortgage derivative instruments, Dr. Hamm testified "[a]bout I think a third of the 26.7 million dollars is simply a reflection of the fact that the value of certain derivative instruments has gone down and will never ever recover and under GAAP it has to be written off." TR at 3025–26; *see also* DX 613 at WON537 2228, 43. Dr. Hamm surmised that "[m]ost of the balance is due to the fact that Transohio [Savings] for good sound business reasons decided that it was going to sell some [I/O] strips and what are called CMO residuals [52] and once it made the decision that it was going to sell those instruments it had no choice under GAAP but to account for them at the lower cost market. So again the breach is not in any way connected with that 26.7 million dollar loss." TR at 3026.

In addition, Dr. Hamm testified that the reason an additional $18.3 million of goodwill was written off in 1991 was:

> because the outside auditors had great concerns about Transohio [Savings'] ability to generate profits in the future and under GAAP ... goodwill that is being amortized can be recovered out of the profits generated by those assets. And when the auditor said ... we don't think you're going to be able to earn money in the future because of all of the financial problems ... that in effect triggered a write-off of the

goodwill. It had to do with expectations of future unprofitability.

TR at 3029.

As to whether the $18.3 million goodwill loss would have been incurred irrespective of the breach, Dr. Hamm explained:

> Well, all of these losses up to that time so weakened the balance sheet and saddled Transohio [Savings] with so many bad assets and nonearning assets that it imperiled its ability to generate income. So yes, there is a connection between the loss of viability and the loss of future profitability and the losses, the business decisions to try to acquire AmeriFirst, the narrow spread, the high cost of funds, the low yields, the high operating costs, all of those factors together put Transohio [Savings] in a very weakened condition. And this, in my opinion, more than anything is what led the auditors to the conclusion that it really wasn't a viable institution any longer and *couldn't generate the income required to cover the good will* and that forced a write-off.

TR at 3030 (emphasis added).

Once again, Dr. Hamm rejected any suggestion that the losses incurred in 1991 were attributed to shrinkage:

> A: The negative return has to with the yield on the assets, the cost of the liabilities and the performance of the hedges. And it is not sensitive or it need not be sensitive in any way to the volume of assets, liabilities, and hedges that comprise the portfolio.
>
> Q: Can you explain what you mean by that?
>
> A: Certainly. When you shrink the portfolio assets went away, liabilities went away, hedges went away. And there is no reason to believe that the spread at the end of that process should be materially different from the spread at the beginning

TR at 3022.

---

combination of the new charge-offs plus recovery from old charge-offs. And it has the effect of reducing reserves. The losses, the impairment of the asset, occurred much earlier and that's when the reserves were established. This is simply when the loan is closed out or a specific asset is written down in value that the charge-off occurs relative to the reserves.

**52.** Dr. Hamm defined a CMO residual as "everything that is left over from a pool of mortgages after securities have been created to provide a certain cash flow to investors." TR at 3026; *see also* TR at 3027–28.

of that process if the portfolio were structured in such a way that the hedges were performing. Now, if your question was would the losses have been bigger if the portfolio had been bigger in absolute terms? Yes. Probably they would have been. But the fact that what was left in the portfolio was unprofitable doesn't in any way suggest that if the portfolio had been larger it could have been profitable. As a matter of fact, I think it's more likely that the losses would have been greater if the portfolio had been larger.

TR at 3109–10.

### (3) Mr. Johnson.

Mr. Johnson testified that Transohio Savings incurred $100.456 million of "capital erosion" in fiscal year 1991 comprised of: $26.743 "speculative investments;" $9.219 million interest rate swaps; and $64.494 million on loan and real estate losses. *See* Johnson Direct at 8. Mr. Johnson proffered no opinion about the $15.0 million in amortization charges nor the $18.3 million of goodwill write down.

### c. The Government Established With Reasonable Certainty That Transohio Savings Bank, FSB Would Have Incurred Net Losses of $18.8 Million In Fiscal 1991 Irrespective Of The Breach.

In fiscal year 1991, Transohio Savings incurred net losses of $122.6 million. *See* DX 613 at WON537 2228. In May 1991, the Chief Lending Officer of Transohio Savings was terminated because of improper loan modifications in the real estate portfolio. *See* TR at 739–40. Subsequently, this individual was indicted for bank fraud together with Transohio Savings' Vice President of Commercial Real Estate. In the court's judgment, the Government did not establish with reasonable certainty that all of the $26.076 million of net losses associated with Transohio Savings' real estate portfolio was caused

by the fraudulent activities of certain Transohio Savings' managers. *See Hansen Bancorp. Inc. v. United States*, 367 F.3d 1297, 1319 (Fed.Cir.2004) ("If mismanagement ... is established, the [plaintiff] may be accountable for any diminishment of the character or value of property that could be directly traced to their mismanagement."); *see also* DX 518; DX 585; DX 595; TR at 739–46, 774–792, 1105–1111; Post Hearing TR at 175. To his credit, however, Transohio Savings' former CEO testified that there was no "direct cause and effect" between the real estate write downs and the breach. *See* TR at 2599, 2601–02, 2847–48; *see also* DX 560 at CAC409 0093. In addition, Mr. Cook did not walk away at the hearing from a contemporaneous statement made in his August 26, 1991 Corporate Analysis that the real estate losses experienced by Transohio Savings in 1991 were "due to management problems." *See* DX 560 at CAC409 0105; DX 571; DX 579; DX 834 at WON069 0063, 64.[53] The Government, however, argued there was an $18.8 million increase in real estate losses from 1990 to 1991. Therefore, the court believes it is reasonably certain that at least this amount can be attributed to Transohio Savings' mismanagement and therefore that amount will be treated as a RESTATEMENT § 349 loss.

The Government also did not establish with reasonable certainty that the $97.52 million remainder of net losses in fiscal year 1991 would have occurred irrespective of the breach. *See, e.g.,* DX 571; TR at 747–808. The largest component of these net losses included: $38.4 million for "possible losses on loans;" $15 million mortgage banking losses from increased amortization; and $26.7 million losses on mortgage derivatives. *See e.g.,* DX 613 at WON537 2228, 31, 36. These losses either were incurred with the knowledge of the regulators and/or were noted by the regulatory authorities as being attributed to Transohio Savings' shrinkage undertaken specifically in response to FIRREA. *See,*

---

**53.** The court appreciated Mr. Wooldredge's and Mr. Cook's candor in light of the fact that both had entered into a Reimbursement and Security Agreement on or about January 31, 1997 and executed other documents, pursuant to which they would be reimbursed by plaintiffs for prior settlement payments made to the RTC from any award that this court may make in this case. In Mr. Wooldredge's case, that amount would be $50,000. In Mr. Cook's case, that amount would be $90,000. *See, e.g.,* DX 1108; DX 1109; DX 1110; *see also* TR at 2980–84.

*e.g.,* DX 102 at PAC096 0482; DX 222 at WOT970 0885, 898; DX 247 at PAC082 1599; DX 259; DX 323 at FAC009 1714, 18, 32; DX 512; DX 595 ("In [OTS] discussions with senior management, [OTS] has obtained [Transohio Savings'] concurrence on approximately $13.6 million of ... losses [booked in the September quarter of 1991]"); DX 613 at WON537 2236; DX837; *see also* TR at 206–08, 632, 662–63, 2799–2800, 3148–50, 3324, 3347–49, 3473–74.

As Mr. Cook explained during the Evidentiary Hearing, the losses recognized by Transohio Savings in 1991 and later in 1992 were booked at the direction and with full knowledge of the regulators, particularly in determining the amount of loan loss reserves.

> THE COURT: My sense is that ... you realized or revealed these ... potential losses on paper because of the regulatory attitude ... you are trying to show them that you were trying to come into compliance [despite losing the benefits of regulatory capital conveyed by the Assistance Agreement]?

> MR. COOK: Yes, Your Honor.... if you book a loan provision different from a regulatory determination, you are doing that at *your own peril. Ultimately you will* lose. Best to agree. Let the loan convert to cash and when you book a loan loss, as I said before, you are not giving up anything economically. You are making an accounting entry. And when you foreclose on that loan or rehabilitate or whatever you do and convert it to cash, you always get to conform your final accounting to the economic realization. And so we always, the short answer is we always conformed our reserve to the regulatory findings. We did not want to fight that battle. We had some other battles that we were fighting with them. That one was not something we wanted to do. And I will say that, you know, there was some element of, you know, economic losses in those increasing amounts. I wouldn't shy away from that. But I will tell you that, I mean, it is graphic, the change in the regulatory standards, FDIC versus OTS, is, you know, the numbers are before us. And that was particularly harsh on Transohio.

TR at 2772–74; *see also* TR at 2769–72, 2799, 3397–98; DX 599 at WON590 0517, 33; DX 629; DX 1286; PX 249 at WOT623 0563–65; PX 322 at WOL235 0412; PX 365 (OTS told Transohio Savings' CEO Snider "to book what was on the report.").

Mr. Wooldredge, Transohio Savings' former CEO, testified that the recording of the I/O strips at the lower of the cost or market "would not be a direct cost of the breach." TR at 2557. Mr. Wooldredge's impression, however, was contradicted by an internal October 23, 1991 memorandum reflecting OTS had decided that Transohio Savings would have to sell its I/O strips, because "Transohio's actions over the past two years in reducing the size of the portfolio and replacing fixed rate MBS with variable rate securities appears to have eliminated the hedge that was in place at one time.... The examiners are in agreement that the I/O's and residuals as well as swap positions should be accounted for on a *market-to-market basis.*" DX 585 at WOL235 0355; *see also* TR at 3347–52 (Mr. Wooldredge testifying about how the regulators told Transohio Savings to write down the I/O strips and "backdate" the loss into 1991).

Because of the aforementioned itemized losses, the regulators and auditors also required Transohio Savings to write-off the remaining $18.3 million in goodwill. *See, e.g.,* DX 613 at WON537 2228, 62; DX 629 at WOL226 2022–23. As Mr. Snider, Transohio Savings' former Executive Vice President Financial and CFO testified:

> TFC'S COUNSEL: Could you explain why the $18.3 million in goodwill on the balance sheet had to be written off?

> MR. SNIDER: Uhm, as I recall, GAAP accounting will let you carry goodwill on your balance sheet if you are a going concern. And if you think at some point there is substantial doubt to the survivability of the company, then you can't realize the economic benefits over a long enough time to continue to carry it, so that you're-under GAAP accounting you have to write it off.

> TFC'S COUNSEL: Did the auditors give you any heads up that this was coming or explain why they were doing it?

MR. SNIDER: They certainly didn't me. And I recall discussions with the board that they said they hadn't them either. So they came in in January and said that.

TFC'S COUNSEL: Did, in your judgment, did this charge have anything at all to do with the disallowance of the regulatory capital?

MR. SNIDER: Well, it was all—I think it was all tied together, and the OTS at that point had asked us to produce some capital plans. And we had submitted some, and they had disallowed some, and I think in that environment, KPMG had significant doubt as to the ongoing viability. So I think yes, there would be some.

THE COURT: I just had a quick question relating to something that you said this morning. Do you have your auditors communicate with the regulatory agencies? Did they do it in your presence always, or did they call and ask about things as they were working through things? What is the protocol? Lawyers can't obviously do that type of thing, so I don't know what the protocol is here.

MR. SNIDER: I don't know the exact time. But the protocol for a long period of time was that you always talked about it before you did it. So KPMG—

THE COURT: With the agencies.

MR. SNIDER: Right. So KPMG before they would talk to the regulators would have to talk to management, usually in their presence. There was some change in regulations somewhere where they didn't have to do that, and then they were encouraged to meet. So when this was going on, KPMG and OTS meet independently of us on this.

TR at 3398–3400.

\* \* \* \* \* \*

TFC'S COUNSEL: I think a month ago, I had asked you what was the relationship between the write-off of the goodwill at the beginning of 1992 and the loss of the regulatory capital. And you said something to the effect of that it was all tied together. And I just wanted to ask you what you meant by that.

MR. SNIDER: Well, you know, the disallowance of the capital under FIRREA caused, you know, major seismic changes in the whole organization and its survivability. And we have been talking about those most of the day. And that required an awful lot of shrinkage. I think when the OTS didn't approve capital plans, and given the, you know, the levels of capital at that time, I think KMPG had enough doubt in their minds to say whether it was a going concern. So, yeah, I think the cause and effect would take you back for a fair-some major part of it to that disallowance.

TR at 3401.

In sum, the court has determined that Transohio Savings would have incurred losses of $18.8 million in fiscal year 1991 on its remaining goodwill irrespective of the breach.

### 4. January 1, 1992–July 10, 1992.

Although Transohio Savings subsequently incurred a net loss of $13 million during the first half of 1992 until OTS issued a July 10, 1992 Order seizing Transohio Savings' assets, none of these losses would have been incurred irrespective of the breach, because Transohio Savings effectively was no longer in charge of its destiny. See DX 681. As Dr. Hamm testified: "I've only gone as far as 1992 because frankly I don't think anything after that is relevant given the magnitude of the deficiencies and the weaknesses that Transohio had[.]" TR at 3173–74. At the post hearing argument, this issue was raised by the court:

THE COURT: What is your response to my ... problem in figuring out when do we stop looking at the losses.... [In] [t]his case, it is easy to understand how there is some logic to what we're doing here, but, I mean, for a rule of law, where would you stop looking? Or would you always, would we go through the full term of the contract?

GOVERNMENT'S COUNSEL: Well, let's start with the proposition that Plaintiffs must prove their losses. They can prove the losses at any time during the contract.

I will grant you it gets harder and harder as you go farther out from the breach.

THE COURT: Right.

GOVERNMENT'S COUNSEL: But that only is natural. The breach is going to stop, really, producing losses at a certain point in time.

THE COURT: At some point in time.

GOVERNMENT'S COUNSEL: And it is more likely that the breach is going to produce immediate losses than produce losses down the road.

Post Hearing TR at 158–59.

The court agrees and therefore has determined that the relevant RESTATEMENT § 349 losses occurred in 1989–1991. *See* DX 652; *see also* TR at 3621–22.

## J. Limiting Rules On Reliance Damages.

As discussed in *American Capital II,* the doctrines of foreseeability, avoidability,[54] and uncertainty are well embedded common-law limitations on any damage award for breach of contract, based on a reliance interest.

### 1. Foreseeability.

Professor Corbin cautions: "Our only test of 'causation,' ... is foreseeability, based upon uniformity of sequence in our experience. Without question we frequently make mistakes in determining causes ... damages are recoverable only for those injuries that the defendant had reason to foresee as a probable result of [its] breach when the contract was made." 11 CORBIN, *supra,* §§ 1006, 1007, at 60–61 (interim ed.2002). Pragmatically, Professor Corbin asks: "[a]t what time must the defendant have had *reason* to foresee the injury? The answer generally made is that [defendant] must have such reason at the time that he enters into the contract, and that it is not enough that he had such reason at the time that [defendant] committed the breach." *Id.* § 1008 at 64.

The RESTATEMENT likewise provides that damages are "not recoverable for loss that the party in breach did not have reason to foresee as a probable result of the breach when the contract was made." RESTATEMENT at § 351(1). A foreseeable loss is defined as "a probable result of a breach because it follows from the breach (a) in the ordinary course of events, or (b) as a result of special circumstances, beyond the ordinary course of events, that the party in breach had reason to know." *Id.* at § 351(2). The court is advised that it may limit damages where a loss is determined to be foreseeable "by excluding recovery for loss of profits, by allowing recovery only for loss incurred in reliance, or otherwise if it concludes that in the circumstances justice so requires in order to avoid disproportionate compensation." *Id.* at § 351(3).

Moreover, Comment a to RESTATEMENT § 351 states that the breaching party is generally "expected to take account of those risks that are foreseeable at the time [it] makes the contract. [The party in breach is not] liable in the event of breach for loss that [it] did not at the time of contracting have reason to foresee as a probable result of such a breach." *Id.* at § 351 cmt. a.

Accordingly, a foreseeability inquiry is central to whether damages are appropriate in all *Winstar* cases, as well as the theory under which recovery may be appropriate. The issue is whether the party in breach had reason to foresee the "loss," not the precipitating events that caused the loss. Again, as Professor Corbin explains:

> The existing rule requires only reason to foresee, not actual foresight. It does not require that the defendant should have had the resulting injury actually in contemplation or should have promised either impliedly or expressly to pay therefore in case of breach. It is erroneous, therefore, to refuse damages for an injury merely because its possibility was not in fact in the contemplation of the parties at the time they made the contract.

11 CORBIN, *supra,* § 1009, at 66.

Therefore, the Government is not required to know, or even suspect, that a loss would

---

**54.** The doctrine of avoidability also is an important limitation on damages, but one that is not applicable in the *Winstar* context since none of the injured parties could have avoided the loss that resulted from the enactment and implementation of FIRREA. *See generally* RESTATEMENT § 350.

be caused by the enactment of FIRREA, only that the Government foresaw, at the time the Assistance Agreement was made, the amounts that were being placed at risk and could be lost, regardless of the actual cause of the loss. "It is enough ... that the loss was foreseeable as a probable ... result of [a] breach." RESTATEMENT at § 351 cmt. a; *see also Prudential Ins. Co. v. United States*, 801 F.2d 1295, 1300 (Fed.Cir.1986) (citing *Globe Refining Co. v. Landa Cotton Oil Co.*, 190 U.S. 540, 544, 23 S.Ct. 754, 47 L.Ed. 1171 (1903) for the proposition that "the party who breaches a contract can only be held responsible for such consequences as may be reasonably supposed to be within the contemplation of the parties at the time the contract was made."). The RESTATEMENT, however, instructs: "There is no requirement of foreseeability with respect to the injured party.... [However,] the requirement of foreseeability is a more severe limitation of liability than is the requirement of substantial or 'proximate' cause in the case of an action in tort or for breach of warranty." *Id.* at § 351 cmt. a.

In making this determination, the court has considered and is satisfied that foreseeability requirements have been met since the record establishes the regulatory agencies knew TFC's equity in Transohio Savings had a book value of $126,479,000 at the time the Assistance Agreement was finalized. *See American Capital II*, 59 Fed.Cl. at 582 (citing Pl.App. on Damages at 563); *see also* RESTATEMENT § 351(2). In addition, since the Government did not object to this amount, which also was verified by independent auditors, it likewise satisfies the "reasonable certainty" requirement. *See* RESTATEMENT § 352.

### 2. Certainty.

As the court also discussed in *American Capital II*, "[u]ncertainty is an independent limitation on damages." *American Capital II* at 576 (citing RESTATEMENT § 352 and cmt. a. (requiring plaintiff to proffer evidence to establish damages "with reasonable certainty.")). Since reliance damages are a form of consequential damages, the "reasonable certainty" rule applies. *See* DOBBS, *su-

pra*, § 3.4, at 318 ("On this narrow rule courts usually take either a hard or soft approach. The soft approach in effect says that the plaintiff must show he has realized or will realize actual losses, but that once he has made this proof, the court will not require precision as to the amounts."); *see also* DOBBS, *supra*, § 3.4, at 319–20 and n.8 (citing *Lam, Inc. v. Johns–Manville Corp.*, 718 F.2d 1056, 1065 (Fed.Cir.1983)) (explaining that "[i]n proving ... damages, the ... burden of proof is not an absolute one, but rather a burden of reasonable probability."); *see also id.* n. 9 (citing *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 264, 66 S.Ct. 574, 90 L.Ed. 652 (1946) (requiring a "just and reasonable estimate of the damage based on relevant data.")).

Those courts that apply the "soft approach," however, typically include dicta in the form of "an escape clause in which the court warns that it will not permit speculation." DOBBS, *supra*, § 3.14, at 320. Consequently, the "hard approach is more like the escape clause [in that] ... the plaintiff must prove consequential damages with reasonable certainty, both as to their existence and amount." *Id.* DOBBS observes, however, that: "[n]either approach has much actual content. Both approaches reflect summaries of how the court feels about particular facts." *Id.*; *see also Standard Oil Co. v. Southern Pac. Co.*, 268 U.S. 146, 156, 45 S.Ct. 465, 69 L.Ed. 890 (1925) ("The ascertainment of value is not controlled by artificial rules. It is not a matter of formulas, but there must be a reasonable judgment having its basis in a proper consideration of all relevant facts.").

The court has made a final determination that TFC's total reliance interest in this case was $159.645 million based on substantial and reliable evidence. The Government or the record otherwise established with reasonable certainty that Transohio Savings would have incurred net losses of $50.336 million irrespective of the breach. Therefore, pursuant to RESTATEMENT § 349, TFC is entitled to damages in the amount of $109.309 million determined by the total of its reliance interest minus losses, both of which meet the certainty limitation on consequential damages.

## K. The Government Is Not Entitled To A Credit In This Case.

■ Reliance damages are a "recovery for net reliance loss, so that the defendant is credited with any benefit the plaintiff receives from the expenditures in reliance." DOBBS, *supra*, § 12.3(1), at 51–52. The Government argued that plaintiffs received the benefit of $150 million of "FSLIC assistance" at the time the Assistance Agreement was executed. *See* Gov't Brief at 37 (citing DX 30 at 15). In addition, the Government argued that Transohio Savings received $66.6 million of NOLs to offset future tax liability. *See* Gov't Brief at 37 (citing DX 79 at 12).

According to Transohio Savings' 1989 SEC Form 10K, at the time of the breach, Transohio Savings had utilized $14.7 million of the $107.5 million capital credits, leaving $92.8 million of unamortized capital credits on its books. *See e.g.*, DX 305 at PAC087 1066; PX 1075 at PAC087 1066; *see also* TR at 3308–09. In addition, the 1989 SEC Form 10–K reported that, at the time of the breach, Transohio Savings had utilized $18.6 million of the $50 million in supervisory goodwill, leaving $31.4 million of unamortized supervisory goodwill on its books. As Professor James correctly noted, however, the 1989 SEC Form 10K reflected that these amounts were calculated pursuant to the new FIRREA requirements. *See* James Direct at 18–19. Transohio Savings actually utilized only $13.975 million of capital credit and $8.976 million of supervisory goodwill prior to the breach, however, these amounts were part of what Transohio Savings acquired, pursuant to the terms of the August 29, 1986 Assistance Agreement and for which Transohio Savings contributed $126.479 million in stock equity and a $42.166 million capital contribution as consideration. Therefore, the used $22.952 million of capital credits and supervisory goodwill was not a benefit to Transohio Savings. In the alternative, if, as Dr. Hamm testified, "forbearance capital ... has no intrinsic value.... Supervisory goodwill and regulatory capital credits cannot be invested, sold, used to pay debts, or pledged as collateral for a loan," *see* Hamm Direct ¶ 59, at 23, then the Government should not receive any credit for the regulatory capital and supervisory goodwill that Transohio Savings amortized prior to the breach, as a benefit, since it has no value.

As for the so-called $42.5 million in "FSLIC assistance," *see* DX 30 at 15, as part of the August 29, 1986 Assistance Agreement, the Government and plaintiffs entered into an arms length transaction under which the Government decided to purchase certain Citizens and Dollar assets that it valued at $42.5 million. Consequently, Transohio Savings and TFC received no "benefit" from a payment made in exchange for the purchase of assets.

As to the $66.6 million of net operating loss carry forwards, first, the NOL provisions in the Internal Revenue Code were not a benefit that the Government conveyed to Transohio Savings, since the NOL provisions already existed in law and were available to all qualifying taxpayers. Second, for the reasons discussed herein, since the NOLs were property acquired as part of the Citizens and Dollar acquisition, Transohio Savings received no benefit for which it did not pay the Government full consideration. For the same reasons, Transohio Savings also received no benefit from the $20 million NOLs that it was able to utilize to reduce federal tax liability.

Dr. Hamm approached the "benefits" issue from a different perspective from what the Government argued prior to the Evidentiary Hearing. He testified that Transohio Savings received the following "significant economic benefits:" 1) "Off–Balance–Sheet franchise values" of $55 million; 2) "Off–Balance–Sheet mortgage servicing rights" of $5 million; and 3) "net operating losses" of $20 million. *See* Hamm Direct ¶¶ 361–372, at 128–32. To ascertain the total "net benefits" obtained by Transohio Savings, Dr. Hamm added the "net" benefits that he identified and then subtracted $55 million, reflecting the "excess of cost over acquired assets" to reach a $25 million benefit that he suggests be deducted from any final damage award. Again, whatever "value" Transohio Savings may or may not have received from the "franchise" and "servicing portfolio" were part of the property rights Transohio Savings acquired via the Citizens and Dollar

transaction. Therefore, Transohio Savings received no special benefit for the "franchise" or "servicing portfolio" for which Transohio Savings contributed $126.479 million in equity and a $42.166 million capital contribution, as consideration.

## L. *Winstar*–Related Decisions Of The United States Court Of Appeals For The Federal Circuit Issued After *American Capital II, American Capital III,* And *American Capital IV.*

The United States Court of Appeals for the Federal Circuit issued five decisions in *Winstar*-related cases after the court's Memorandum Opinion and Order in *American Capital III* and *American Capital IV* were issued. Each of these recent decisions and relevance to this case is discussed herein.

### 1. *California Federal Bank v. United States,* 395 F.3d 1263 (Fed.Cir.2005).

The court's Memorandum Opinion in *American Capital III* was issued the same day as *California Federal Bank v. United States,* 395 F.3d 1263 (Fed.Cir.2005). Therefore, on January 19, 2005, the court requested that the parties address the relevance of *California Federal Bank* in their briefs concerning the Government's February 25, 2005 Motion for Reconsideration.

In *American Capital IV,* 65 Fed.Cl. 241 (2005), the court stated that in *California Federal Bank* the trial court was affirmed in determining that:

> the plaintiff . . . failed to meet its burden of proof to show that the Government's breach of a contractual promise to treat "supervisory goodwill" as part of regulatory capital caused plaintiff to sell certain adjustable rate mortgages from which it could have earned substantial profits. The Federal Circuit noted therein that the trial court held that the standard of causation for lost profits must "inevitably and naturally, not possibly nor even probably" flow from defendant's breach. *Id.* at 1267 (quoting *Myerle v. United States,* 33 Ct.Cl. 1, 27[, 1800 WL 2024] (1897)). On appeal, plaintiff-appellant argued that the proper standard of causation for lost profits required only that the breach be a "substan-

tial factor" contributing to the loss, citing *Bluebonnet Sav. Bank, F.S.B. v. United States,* 266 F.3d 1348 (Fed.Cir.2001) ("*Bluebonnet Savings Bank*"). The United States Court of Appeals for the Federal Circuit did not adopt either of these proposed standards, but instead read *Bluebonnet Savings Bank* to hold only that the "causal connection between the breach and the loss of profits must be *'definitely established'* [to ensure] that the non-breaching party will not be awarded more than it would have received if the contract had been performed." *California Federal Bank,* 395 F.3d at 1268 (emphasis added) (citations omitted).[5] In addition, the Federal Circuit emphasized that the breach need not be the *"sole factor or sole cause"* of the loss of profits. *Id.* (emphasis added). Indeed, "other factors operating in confluence with the breach will not necessarily preclude recovery based on the breach." *Id.*

---

5. The Government mistakenly stated that "the Federal Circuit held" and adopted the language of *Myerle. See* 2/25/05 Gov't Mot. to Reconsider at 13 (citing to *California Federal Bank,* 395 F.3d at 1267). The decision is quite clear that it was the trial court that was urging the *Myerle* language. Instead, the Federal Circuit endorsed a different standard, *i.e.,* "the causal connection between the breach and the loss . . . must be 'definitely established.' " *California Federal Bank,* 395 F.3d at 1268 (citing cases other than *Myerle*).

In this case, the Government argued on reconsideration that because "the Court, in its Opinion, relied upon the 'less exacting' version of the substantial factor standard now rejected by the Federal Circuit, [*California Federal Bank,* 395 F.3d] at 1267, and because the Court did not find that plaintiffs 'definitely established' that the breach caused the loss of either their 'essential' or 'collateral' reliance interests, any judgment in favor of plaintiffs in this case cannot be reconciled with *CalFed.*" 2/25/05 Gov't Mot. to Reconsider at 12. Accordingly, the Government requests that the court "vacate [the January 19, 2005] Opinion in light of the Federal Circuit's decision in *CalFed.*" *Id.* at 20. No opinion of the United States Court of Appeals for the Federal Circuit has spoken directly to

the issue of whether the proper standard of causation in a breach of contract case for expectancy damages is different from the standard to be applied in a case seeking damages based on reliance interests. Therefore, one could argue, as plaintiffs have, that the decision in *California Federal Bank* is limited only to cases where lost profits are claimed and therefore has no applicability in this case. *See* Pl. Resp. at 4.

The court, however, views the holding of *California Federal Bank* that a "causal connection between the breach and the loss of profits must be definitely established" is neither inconsistent nor incompatible and the court's determination in this case that a causal connection between the breach and loss of reliance interest was both foreseeable and certain. *See American Capital II*, 59 Fed.Cl. at 575–76; *American Capital III*, 63 Fed.Cl. at 712–13. The Government argues that "the Court appears to have adopted an approach that equates the causation requirement with the foreseeability requirement." 2/25/05 Gov't Mot. to Reconsider at 19 (citing *American Capital III*, 63 Fed.Cl. at 712) (quoting ARTHUR L. CORBIN, CORBIN ON CONTRACTS §§ 1006 at 60 (interim ed. 2002) ("Our only test of 'causation,' ... is foreseeability[.]")) (citation corrected by court). The Government thus concludes that "to the extent the Court in the present case collapsed the causation analysis into its foreseeability analysis, that approach is incompatible with *CalFed.*" 2/25/05 Gov't Mot. to Reconsider at 20. The Government fails to appreciate that for causation to be "definitely established," *i.e.*, "directly and primarily" and "inevitably and naturally, not possibly or probably," both foreseeability and certainty must be established, as plaintiffs have done in this case, and the court so held.

As *California Federal Bank* further explained, the purpose of "definitely establish[ing]" a causal connection between the breach and loss is so the non-breaching party will not be awarded more than if the contract had been performed. In this case, the court's determination that TFC is entitled to a damage award of $109.309

million meets the "definitely established" standard in that the award does not exceed the Government's contractual promise that Transohio Savings could treat the $157.5 million capital credit and supervisory goodwill as an asset towards meeting its net worth requirement, for which plaintiff, TFC, contributed its equity in Transohio Savings with a book value of $126.479 million and authorized an additional $42.166 million in equity. In making this determination, the court did not "rel[y] upon the 'less exacting' version of the substantial factor standard[.]" *See* 2/25/05 Gov't Mot. Reconsider at 12. Instead, the court followed the rule that "the requirement of foreseeability is a more severe limitation than is the requirement of substantial or 'proximate cause' in the case of an action in tort or for breach of warranty[.]" *See American Capital III*, 63 Fed.Cl. at 712–13 (citing RESTATEMENT § 351(1) and cmt. a).

*American Capital IV*, 65 Fed.Cl. at 253–54.

In this and other *Winstar*-related cases the observations of Professor Corbin have proven prophetic:

> what is meant by 'causation,' when we assert that we have found the 'cause' of an injury we mean that there is such a degree of uniformity of sequence between them that if we can prevent the recurrence of the first we may prevent the recurrence of the second; and we mean also that we can correctly predict that if the first again occurs it is likely to be followed by the second. The uniformity of sequence in our experience enables us to *foresee* the future, not with certainty, indeed, and perhaps not with a high percentage of accuracy, but at all events with such a degree of accuracy as makes for survival and success in life.

CORBIN, *supra*, § 1006 at 60 (emphasis in original). The lesson learned is the public would have been better served in allowing Citizens and Dollar to fail in 1986, rather than have the Government interfere with the market which, in the end, caused TFC to realize losses that never should have been incurred. In the future, if the Government induces a private party to enter into a contract not based on sound economics and es-

tablished accounting principles in order to forego or delay the consequences of the Government's prior failure to enforce regulatory requirements and later "corrects" that action by failing to honor the inducement, the Government is on notice that it will be held liable for the consequences of the breach. As a result, the Government likely will not interfere with market forces in this manner again or breach contractual promises without a second thought.

## 2. *Home Savings of America, FSB v. United States,* 399 F.3d 1341 (Fed. Cir.2005).

On March 7, 2005, the United States Court of Appeals for the Federal Circuit affirmed in *Home Savings of America, FSB v. United States,* 399 F.3d 1341 (Fed.Cir.2005) two rulings of the trial court that are relevant to the court's decision in this case. First, in *American Capital I,* the court determined that the Secretary of the FHLBB and Director of the FSLIC "were representatives of the United States with authority to bind the Government." *American Capital I,* 58 Fed.Cl. at 408. On reconsideration, the Government argued that the court erred in not directly addressing the FHLBB's authority to enter into the August 29, 1986 Assistance Agreement. *See American Capital IV,* 65 Fed.Cl. at 243–44 (citing 11/17/01 Gov't Mot. to Reconsider at 3). In *American Capital IV,* however, the court re-stated specific reliance on *United States v. Winstar Corp.,* 518 U.S. 839, 890, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996) as settling any question regarding the authority of the FSLIC and FHLBB to enter into contracts like the August 29, 1986 Assistance Agreement in this case. *See American Capital IV,* 65 Fed.Cl. at 243–44. *Home Savings* also reaffirmed that the United States Supreme Court in *Winstar* "unequivocally demonstrate[d] that transactions authorized by [the grant of general authority under 12 U.S.C.] § 1725(c)" were lawful. *See Home Savings,* 399 F.3d at 1357.

Second, in *American Capital II,* the court held that because of the breach, TFC, which owned 100% of the stock of Transohio Savings, was entitled to damages in the amount of its reliance interests, a component of which was the essential reliance interest rep-

resented by the $126.479 million book value of the Transohio Savings stock, which was partial consideration for the August 29, 1986 Assistance Agreement. *See American Capital II,* 59 Fed.Cl. at 582. One of the issues on which the Government sought reconsideration was whether a "shareholder-plaintiff can recover directly as damages in a breach of contract case the equity of the corporation in which they own stock." *American Capital IV,* 65 Fed.Cl. at 245–47 (citing 3/12/04 Gov't Mot. to Reconsider at 1). In *American Capital IV,* the court again determined that TFC was not only a party to the August 29, 1986 Assistance Agreement with the Government but also a shareholder with standing to seek damages for injuries separate and distinct from injuries to Transohio Savings. *See American Capital IV,* 65 Fed.Cl. at 245–47.

In *Home Savings,* the Federal Circuit also held where plaintiff "was not only a shareholder, but an essential participant as a contracting party ... 'it was [plaintiff] that FHLBB recognized as obligating itself, as part of that acquisition, ... [therefore, plaintiff] has standing as a party to the contract and shareholder to assert claims for breach.'" *Home Savings,* 399 F.3d at 1350. The plaintiff in *Home Savings* was similarly situated to TFC in this case. Accordingly, TFC has standing to seek recovery of the loss of reliance interests caused by the Government's breach.

## 3. *Fifth Third Bank of Western Ohio v. United States,* 402 F.3d 1221 (Fed. Cir.2005).

On March 31, 2005, in *Fifth Third Bank of Western Ohio v. United States,* 402 F.3d 1221 (Fed.Cir.2005), the United States Court of Appeals for the Federal Circuit re-stated that the relevant contractual documents in *Winstar* "included either an Assistance Agreement or a Supervisory Action Agreement, each containing an integration clause incorporating contemporaneous documents such as the Bank Board Resolutions issued prior to each transaction." *Id.* at 1229. The Government in this case challenged the court's determination in *American Capital I* that the FHLBB Resolution 86–864, approving Transohio Savings' proposed merger

with Citizens and Dollar, "can properly be considered an 'offer' for the purpose of contract analysis." *American Capital IV,* 65 Fed.Cl. at 244 (citing 11/17/03 Gov't Mot. to Reconsider at 2). In *American Capital IV,* the court re-stated the prior discussion in *American Capital I* that FHLBB Resolution 86–864 fulfilled the requirements of the RESTATEMENT § 24. *Id.* at 265. In *Fifth Third,* the United States Court of Appeals for the Federal Circuit not only reaffirmed that contractual obligations may exist "even though there was no single document *incorporating all the contract terms.*" *Fifth Third,* 402 F.3d at 1229 (citing *California Federal Bank v. U.S.,* 245 F.3d 1342, 1346–47 (2001)). Moreover, where Bank Board Resolutions recorded the terms of an agreement or set forth guidelines or the terms concerning supervisory goodwill, the Federal Circuit emphasized: "We rejected the Government's argument that the FHLBB was merely performing a regulatory function when it approved the transaction and agreed with the trial court that the parties had contracted for special goodwill treatment." *Fifth Third,* 402 F.3d at 1229 (citing *LaVan v. United States,* 382 F.3d 1340, 1346–47 (Fed.Cir. 2004)).

### 4. *Westfed Holdings, Inc. v. United States,* 407 F.3d 1352 (Fed.Cir.2005).

On May 12, 2005, in *Westfed Holdings, Inc. v. United States,* 407 F.3d 1352 (2005) ("*Westfed III*"), the Government challenged the trial court's determination that reliance damages in *Winstar*-related cases generally have applied the "substantial factor" test for causation. *Id.* at 1362–63 (citing *Westfed Holdings, Inc. v. United States,* 55 Fed.Cl. 544, 553 (2003) ("*Westfed II*")). The United States Court of Appeals for the Federal Circuit did not address whether the "substantial factor" test was the only appropriate standard, but instead affirmed the trial court's alternative determination that "credible evidence presented ... supports a finding of causation under the 'but for' test urged by the [Government]." *Westfed III,* 407 F.3d at 1363–64 (relying on the trial court's findings that 1.) prior to FIRREA, the thrift was successful implementing a 1988 business plan that OTS changed while imposing various

limitations on growth "to force it into compliance with FIRREA ... stymied [the thrift's] growth, and in fact, caused the company to contract." *id.*; 2.) allegations of "uneven management," "poor asset quality," and the "weak economy" were offset by testimony that "capital inadequacy [under FIRREA] was the primary reason for the downgrading of [the thrift's] composite ratings." *id.* (citing *Westfed II,* 55 Fed.Cl. at 556); 3.) despite the fact that several Government witnesses testified that the thrift "would have incurred millions of dollars in losses and failed, irrespective of the government's breach, the trial court did not give credit to their testimony because none of the witnesses developed a model to support their opinions of what losses [the thrift] would have incurred in the 'but for' world of no breach." *id.* (citing *Westfed II,* 55 Fed.Cl. at 558); and 4.) after weighing all the credible evidence presented "that but for defendant's breach, [the thrift] would not have been seized." *Id.* (citing *Westfed II,* 55 Fed.Cl. at 559).

The United States Court of Appeals for the Federal Circuit, however, reversed the trial court's award of $20 million paid to acquire Bell stock because the tax consequence of acquiring Bell was the "purchase price was zero." *Westfed III* at 1368–69 (citing *Glendale,* 239 F.3d at 1382) (holding reliance damages are for "any losses actually sustained as a result of the breach of that promise."); DAN B. DOBBS, LAW OF REMEDIES, § 12.3(1) at 51–52 (2nd ed. 1993) ("The reliance damages recovery is a recovery for net reliance loss, so the defendant is credited with any benefit the plaintiff received from the expenditures in reliance.").

On May 17, 2005, the Government in this case filed a Motion for Leave to File Notice of Supplemental Authority to bring this holding of *Westfed III* to the court's attention. *See* 5/17/05 Mot. Re. Supp. Authority at 2. Therein, the Government argued that because American Capital and TFC's August 29, 1986 SEC Form 8–K reported that no consideration was paid for Citizens/Dollar, therefore, TFC cannot claim a loss of its essential reliance interest that had a book value of $126.479 million on the day the Assistance Agreement was signed. The SEC

Form 8–K does not define "consideration." The court, however, read that language to disclose to American Capital's shareholders that no cash contribution was made as consideration for the August 29, 1986 Assistance Agreement, instead TFC's stock in Transohio served that function. For this reason, the court held that the book value of TFC's stock was partial consideration for the August 29, 1986 Assistance Agreement. *See American Capital II,* 59 Fed.Cl. at 580.

In addition, in *Westfed III,* the Government apparently considered that the $20 million paid to acquire Bell stock was offset by a tax benefit received by the shareholders. *Id.* at 1368–69. In this case, the court complied with the Federal Circuit's admonition that reliance damages are for *"net reliance loss." See, e.g., American Capital, III,* 63 Fed.Cl. at 714 (emphasis added) (citing DOBBS § 12.3(1) at 51–52). Indeed, that was the entire purpose for the Evidentiary Hearing. At that hearing, the Government did not argue that TFC received any federal income benefits, although Transohio Savings received $66.6 million of net operating loss carry forwards ("NOLs") to offset further tax liability. *See American Capital III,* 63 Fed.Cl. at 714 (citing Gov't Brief at 37 (citing DX 79 at 12)). As the court explained, the NOLs were not a benefit conveyed to Transohio Savings under the Assistance Agreement, since they were available to all federal taxpayers. To the extent the NOLs were property acquired, Transohio Savings received no benefit for which TFC did not provide consideration in the form of its stock in Transohio Savings and support for the subsequent equity rights offering. As the court previously stated, Transohio Savings, however, received no benefit from $20 million of the NOLs because it had no offsetting income. *See American Capital III,* 63 Fed. Cl. at 714.

The Government also asserts that *Westfed* "undercuts" the court's causation findings because "*Westfed* makes clear ... in the context of reliance damages, it is insufficient for a plaintiff simply to prove that the defendant caused a breach that deprived the plaintiff of the full benefits of its agreement. In addition, the plaintiff must definitely establish a 'causal connection ... between the breach and the loss claimed by [the plaintiff].'" 5/17/05 Gov't Mot. Re. Supp. Authority at 3 (citing *Westfed* at 1363–64). The court is further advised that "*the Federal Circuit stated* that the plaintiff had satisfied its causation burden by showing 'that but for defendant's breach, [the thrift] would not have been seized.'" *Id.* (quoting *Westfed II,* 55 Fed.Cl. at 559) (emphasis added).

The Government's argument is misplaced. Although the trial found that but for the breach the thrift at issue in *Westfed II* would not have been seized, the United States Court of Appeals for the Federal Circuit did not hold in *Westfed III* or in any other case of which the court is aware that a plaintiff asserting a claim for breach of contract in a *Winstar*-related case based on lost reliance interests is required to prove that "but for" the breach, the thrift would not have been seized or that seizure is a prerequisite to a recovery of lost reliance interests.

To the extent that there is any uncertainty in *American Capital II* and *American Capital III,* the court determined therein that the record evidenced that TFC established causation-in-fact and causation-in-law by the "substantial factor" test. Causation, however, also was established, as in *Westfed III,* under the "but for" and "definitely established" tests. *See Westfed III,* 407 F.3d at 1363–64. First, prior to FIRREA, Transohio Savings was a stable financial institution, albeit in need of corrective action. *See supra; see also American Capital III,* 63 Fed.Cl. at 687 (citing DX 222 at WOT970 0879) (On March 31, 1989, Transohio Savings' "overall strength and financial condition make failure a remote possibility," thereby earning a joint overall "3" composite rating by the Supervisory Authorities.). Second, the Government imposed limitations on Transohio Savings to force it into capital compliance with FIRREA, including shrinkage and increased regulatory presence in the daily operations of Transohio Savings. *See supra; see also American Capital III,* 63 Fed.Cl. at 699–701 (discussing Transohio Savings' shrinkage immediately following the implementation of FIRREA from January 1, 1990–December 31, 1990 and the role of OTS therein, includ-

ing the threat of an IMCR to force Transohio Savings to drop the federal lawsuit, wherein Transohio Savings filed a breach of contract and injunction action against the FDIC and OTS concerning the "inclusions of goodwill and a FSLIC contribution in its capital[.]"). Third, although the Chairman of American Capital, Transohio Savings' parent, was a problematic figure, no state or federal regulator recommended his removal until almost a year after the breach and no regulator criticized the working management until the fall of 1991. *See supra; see also American Capital III,* 63 Fed.Cl. at 647, 663–66, 705–07. Fourth, post-breach capital inadequacy was the primary reason for the downgrading of Transohio Savings' composite rating. *See supra; see also American Capital III,* 63 Fed.Cl. at 694–95, 697, 699–707. Fifth, the court was not persuaded by the Government's expert opinions that Transohio Savings would have failed irrespective of the breach. *See supra; see also American Capital III,* 63 Fed.Cl. at 701, 707–09. Sixth, as a matter of law, the court does not need to determine that but for the breach, Transohio Savings would not have been seized, however, in the event that the appellate court differs and requires that factual determination, the court so finds based on the record herein, evidencing the severe "body-blow" that the Government's breach of the August 29, 1986 Assistance Agreement delivered to Transohio Savings that ultimately proved fatal.

5. ***Hometown Financial, Inc. v. United States,* 409 F.3d 1360 (2005).**

On May 27, 2005, in *Hometown Financial, Inc. v. United States,* 409 F.3d 1360 (2005), the United States Court of Appeals for the Federal Circuit again rejected the Government's argument that the FHLBB did not have authority to enter contracts regarding treatment of goodwill that were binding on the government. *Id.* at 1366–68 (quoting *California Federal Bank,* 395 F.3d at 1274–75) ("[T]he FHLBB had statutory authority to enter into contracts involving the treatment of regulatory capital and that Congress 'specifically acknowledged' the FHLBB's authority to permit thrifts to count goodwill toward capital requirements."). The court

held that the general grant of authority under 12 U.S.C. § 1725(c) was sufficient to support an FHLBB promise of favorable accounting treatment of goodwill. *See id.* at 1367–68 (citing *Home Savings of America,* 399 F.3d at 1356–57). In this case, the Government made similar arguments that the court previously has addressed and rejected. *See American Capital I,* 58 Fed.Cl. at 408, and *American Capital IV,* 65 Fed.Cl. at 243–44.

## IV. CONCLUSION

In this case, the court has determined TFC is entitled to damages of $109.309 million, which is $59.336 million less than the full measure of its reliance interests and $47.291 million less than the full benefit of the regulatory capital to which Transohio Savings was entitled as of December 7, 1989. The court does not view this final award as a "windfall," since lost profits or opportunity costs are not included. *See DPJ Co., Ltd. Partnership v. FDIC,* 30 F.3d 247, 249–50 (1st Cir.1994) (emphasis added) ("There is normally no windfall involved in the recovery of reliance damages ..., [*i.e.,* those] seeking to recapture money actually spent under the [contract].... Whether or not one shares Congress' belief that 'lost profits and opportunities' are a special category of damages which should be disfavored, that policy is not even remotely offended by returning [plaintiff] its out-of-pocket expenditures which, because of the FDIC's repudiation, have made [plaintiff's] own expenditures ... fruitless.... [R]eliance damages ... *merely restore to the claimant[s] what* [they] spent before the opportunity was withdrawn.").

The court further notes that TFC is not entitled to interest on this award, despite the fact that almost a decade has passed since plaintiffs filed a complaint on August 8, 1995 in the United States Court of Federal Claims seeking damages for a breach of contract. As former-Chief Judge Smith of the United States Court of Federal Claims observed in *C. Robert Suess v. United States,* 52 Fed.Cl. 221 (2002), the prohibition on pre-judgment interest is "a recurring problem in the *Winstar*-related cases, because parties who are harmed, even when able to prove damages in

these difficult and novel cases, will not be made fully whole. Indeed, it is ironic that [plaintiff] is prevented under the law from being made whole because it cannot obtain interest on its damages caused by the government's breach[.]" *Id.* at 232. And, it is a problem that Congress should consider solving.

For the foregoing reasons, the court has made a final determination that the total of TFC's essential and collateral reliance interests lost in this case because of the Government's breach was $159.645 million, however, because the Government, or the record otherwise established, with reasonable certainty that Transohio Savings would have incurred net losses of $50.336 million irrespective of the breach, pursuant to RESTATEMENT § 349, TFC is entitled to damages in the amount of $109.309 million.

In addition, for the reasons set forth herein, plaintiffs' pending claims under the Fifth Amendment of the United States Constitution for Just Compensation are dismissed, without prejudice.

The Clerk of the Court is directed to enter judgment in favor of plaintiff Transcapital Financial Corporation in the amount of $109.309 million. Each party shall bear its own costs.

**IT IS SO ORDERED.**